UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ROBERT LEE STINSON,

        Plaintiff,

        v.                           Case No.  09-C-1033

CITY OF MILWAUKEE, JAMES GAUGER,
OTHER AS-OF-YET UNKNOWN EMPLOYEES
OF THE CITY OF MILWAUKEE,
DR. LOWELL T. JOHNSON,
and DR. RAYMOND D. RAWSON,

        Defendants.

DECISION AND ORDER DENYING RAWSON'S MOTION FOR SUMMARY
JUDGMENT (DOC. 90), JOHNSON'S MOTION FOR SUMMARY
JUDGMENT (DOC. 96), GAUGER'S AND THE CITY'S MOTION FOR
SUMMARY JUDGMENT (DOC. 100), AND SETTING A STATUS CONFERENCE

      Robert Stinson served twenty-three years in prison for crimes he did not commit.

Stinson's conviction hinged on bite mark evidence found on the murder victim, Ione

Cychosz, and testimony by two forensic odontologists[1] that Stinson's dentition matched

those bite marks.   Now, under 42 U.S.C. § 1983, Stinson sues the two forensic

odontologists and one of the police officers assigned to the criminal case.  He asserts

violation of his due process rights to a fair trial through the fabrication of evidence and the

withholding of exculpatory evidence (count I), failure to intervene (count IV), conspiracy to

deprive him of his constitutional rights (count V), and several state-law tort claims.[2]

_____

[1]"Odontology" is the scientific study of teeth, especially as a branch of forensic medicine.  Oxford
English Dictionary, available at http://www.oed.com/view/Entry/130454?redirectedFrom=odontology#eid (last
visited Sept. 30, 2013).

[2]Previously, at a status conference in August 2012 (*see* Doc. 89), Stinson dismissed a Fifth
Amendment retaliation claim (count III), a supervisor liability claim (count VI), and all *Monell* claims against
the City of Milwaukee, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978). Stinson now
dismisses his First Amendment retaliation claim against detective James Gauger (count II). (Doc. 110 at 70.)

Defendants James Gauger, Lowell T. Johnson, and Raymond D. Rawson move for summary judgment on all remaining federal claims and dismissal of all supplemental claims.[3]

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating he is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of his cause of action, showing that a genuine issue exists for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must

---

[3]The City of Milwaukee joined in Gauger's motion for summary judgment, though all *Monell* claims have been dismissed. The City may remain involved in this case because of indemnity issues. However, because the motion for summary judgment relates primarily to Gauger, the court for simplicity refers to the motion as Gauger's alone.

2

present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## STATEMENT OF FACTS

The following facts are set forth in the light most favorable to Stinson.[4] Certain controverted facts are noted with footnotes. To the extent that a party objected to a proposed fact and that fact appears below, the objection is overruled.

James Gauger joined the Milwaukee Police Department in 1958 and was assigned to the detective bureau in 1969. (GFOF ¶¶ 1, 3.) When the Homicide Division was created in January 1982, Gauger and Tom Jackelen were two of the original four detectives assigned to it. (GFOF ¶¶ 5, 6; SFOF ¶ 20.) Gauger and Jackelen were partners from 1982 through 1985. (GFOF ¶ 6; SFOF ¶ 21.) During that time, the general detective bureau would handle a homicide investigation initially, but if the crime was not solved within a day or two, the investigation would be assigned to the Homicide Division. (GFOF ¶ 7.)

Ricky Johnson was murdered on or about November 1, 1982. (SFOF ¶ 23.) On the night of the Johnson murder, Darin Lloyd was on his way to catch up with his brother, Jody Lloyd, and Derrick Arms and Robert Lee Stinson, when they heard men arguing and a gunshot. (SFOF ¶¶ 24-26.) Gauger and Jackelen were assigned to investigate the Johnson murder. (SFOF ¶ 27.) A witness came forth and indicated that she heard Darin and Jody Lloyd were present around the time Johnson was shot. (SFOF ¶ 28.) Gauger

---

[4]Proposed statements of material fact are identified with initials from a party's last name. In other words, "GFOF" means Gauger's proposed statements of material fact (Doc. 104), "JFOF" means Johnson's proposed findings of fact (Doc. 97), "RFOF" means Rawson's proposed findings of fact (Doc. 106), and "SFOF" means Stinson's Statement of Additional Facts (Doc. 111). Stinson filed separate responses to each defendant's proposed statements of fact. Those are identified with the words "Resp. to": "Resp. to GFOF" (Doc. 116), "Resp. to JFOF" (Doc. 114), and "Resp. to RFOF" (Doc. 115). The defendants filed a combined response to Stinson's proposed additional facts (Doc. 126), which the court references as "Resp. to SFOF."

3

and Jackelen interviewed Jody and Darin Lloyd and coerced Darin into making a false statement implicating Jody. (SFOF ¶¶ 34, 38, 40.) Gauger and Jackelen then pressured a Lester Franklin into identifying Arms, Jody Lloyd, and Stinson as being involved in the Ricky Johnson homicide, with Jody Lloyd as the shooter. (SFOF ¶¶ 43, 47, 49, 50.) Gauger and Jackelen arrested Jody Lloyd. (SFOF ¶ 51.)

Stinson was interrogated about the murder. (SFOF ¶ 52.) He told the detectives what he had done on the night of the shooting and that he had no information about who committed the murder. (SFOF ¶ 53.) The detectives told Stinson that they were "tired of all that bullshit story you telling." (SFOF ¶ 54.) Stinson reiterated that he had told the police the truth that he and his friends were not involved in the murder. (SFOF ¶ 56.) Eventually, charges against Jody Lloyd were dropped. (SFOF ¶ 58.) However, Gauger believed that Jody and Darin Lloyd, Arms, and Stinson murdered Ricky Johnson. (SFOF ¶¶ 59, 63.) Gauger believes that the Johnson case remains open to this day, "mainly because we had the right guys, but couldn't prove it." (SFOF ¶ 60.)

Ione Cychosz was murdered on November 3, 1984; her body was found in the rear yard at 2650 North 7th Street in Milwaukee, Wisconsin. (JFOF ¶ 14; SFOF ¶ 64; (GFOF ¶¶ 11, 12.) At 7:05 a.m. that day, City of Milwaukee police were dispatched to investigate the homicide. (JFOF ¶ 17.) At 8:22 a.m. that day, an assistant medical examiner performed an external examination on Cychosz's body at the Medical Examiner's Office. (JFOF ¶ 18.) At approximately 9:00 a.m. that day, an assistant deputy medical examiner authorized the use of Dr. Lowell T. Johnson in the Cychosz murder investigation as a forensic odontology consultant. (JFOF ¶ 19.)

4

At all times between 1961 and 2012, Dr. Lowell T. Johnson was a member of the faculty of the Marquette University School of Dentistry and held a Wisconsin license in dentistry and oral surgery. (JFOF ¶¶ 5, 6.) From 1977 to 2012 Johnson was a diplomat of the American Board of Forensic Odontology. (JFOF ¶ 12.) Between 1961 and 2010, Johnson served as a forensic consultant for the Milwaukee County Medical Examiner's Office. (JFOF ¶ 7.) During calendar years 1984 and 1985, Johnson was employed in the private practice of dentistry and as a member of the Marquette faculty. (JFOF ¶ 9.) He was not an employee of the City of Milwaukee, Milwaukee Police Department, or Milwaukee County District Attorney's Office in the sense of receiving a regular pay check or having an ongoing contract for his services. (JFOF ¶¶ 10, 11; Resp. to JFOF ¶¶ 10, 11.)

Around 9:00 a.m. on November 3, 1984, a Thomas Hanratty called Johnson and then (at Johnson's direction) David Cadle, a photographer for the state crime lab, to examine Cychosz's body. (JFOF ¶¶ 20, 66; SFOF ¶¶ 69, 70.) In 1984, Cadle was a forensic photography specialist or scientist and imaging unit leader with the Wisconsin State Crime Lab offices in Milwaukee. (JFOF ¶¶ 22, 23; Resp. to JFOF ¶ 22.) At 11:00 a.m. on November 3, 1984, Cadle took sixty photographs, including views of bite marks. (JFOF ¶ 21.) The cameras Cadle used for those photographs included a Polaroid CU-5 close-up land camera and a medium format film camera that provided negatives from which additional copies or enlargements could be made. (JFOF ¶ 24.) The Polaroid CU-5 had a specialized "dental kit." (JFOF ¶ 25; Resp. to JFOF ¶ 25.) The CU-5 camera used Polaroid film to create nondigital photos at several possible scales. (JFOF ¶ 26; Resp. to JFOF ¶ 26.)

5

At 3:00 p.m. on November 3, 1984, Johnson went to the Milwaukee County Medical Examiner's Office and examined bite marks on Cychosz's body. He found eight complete or partial bite marks on the body, and he took rubber impressions of the bite marks on the right breast. (JFOF ¶¶ 27, 65, 67; SFOF ¶ 71.) On November 5, 1984, Johnson returned to the Medical Examiner's Office and extracted the tissue from Cychosz's right breast. (JFOF ¶ 28; SFOF ¶ 73.)

Gauger and Jackelen were the lead detectives on the Cychosz homicide investigation. (SFOF ¶ 65.) The first thing Gauger did on the investigation was to review the entire file that had been assembled up to the point of two to three days after the homicide. (GFOF ¶ 9.) The Cychosz murder investigation was the first homicide investigation recalled by Gauger that involved the collection and use of bite mark evidence. (GFOF ¶ 8.)

Prior to going to the scene, Gauger learned information about the assailant's dentition; even before interviewing witnesses, Gauger knew they were looking for someone with a missing tooth and a twisted tooth. (GFOF ¶¶ 18, 19; SFOF ¶ 80.) Gauger and Jackelen met with Johnson prior to their first visit, on November 6, 1984, to the scene where Cychosz was found. At that meeting, Johnson showed the detectives a sketch or "detailed drawing" he had made representing the assailant's teeth. (SFOF ¶¶ 74, 75, 78; Resp. to GFOF ¶ 19; Doc. 112 Ex. P at 79-80, 83-85, 143-44, Ex. AA (*The Memo Book*) at 328.[5])

---

[5]Gauger proposed a statement of fact that he did not use any sketch to try to identify the assailant (GFOF ¶ 24), and defendants objected to Stinson's proposed finding about this meeting in early November between Gauger and Johnson (Resp. to SFOF ¶ 74.) Defendants contend that the first meeting between Johnson and detectives Gauger and Jackelen occurred on November 15, 1984, as supported by the lack of any police report memorializing a meeting between Johnson and the detectives before November 15, 1984. (Resp. to SFOF ¶ 74.)

Thereafter, Gauger and Jackelen visited the scene. (GFOF ¶ 11.) It was Gauger's and Jackelen's practice to interview neighbors who had not been interviewed by uniformed officers or reinterview those who had previously been interviewed. The Stinson home happened to be closest to the scene and probably was the first home Gauger and Jackelen visited. (GFOF ¶ 15; SFOF ¶ 95, 96.) Stinson lived there with his mother, twin brother, and younger siblings. (SFOF ¶ 97.)

On November 6, 1984, Gauger and Jackelen spoke to Stinson's mother and his brother, Robert Earl Stinson. Afterward, Gauger interviewed Robert Earl while Jackelen interviewed Stinson.[6] (GFOF ¶ 17; SFOF ¶ 98.)

Stinson is missing his right central incisor, also known as tooth number eight (or, in the court's language, the right front tooth). (SFOF ¶ 18.) His right central incisor is fractured and decayed almost to the gum line. (SFOF ¶ 138.[7])

After the two detectives finished their interviews and were in the front of the house, Jackelen said "we have him" and Gauger asked Jackelen what he was talking about. Jackelen and Gauger then went back to talk with Stinson and Jackelen said something that

---

However, Gauger testified at deposition that he had seen a sketch at the meeting with Johnson prior to going to the scene and interviewing the Stinsons (Doc.112 Ex. P at 73-74, 79, 83-85.) Defendants contend that Gauger's memory, after about twenty-five years, was faulty without his being able to refresh his recollection with police reports, but Gauger's deposition testimony and his memoirs support Stinson's version of the facts. In Gauger's memoirs, titled *The Memo Book*, he wrote that the forensic odontologist provided Gauger and Jackelen with "photos of the bite marks from every conceivable angle, along with a detailed drawing" showing that the assailant had a missing or broken front tooth and a twisted tooth to the side. Then, "[w]ith this information we started to re-interview all the neighbors," including Stinson. (Doc. 112 Ex. AA at 328-39.) Any contradictions about the date of the detectives' first meeting with Johnson are for the jury, not this court, to decide. Taking the facts in Stinson's favor, Gauger and Jackelen met with Johnson and saw Johnson's sketch prior to going to the scene and interviewing Stinson on November 6, 1984.

[6]In this opinion, "Stinson" refers to the plaintiff, Robert Lee Stinson; Stinson's twin brother is referred to as "Robert Earl."

[7]Stinson's counsel submitted a photo of Stinson's dentition, which counsel says was taken at the John Doe hearing. (Doc. 112 ¶ 43.) However, she sets forth personal knowledge regarding the photo as the basis upon which to make that statement. Hence, the court will not consider the photo.

7

made Stinson laugh so both detectives could see his teeth. (GFOF ¶ 20.) Gauger saw that Stinson had a missing upper front tooth. (GFOF ¶ 21.) According to Gauger's memoirs: "There it was. The broken front tooth and the twisted tooth just like on the diagram and pictures." (Doc. 112 Ex. AA at 329; *see* SFOF ¶ 104.) However, at deposition, Gauger recalled that the missing tooth was on the upper right side, to the right of the front tooth. (GFOF ¶ 22; Doc. 112 Ex. P at 75-76.)

Following their interviews at the Stinson residence, Gauger and Jackelen went to the office and discussed what they had found with Lieutenant Ruscitti. (GFOF ¶ 28; SFOF ¶ 106.) Either that day or the following day, Ruscitti and the two detectives met with District Attorney McCann. (GFOF ¶ 29.) They explained what they had found to the district attorney and asked his opinion on how to proceed. (GFOF ¶ 30.) They told McCann about the bite mark and Stinson's missing tooth and that Gauger thought it was comparable to Johnson's sketch. (GFOF ¶ 31; Resp. to GFOF ¶ 31; Doc. 112 Ex. P at 93, 142-44.)

McCann called Assistant District Attorney Dan Blinka into the meeting. (GFOF ¶ 33; Resp. to GFOF ¶ 33; Doc. 112 Ex. P at 94.) Blinka stated his belief that insufficient evidence existed to obtain a search warrant to examine Stinson's dentition. (GFOF ¶ 34.) Blinka called Johnson during the meeting and inquired whether Johnson could make an identification from the bite marks; Johnson responded that under the right conditions he could make an identification if he had a full make-up of the suspect's dentition. (SFOF ¶¶ 114, 115.) Someone at or after the meeting recommended that a John Doe investigation be started. (GFOF ¶ 34.) Blinka did not have the impression at the meeting that the detectives were "locked on" to Stinson. (GFOF ¶ 35; Doc. 102 Attach. B at 29-30.)

On November 15, 1984, Johnson met with and was interviewed by Jackelen and Gauger. (JFOF ¶ 29.)

On November 16, 1984, Gauger and Jackelen interviewed and prepared a report concerning a Larry Darnell Patterson, who was missing two of his upper front teeth. (GFOF ¶ 38.) On that same day, Gauger and Jackelen interviewed and prepared a report concerning a Kenneth Edward King, who had a broken right front upper tooth. (GFOF ¶ 39.) The detectives subsequently discussed this subject with Johnson and obtained photographs of King for review by Johnson. (GFOF ¶ 39.) Johnson, at the request of the Milwaukee Police Department, reviewed photographs of the dentition of the two additional potential suspects. Johnson ruled them out as perpetrators. (JFOF ¶ 82; Resp. to JFOF ¶ 82.) He did not have or request dental models, wax exemplars, and intraoral photographs of the two individuals before ruling them out. (SFOF ¶¶ 123, 124, 128, 129; Resp. to SFOF ¶¶ 123, 124, 128, 129.) Stinson's odontological expert in this case, Dr. Michael Bowers, opines there was no scientific basis for Johnson to have excluded the first two individuals by viewing photographs of their mouths; he would have needed to evaluate the biting edges of their teeth through molds or wax exemplars. (SFOF ¶ 131; Doc 117 ¶ 33.)

At some point in late November or early December 1984, Johnson collaborated with a Milwaukee Police Department detective who worked as a police sketch artist to create a second sketch of the assailant's dentition. (JFOF ¶¶ 32, 35; Resp. to JFOF ¶¶ 32, 35; SFOF ¶ 82; Resp. to SFOF ¶ 82; Doc. 112 Ex. CC at 13.) Johnson says that he did not specify to the police artist that any specific tooth or tooth number was missing but only said

9

a tooth in the upper right quadrant was missing. (Doc. 125 Ex. B at 156.[8]) However, according to Johnson, the police artist "made a sketch from my sketch and visited the office and asked me if this was consistent with what I had in mind." (Doc. 112 Ex. CC at 13.) Johnson understood that the police artist's sketch would be used as a tool for police to understand dental terminology and the dental description to help find the assailant; but the sketch was done from memory and was a preliminary opinion. (Doc. 112 Ex. N at 151; *see* SFOF ¶¶ 85, 86; Resp. to SFOF ¶¶ 85, 86.) The sketch was included in the Milwaukee Police Department's homicide file for the Cychosz investigation (SFOF ¶ 89) and appears as follows:



(SFOF ¶ 140; Resp. to SFOF ¶ 141.)

---

[8]The sketch identifies a missing or broken "upper right lateral incisor" and a "lower left central incisor worn and/or rotated." (Resp. to JFOF ¶ 39; Doc. 112 Ex. FF.) The sketch was made by an unidentified police sketch artist. (Resp. to SFOF ¶ 141; *see* SFOF ¶ 140.) Johnson says that the writing on the police sketch was not written by him or at his behest, and he does not know who added it or when it was added. (JFOF ¶ 39.) Defendants say the writing on the sketch is hearsay because Stinson has not shown who wrote the words. For summary judgment purposes the writing need not be considered; the admissibility of the writing can be addressed at trial. Defendants do not challenge the admissibility of the sketch.

On November 19, 1984, the district attorney petitioned for a John Doe proceeding. (GFOF ¶ 40.)  In an affidavit to the assigned judge, David Jennings, Blinka stated that based on Milwaukee Police Department reports and the autopsy, he had reason to believe a crime had been committed and a proceeding was necessary to subpoena and examine witnesses and collect evidence.  (GFOF ¶ 41.)  On November 30, 1984, Judge Jennings ordered a John Doe proceeding.  (GFOF ¶ 42.)

Any person who may have knowledge or information bearing on an investigation may be subpoenaed to a John Doe hearing.  (GFOF ¶ 36.)  No one had to demonstrate probable cause to question Stinson at a John Doe hearing.  (GFOF ¶ 37.)

Stinson was subpoenaed to the John Doe proceeding, which occurred on December 3, 1984, before Judge Jennings.  (GFOF ¶¶ 43, 44; JFOF ¶ 40.)  Stinson was not in custody at that time.  (GFOF ¶ 44.)  Blinka subpoenaed Stinson to the hearing so a dental expert could conduct an oral examination of Stinson's dentition to say whether it was consistent or inconsistent with the bite wounds that appeared on Cychosz's body.  (GFOF ¶ 45.)  Johnson was present at the John Doe hearing.  (JFOF ¶ 41.)  Prior to the John Doe hearing, Johnson had never met Stinson.  (JFOF ¶ 16; Resp. to JFOF ¶ 15.)

At the hearing, Jackelen testified that he had observed that Stinson had missing and crooked teeth consistent with information he had received from Johnson (GFOF ¶ 47) and Johnson testified that he needed to see Stinson's teeth to see if they were consistent with his sketch (GFOF ¶ 48; Resp. to GFOF ¶ 48; Doc. 112 Ex. CC at 8-9).  Johnson said he could ascertain by looking into Stinson's mouth whether he could exclude Stinson or needed further evidence to evaluate Stinson.  (SFOF ¶ 135.)

11

Johnson then was allowed to examine Stinson's mouth for fifteen to twenty seconds. (GFOF ¶ 50.) Johnson then asked to see a copy of his sketch of the assailant's dentition but Jackelen said he did not have a copy with him. (GFOF ¶ 50; Resp. to GFOF ¶ 50; Doc. 112 Ex. CC at 12.) Johnson then testified that what he observed of Stinson's teeth was "remarkable" and consistent with what he or the sketch artist drew. (SFOF ¶¶ 83, 137; Doc. 112 Ex. CC at 13.) He said it was consistent with what he expected from his analysis of the bite marks and that there was reason to proceed with a detailed study. (GFOF ¶ 51.)

Judge Jennings ordered Stinson to submit to a dental examination by Johnson and to have impressions or molds and photographs taken; Stinson consented. (GFOF ¶ 52; JFOF ¶ 42; see SFOF ¶ 142.) On December 3, 1984, following the conclusion of the hearing, Johnson performed an extraoral and intraoral dental examination of Stinson and took dental impressions and study casts of Stinson's dentition. (JFOF ¶ 43.) Cadle took photographs of Stinson's dentition and face at or just after the John Doe hearing, using a Polaroid CU-5 camera. (GFOF ¶ 53; JFOF ¶ 44.)

Master casts are poured in stone and show the dentition as in a mouth. (See GFOF ¶¶ 68, 69.) The master cast could not be manipulated without leaving evidence of the change or manipulation. (GFOF ¶ 71.) Similarly, the working models of Stinson are in stone or a hard substance and cannot be changed without leaving evidence of alteration. (GFOF ¶ 72.) Likewise, the copper wax bites cannot be changed without leaving evidence of alteration. (GFOF ¶ 73.)

Following the John Doe hearing, Johnson compared the dental molds of Stinson's teeth, wax exemplars of his bite, and photographs of Stinson's dentition with the bite mark evidence obtained from Cychosz's body. (SFOF ¶ 143; JFOF ¶ 46; Resp. to JFOF ¶ 46.)

12

Various items were used by Johnson, including master casts and models of Stinson, a copper wax bite of Stinson, and a cast of Cychosz's right breast. (GFOF ¶ 66.) One of the techniques Johnson used was an in-depth comparison of models of Stinson's dentition with the model of the indentations on the victim's right breast. (JFOF ¶ 48.) Johnson also compared the models of Stinson's dentition to the scale photographs taken by Cadle on November 3 of the bite marks on Cychosz's body. (JFOF ¶ 49.) In addition, Johnson used positive transparencies created from the negatives of Cadle's photographs. (JFOF ¶ 50.)

After his work-up, Johnson expressed the opinion that the teeth of Stinson were identical to those that caused the bite mark injuries. (JFOF ¶ 51; Resp. to JFOF ¶ 51; Doc. 112 Ex. N at 81.) Subsequently, Johnson provided Gauger, Jackelen and Blinka with an opinion concerning the dentition and that Stinson's dentition was consistent with the wounds on the body. (GFOF ¶¶ 54, 55.) Blinka met with Johnson and one or both Gauger and Jackelen to review the bite mark evidence Johnson had generated and examined in the Cychosz case, including the photographs, Stinson's molds and impressions, and several "overlays." (RFOF ¶ 25.) During the meeting, Johnson stated that based on his review of the evidence Mr. Stinson's dentition was consistent with the person who inflicted the bite wounds on Cychosz. (RFOF ¶ 26.) After speaking with Johnson, Blinka believed there was probable cause to charge Stinson with Cychosz's murder but he still had questions. (RFOF ¶ 27; Resp. to RFOF ¶ 27; Doc. 94 Ex. 1 at 116-17.)

However, Johnson and Blinka wanted a second opinion from a forensic odontologist, and Rawson was chosen by Johnson or Blinka. (GFOF ¶ 56; Resp. to GFOF ¶ 56, 57; Resp. to GFOF ¶ 57; RFOF ¶ 28; Resp. to RFOF ¶ 28; JFOF ¶ 52; Resp. to JFOF ¶ 52; Doc. 112 Ex. P at 105, Ex. AA at 332; Doc. 94 Ex. 1 at 117-19. ) Johnson

13

says he gave the district attorney's office two names of senior experienced members of the American Board of Forensic Odontology who could provide a second opinion: Rawson and a Dr. Levine. (Sullivan Suppl. Aff. ¶ 4, Ex. 2 at 253-55; *see* Resp. to SFOF ¶ 146.) At Blinka's direction or on his own, Johnson contacted Rawson about the case. (SFOF ¶¶ 147, 148; Resp. to SFOF ¶¶ 147, 148.) Johnson told Gauger that he "wanted the best forensic odontologist in the United States to confirm his findings." (Doc. 112 Ex. AA at 332.)

In 1984 and 1985, Rawson had a private dental practice in Las Vegas. (RFOF ¶¶ 7, 16.) He had been continuously licensed as a dentist in Nevada since 1968. (RFOF ¶ 8; JFOF ¶ 54.) Also, Rawson had been a diplomat of the American Board of Forensic Odontology since 1978 and an adjunct professor of biology at the University of Las Vegas since 1981. (RFOF ¶¶ 11, 12; JFOF ¶ 55.) He possessed a master's degree in physical anthropology and had served as a forensic odontologist for the Clark County, Nevada Coroner's Office commencing in 1976. (RFOF ¶¶ 9, 10.) Beginning in 1978, Rawson served as an expert forensic odontologist in bite mark cases. (RFOF ¶ 15.) Rawson has never been an employee of the Milwaukee County Medical Examiner's Office, the City of Milwaukee, the Milwaukee Police Department, or the Milwaukee County District Attorney's Office, nor has he contracted to render professional services for these entities. (RFOF ¶ 17.)

Prior to January 1985 Rawson and Johnson were colleagues and professional acquaintances for at least seven years, as Johnson was also a diplomat of the American Board of Forensic Odontology. (RFOF ¶ 21; Resp. to RFOF ¶¶ 21, 22; Doc. 112 Exs. SS

14

at 160, TT, UU.) Rawson and Johnson were also friends, though not close. (SFOF ¶ 151; Resp. to SFOF ¶ 151.)

Rawson was contacted for the first time about the Cychosz case in January 1985 when Johnson communicated with him. (RFOF ¶ 30; Resp. to RFOF ¶¶ 28, 29; Resp. to JFOF ¶ 57; Doc. 112 Exs. RR, SS at 127-28.) However, Johnson says that he did not confer with Rawson concerning Johnson's work-up, findings, or opinions in the case. (JFOF ¶ 57; Johnson Aff. ¶ 77.)

Prior to January 1985 Rawson had not met or had contact with Gauger or Stinson. (RFOF ¶¶ 19, 20.) Moreover, Rawson did not participate in any manner in the John Doe investigation or proceedings involving Stinson. (RFOF ¶ 23.) Rawson did not interview witnesses, go to the scene of the crime, or participate in police interrogations in the Stinson matter. (RFOF ¶ 24.)

Johnson signed over custody of evidence in his possession to Gauger and Jackelen, who hand delivered the material to Rawson in Las Vegas on January 17, 1985. (JFOF ¶ 56.) The evidence included preserved skin tissue of Cychosz and the photographs and dental models and molds of Stinson that Johnson had generated and reviewed. (GFOF ¶ 59; RFOF ¶ 31; JFOF ¶¶ 52, 56; Resp. to JFOF ¶ 52.) Rawson went to Gauger's hotel room to review the bite mark evidence. (SFOF ¶ 153.) He viewed the photographs and models for one to three hours and verbally confirmed Johnson's findings. (GFOF ¶ 60; JFOF ¶ 56; SFOF ¶ 155; Doc. 112 Ex. P at 112-13.) Rawson was "impressed with the amount of evidence." (RFOF ¶ 33; Resp. to RFOF ¶ 33; Doc. 112 Ex. SS at 133.) According to Gauger, Rawson "took a look at the x-rays and the molds, and said that was

15

good enough for him and that he concurred with [Johnson] and would testify to those findings in court." (SFOF ¶ 154; Doc. 112 Ex. AA at 333.[9])

Rawson says he did not notice any signs that the bite mark materials generated by Johnson were fabricated or improperly manipulated in any manner. (RFOF ¶ 37; Doc. 93 ¶ 27.) Rawson further says he did not fabricate or manipulate any of the bite mark materials during his initial review of the evidence. (RFOF ¶ 38; Doc. 93 ¶ 28.) Additionally, Rawson says he did not have a conversation with Gauger in which they discussed framing Stinson for the murder of Cychosz and that Gauger did not attempt to influence the outcome of his work or indicate that he desired Stinson to be identified as the perpetrator. (RFOF ¶¶ 39, 41; Doc. 93 ¶¶ 29, 31.)

On January 21, 1985, a criminal complaint issued charging Stinson with first degree murder of Cychosz. (RFOF ¶ 42.) The criminal complaint did not reference Rawson or his review of the bite mark materials. (RFOF ¶ 43.) Stinson was arrested on January 22, 1985. (GFOF ¶ 64; RFOF ¶ 44; JFOF ¶ 58.)

Rawson did not participate in any manner in any preliminary hearings in Stinson's murder case. (RFOF ¶ 54.) On February 20, 1985, Judge Arlene Connors of the Milwaukee County Circuit Court held a preliminary hearing at which Johnson testified. (JFOF ¶¶ 60, 61.) The State produced during the preliminary hearing a color transparency of one of the partial bite marks on the right breast of the victim, with an overlay made from the black and white negative from the photographs taken by Cadle of Stinson's dentition taped to the photograph. Johnson explained to the court how he had conducted his review

---

[9]Defendants object to this proposed finding to the extent it is contradicted by deposition testimony and affidavit statements that Rawson agreed to an ongoing analysis of the bite mark materials. (Resp. to SFOF ¶ 154.) However, this is a direct quote from Gauger's book.

Case 2:09-cv-01033-CNC   Filed 09/30/13   Page 16 of 44   Document 129

of the color transparencies and photographs of the bite mark evidence using transparent overlays. (JFOF ¶ 69.) Johnson testified that he had conducted twenty-five to thirty analyses using the photographic overlays and had compared seventy-five individual tooth marks, all of which he believed to be consistent with Stinson's dentition. (JFOF ¶ 70.) Johnson said he had compared the models of Robert Lee Stinson's dentition with the model of the right breast, cast from the rubber impression of the preserved tissue. (JFOF ¶ 71.) Following the testimony of the fact witnesses and Johnson at the preliminary hearing, Judge Connors found probable cause to bind Stinson over for trial. (JFOF ¶ 72.)

In March 1985, Rawson requested copies of the Stinson bite mark materials generated and reviewed by Johnson, to conduct a continued and more thorough independent analysis of the evidence. (RFOF ¶ 45; *see* JFOF ¶ 74.) On March 19, 1985, duplicates of the bite mark materials, including copies of the photographs and models generated and reviewed by Johnson, were mailed to Rawson in Nevada. (RFOF ¶ 46; JFOF ¶ 73.) At no time did Rawson review, receive, or rely upon the sketch of Stinson's dentition created by the police sketch artist in collaboration with Johnson. (RFOF ¶ 48.) Rawson did not create any bite mark materials or evidence of Stinson's dentition; instead, he reviewed the bite mark materials created by Johnson. (RFOF ¶ 61.)

Rawson says he did not notice any signs that the bite mark materials generated by Johnson were fabricated or improperly manipulated. (RFOF ¶ 51; (GFOF ¶ 70'[10]; Doc. 93 ¶ 37.) According to Rawson, he did not alter or manipulate any evidence in an attempt to falsely accuse Stinson of Cychosz's murder. (RFOF ¶ 52; Doc. 93 ¶ 51.) Rawson

_____

[10]There are two paragraphs numbered 70, so the court has labeled the second one 70'.

concurred with Johnson's opinion that Stinson's dentition was consistent with the person who inflicted the bite wounds on Cychosz.  (RFOF ¶ 50; Resp. to RFOF ¶ 50.)

Blinka never became aware of any statements by Gauger, Rawson, or Johnson supporting a belief of a conspiracy among them.  (GFOF ¶ 62.)  Blinka says he did not believe or come across evidence that Gauger, Johnson, and Rawson withheld or fabricated any physical evidence.  (RFOF ¶ 68; Resp. to RFOF ¶ 68.)

At no time was Rawson given prosecutorial authority or decision-making power by the Milwaukee County District Attorney's Office.  (RFOF ¶ 18.)

Blinka and the Milwaukee County District Attorney's Office insisted that exact replicas of the bite mark materials that Johnson created and Rawson reviewed be provided to Stinson and defense counsel so an accurate record could be made of what the State's experts did and to provide the defense with the evidence to perform an independent analysis.  (RFOF ¶ 70.)  Those duplicates "would have been immediately turned over to the defense."  (Doc. 101 Ex. W at 163; see JFOF ¶ 125; Resp. to JFOF ¶ 125 (objecting to use of Morgan report but not Blinka deposition).)

Johnson spent between 130 to 140 hours in total performing his work-up prior to trial.  (JFOF ¶ 47.)  Following the completion of his comparison of the photographs, models, and overlays of the bite marks and Robert Lee Stinson's dentition, Johnson authored an expert report to Assistant District Attorney Blinka setting forth his professional opinions, plus an accounting of the work that he did in arriving at those opinions.  (JFOF ¶ 83.)  Johnson opined that "to a reasonable degree of scientific certainty . . . the teeth of Robert Lee Stinson would be expected to produce bite patterns identical to those which [he] examined and recorded in this extensive analysis."  (Doc. 98 Ex. J at 3.)

18

On December 8, 1985, Rawson authored a one-page expert forensic report summarizing his opinions and stating that he was in agreement with Johnson's opinions; after reviewing the materials generated by Johnson he agreed with Johnson's conclusion that Stinson caused the bite mark injury patterns on the body of Cychosz. (RFOF ¶ 55; JFOF ¶ 77.) At no time between March 19, 1985, and December 8, 1985, did Johnson have any contact with Rawson in which Johnson's opinions of the Cychosz case were discussed. (JFOF ¶ 78.)

Stinson's trial began December 9 or 10, 1985, and all witnesses were sequestered. (JFOF ¶ 91; SFOF ¶ 167; Resp. to SFOF ¶ 167.) According to Johnson, at no time prior to trial did he discuss with Rawson his opinions or the work that he performed on the bite mark evidence on the Cychosz murder case. (JFOF ¶ 93; Resp. to JFOF ¶ 93.) Similarly, Rawson states that at no time prior to or during Stinson's trial did he have any contact with Johnson in which Johnson's opinions or the work performed on the bite mark evidence in the Cychosz murder investigation were discussed. (RFOF ¶ 62.)

During the trial, there was no evidence of motive or any witness testimony linking Stinson to Cychosz's murder, though testimony indicated that Stinson had given conflicting versions of his whereabouts on the night of the murder, and his version of the events of the night conflicted with some of the testimony of his friend, Darin Lloyd. (SFOF ¶ 168; Resp. to SFOF ¶ 168.)

On December 11, 1985, before Johnson or Rawson testified at the criminal trial, Stinson's criminal defense counsel moved to exclude forensic odontology evidence, and on that issue, Rawson was called to testify before the trial judge. (JFOF ¶ 94.) Rawson testified that Johnson's work-up of the bite mark evidence was "exceptionally fine," and

19

complied with the standards of the Board of Forensic Odontology.  (JFOF ¶ 96.)  No opposing expert testimony was adduced at trial to counter Rawson's expert opinion that Johnson's work complied with the standards of the Board of Forensic Odontology at the time of the trial.  (JFOF ¶ 97.)

Thereafter, Johnson testified at the criminal trial.  (JFOF ¶ 98.)  He discussed the steps he took to preserve the bite mark evidence he observed on Cychosz's body on November 3, 1984, and how he preserved evidence of Stinson's dentition following the John Doe hearing.  (JFOF ¶¶ 99, 100.)  During Johnson's expert testimony at the criminal trial, the photographs, models, and overlays he used in formulating his opinion were marked as exhibits and accepted into evidence without opposition from the defense. (JFOF ¶¶ 101, 102, 119, 124.)

Also, Johnson testified at trial that he performed an odontological work-up of Robert Earl Stinson that was identical to the one that he performed on Stinson but there were gross discrepancies ruling out Robert Earl as having possibly made the bite marks.  (JFOF ¶¶ 122, 123.)  Johnson further testified, consistent with his report, that "the bite marks [he] examined on Ione Cychosz had to have been made by teeth identical in all of these characteristics to those that I examined on Robert Lee."  (SFOF ¶ 171.)

Rawson testified that he was retained as an expert to perform an independent examination of the bite mark evidence created by Johnson to identify any discrepancies or errors in his work.  (RFOF ¶ 58.)  Rawson said at trial that he did not find any discrepancies in Johnson's work and that Johnson in fact performed a "very good work-up." (RFOF ¶ 59.)  Additionally, Rawson testified that he agreed with Johnson's conclusion to

20

a reasonable degree of scientific certainty that Stinson caused the bite marks on Cychosz's body. (RFOF ¶ 60.)

According to Rawson, at no time did he discuss with Johnson framing Stinson for the murder of Cychosz (RFOF ¶ 63), believe that any of the Stinson bite mark evidence that he reviewed was improperly fabricated or altered (RFOF ¶ 64), or participate in a conspiracy with Gauger and Johnson to frame Stinson for the murder of Cychosz. (RFOF ¶ 66.)

Stinson's criminal defense attorney, Steven Kohn, searched for a bite mark expert to analyze the evidence and testify on Stinson's behalf. Blinka had provided a list of fifty-four diplomats of the American Board of Forensic Odontology for Stinson's lawyers to contact. (SFOF ¶ 218.) According to Bowers, in 1983 bite mark analysis was a relatively new field of study and there were fewer odontologists experienced in bite mark analysis than those who identified human remains from dental records. In 1983, approximately twenty-five members of the American Association of Forensic Science Odontology Section and the American Board of Forensic Odontology were active in bite mark analysis. (Doc. 117 ¶ 42; *see* SFOF ¶ 218.)

Stinson's defense counsel hired George Morgan as an odontology expert but did not call Morgan to testify at the criminal trial or offer Morgan's expert report into evidence. (*See* JFOF ¶ 88.) Stinson's defense counsel submitted Morgan's report, his resume, and a cover letter to the court; the trial judge sealed all three documents for appellate purposes.

(JFOF ¶ 89.)  The documents were unsealed by the court on September 25, 2008.[11] (JFOF ¶ 90.)

On December 12, 1985, the jury found Stinson guilty of murder.  He was sentenced to life imprisonment.  (SFOF ¶ 174.)  Following the conviction, Johnson used portions of the Cychosz bite mark evidence for teaching purposes.  (SFOF ¶ 227; Resp. to SFOF ¶ 227.)

More than twenty-three years after Stinson's conviction, the DNA profile obtained from evidence found on Cychosz was determined to exclude Stinson.  (SFOF ¶ 2; Doc. 112 Ex. B at 47-48, 52, 56-57, Ex. C.)  In February 2008, a panel of four forensic odontologists (the "Panel") reanalyzed the bite mark evidence created by Johnson and the photographs taken by Cadle on behalf of Stinson and the Wisconsin Innocence Project. They concluded that the bite mark evidence excluded Stinson.  (SFOF ¶¶ 3, 184, 186, 187; Doc. 112 Ex. D.)  On January 30, 2009, Stinson's conviction was vacated and he was released from prison.  (SFOF ¶ 4; Resp. to SFOF ¶ 4.)  In July 2009, the State of Wisconsin dismissed all charges against him.  (SFOF ¶ 6.)

In April 2010, the Wisconsin State Crime DNA Database matched the DNA profile of blood found on Cychosz's clothing with the DNA of Moses Price, a convicted felon. (SFOF ¶ 10.)  The next month Moses Price confessed to finding himself with a bloody knife

---

[11]Defendants Johnson and Rawson presented proposed statements of material fact regarding the contents of Morgan's report and Morgan's curriculum vitae. (*See* RFOF ¶¶ 71-74; JFOF ¶¶ 85-87.)  Stinson objected to the proposed statements, contending that the report and CV are inadmissible hearsay and pointing to a case for the point that unauthenticated reports are inadmissible. (*See* Resp. to RFOF ¶¶ 71-74; Resp. to JFOF ¶¶ 85-87.)  Defense counsel submitted Morgan's report under their own affidavits with no explanation of where they obtained the documents or any indication of how they have personal knowledge of the report or CV. (*See* Doc. 101 ¶ 16; Doc. 94  ¶¶ 9, 10.)  Because the report and CV have not been properly authenticated by someone with personal knowledge the court will not refer to their contents.  Regardless, the contents of the report and CV would not alter the decision regarding summary judgment.

22

over Cychosz after he had "blacked out." (SFOF ¶ 11; Resp. to SFOF ¶ 11; Doc. 112 Ex. H.) The State hired a new forensic odontologist, Dr. Paula Brumit, to reanalyze the bite mark evidence. She determined that Stinson was excluded and that Price could not be excluded. (SFOF ¶¶ 12, 13, 189; Resp. to SFOF ¶ 13.) In May 2012, the State charged Price with Cychosz's murder; Price pled guilty in July 2012 and was sentenced to seven years of imprisonment. (SFOF ¶¶ 14, 15.)

According to Rawson, when he was discussing the report of the Panel, someone can manufacture a result by changing an overlay. (SFOF ¶ 181; Resp. to SFOF ¶ 181; Doc. 112 Ex. SS at 114.)

Stinson's expert in the present case, Dr. Bowers, reviewed the bite mark evidence and the reports of the four panel odontologists and Dr. Brumit, and concluded that the bite mark evidence found on Cychosz excludes Stinson. (SFOF ¶¶ 190, 202; Resp. to SFOF ¶¶ 190, 202; Doc. 112 Ex. M ¶ 31.)

The Panel and Bowers determined that Johnson's and Rawson's explanation for why a bite mark was on Cychosz's body where Stinson has a missing tooth "has no empirical basis or scientific basis and does not account for the absence of any marks by the adjacent, fully developed teeth." (SFOF ¶ 192; Doc. 112 Ex. D at 8; *see* Doc. 112 Ex. M ¶ 20.d.) Moreover, the Panel and Bowers concluded that Johnson's and Rawson's conclusion that Stinson's upper second molars made a bite mark was inexplicable because molars are located so far back in the mouth. (Doc. 112 Ex. D at 8, Ex. M ¶ 26; *see* SFOF ¶ 193.) In addition, the Panel and Bowers found it puzzling and extremely unusual that Johnson and Rawson would find a second molar "participated in a bite." (Doc. 112 Ex. M ¶ 26; *see* Doc. 112 Ex. D at 9.)

23

In Bowers's opinion, the methods of analysis that Johnson and Rawson used to compare Stinson's dentition with the bite mark injuries "were flawed and did not comport with the accepted standards of practice in the field of forensic odontology at the time." (SFOF ¶ 194; Resp. to SFOF ¶ 194; Doc. 112 Ex. M ¶ 4.[12]) According to the Panel, the overlays Johnson created blocked the view of whether Stinson's bite marks matched the photograph of the bite mark on the victim's body underneath. (SFOF ¶ 195.) Bowers submits that valid overlay analysis in 1984-1985 involved certain methods that revealed the biting edges of teeth, whereas Johnson used photos of teeth, gums, and lips. (Doc. 112 Ex. M ¶ 14; *see* SFOF ¶ 196.) Also, Bowers points to other errors by Johnson, Rawson, and Cadle. For instance, Cadle's photographs with the CU-5 were not scaled properly. (Doc. 112 Ex. M ¶ 15; *see* SFOF ¶ 197), Johnson and Rawson used bite marks on Cychosz's breast although breast tissue is highly prone to distortion and makes it an unreliable medium for capturing bite mark impressions (Doc. 112 Ex. M ¶ 29; *see* SFOF ¶ 200).

Bowers opined that "to a reasonable degree of scientific certainty as a forensic odontologist . . . Johnson and Rawson knowingly manipulated the bite mark evidence and Stinson's dentition to appear to 'match' when there was in fact no correlation between Stinson's teeth and the bite marks inflicted on Cychosz's body." (SFOF ¶ 203; Resp. to SFOF ¶ 203.) According to Bowers, Johnson "went to extreme efforts" to fit Stinson's missing tooth number 8 onto the bite mark patterns. (SFOF ¶ 205.) Also, Bowers found

_____

[12]Defendants deny the substance of this opinion, saying that a comparison of scaled photographic overlays of a suspect's teeth over scaled color transparencies of the bite patterns was superior to another method used by forensic odontologists at that time, which involved hand tracings. (Resp. to SFOF ¶ 194.) But (as defendants seem to accept in their response to the finding) the facts must be taken in Stinson's favor. Defendants similarly deny the substance of other opinions of the Panel and Bowers.

24

with respect to a small bite on the abdomen (Bite 2), that Johnson and Rawson ignored the tooth size and position of the upper teeth; Stinson's tooth 8, which was broken to the root, could not create a mark on the victim's skin without significant damage occurring in the skin by the adjacent teeth, but such damage did not occur in Bite 2. (SFOF ¶ 206.) According to Bowers, "[t]rained forensic odontologists such as Johnson and Rawson would not make a mistake like this because one of the most fundamental principles in an odontologist's analysis of bite mark injury patterns is that an individual's tooth position and tooth size must correlate or correspond in a significant alignment with the bitemark pattern." (Doc. 112 Ex. M ¶ 19; *see* SFOF ¶ 207.) Bowers found that Johnson and Rawson actually mislabeled the upper and lower arches on Bite 2 and that they would be expected to not make such an obvious mistake. (SFOF ¶¶ 208, 209; Doc. 112 Ex. M ¶ 19.) According to Bowers, other errors occurred as well. (*See* SFOF ¶ 211; SFOF ¶ 213; Resp. to SFOF ¶ 213.)

Bowers also found no scientific basis for Johnson to have excluded two suspects using only frontal photographs of their teeth. (SFOF ¶ 215.) And he wrote that it was impossible for Rawson within one hour to have reached the conclusion that Stinson's teeth produced the bite marks on Cychosz's body. (SFOF ¶ 217; Doc. 112 Ex. M ¶ 36.)

Gauger wrote a memoir entitled *The Memo Book* in which he chronicled his career as a police officer and detective with the Milwaukee Police Department. (SFOF ¶ 235.) The book was copyrighted in 2010. (SFOF ¶ 236; Resp. to SFOF ¶ 236; Doc. 112 Ex. AA at unnumbered 3.)

25

FEDERAL CLAIMS

A.    State Actors and State Actions

To state a claim for relief under 42 U.S.C. § 1983 a plaintiff must show that (1) he was deprived of a right secured by the Constitution or laws of the United States, and (2) the defendants acted under color of state law. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 150 (1970); *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). Here, although the second element without question is met for Gauger, Johnson and Rawson dispute that they acted under color of state law. They argue that they cannot be sued under 42 U.S.C. § 1983 because they were private actors regarding all of their actions in Stinson's criminal case.

Acts under color of law are not limited to acts of state officials only; under certain circumstances the acts of private individuals may constitute state action. The state-action determination is made on a case-by-case basis considering the totality of circumstances. *Tarpley v. Keistler*, 188 F.3d 788, 793 (7th Cir. 1999).

One scenario in which private persons act under color of law for § 1983 purposes is when they conspire with or act jointly with state officials. *Adickes*, 398 U.S. at 152; *Whitlock v. Brueggemann*, 682 F.3d 567, 577 (7th Cir. 2012), *cert. denied, McFatridge v. Whitlock*, 133 S. Ct. 921 (2013); *Morfin v. City of East Chicago*, 349 F.3d 989, 1002-03 (7th Cir. 2003); *Tarpley*, 188 F.3d at 791-92. The test is whether a "meeting of the minds" between the officer and the otherwise private actor occurred, *see Adickes*, 398 U.S. at 158, or whether the private party "so injected itself into the state action" that he can be held liable for that action, *Tarpley* 188 F.3d at 792 n.2.

26

Proof of a conspiracy is rarely direct; conspiracy is often proved by circumstantial evidence. *See Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (stating that a meeting of minds "may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"). In *Adickes* the Supreme Court found summary judgment improper where a police officer was present in the same restaurant as the waitresses who denied a white woman service while she was in the company of blacks. *See* 398 U.S. at 158. The woman alleged that the restaurant had conspired with the local police to deny her service. According to the Court, "[i]f a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." *Id.* Similarly, in *Morfin* the Seventh Circuit found summary judgment inappropriate where, although no evidence of an overt agreement between a private individual and a police officer existed, the private individual's presence at the arrest scene, his urgent insistence that an arrest be made, and a sequence of events leading to arrest were enough that a reasonable juror could conclude that the private individual and officer had reached a meeting of minds. 349 F.3d at 1004.

Stinson gets to trial on the issue of state action. Construing the facts in Stinson's favor, Johnson, Gauger, and Jackelen met on or before the detectives' interview with Stinson. At the meeting, Johnson showed the detectives a sketch of the assailant's dentition. A later sketch by a police artist was similar to Johnson's sketch and shows a missing upper tooth one or two teeth to the right of the center tooth in the assailant's mouth. After this first meeting with Johnson, Gauger and Jackelen interviewed Stinson,

who was missing his right central incisor (the right front tooth), and Jackelen told Gauger that they had their man. Following the interview of Stinson, Gauger and Jackelen again met with Johnson.

Thereafter, notwithstanding that the original sketch and the police artist's sketch showed a missing tooth to the right of the central incisor, Johnson's analysis changed: a missing right central incisor, i.e., *front* tooth, rather than a lateral incisor now matched the bite marks. Johnson compared the bite marks on Cychosz's body to molds and impressions and photographs of Stinson's mouth and stated they fit, even though the prior evidence suggested that the missing tooth was to the right. Then, Johnson called Rawson and asked Rawson to become involved in the case as a second opinion. With very little time spent looking at the evidence, Rawson agreed with Johnson's analysis.

At trial, the testimony of Johnson and Rawson was dispositive. Other evidence included Stinson living in close proximity to the crime scene and a story on his whereabouts that was contradicted by other evidence, but the odontologists' testimony was the lynchpin of the prosecution's case.

Six forensic odontologists have since found that Johnson's and Rawson's opinions were grossly incorrect. Moreover, Bowers says that the errors were apparent even in light of the available scientific methods in the mid-1980s and that, in his opinion, trained odontologists would not make such mistakes, suggesting that the errors were made intentionally.

Although Stinson has not presented evidence of any express agreement between Gauger, Jackelen, and Johnson, the circumstantial evidence suggests an implied suggestion by the detectives to Johnson for the odontologist's opinion to confirm that

Stinson was their man. Not until after the second meeting between the detectives and Johnson did a missing right central incisor come into play. Johnson quickly disregarded two other potential suspects from photographs alone, which Bowers says was not scientifically sound. Taking the evidence in Stinson's favor, he never had a chance of being excluded, as Johnson changed his opinion to match Stinson after Stinson became Gauger and Jackelen's suspect. The detectives wanted the evidence to match Stinson's teeth. Evidence suggests the message was conveyed, whether expressly or impliedly, to the odontologist to opine in that manner, and Johnson complied. Thus, Johnson can be considered a state actor for § 1983 purposes. Here, the circumstances are more suggestive of a meeting of minds than was the case in *Adickes*. *See also Burke v. Town of Walpole*, 405 F.3d 66, 88 (1st Cir. 2005) (finding a forensic odontologist consultant to the prosecutor to be a state actor for his review of bite mark evidence); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (finding sufficient evidence of conspiracy by a lab technician where she talked with one of the coconspirators several times by phone and afterward changed the file in which she placed her report).

Further, Johnson's role was one of delegated "public function." A private person may be deemed a state actor "if he performs functions that are 'traditionally the exclusive prerogative of the State.'" *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)). Johnson was called in to examine Cychosz's body similar to the medical examiner's doing so. He made a sketch, molds, and impressions—acquiring or producing evidence for the State similar to a lab technician. The State could have had a forensic odontologist on its payroll but apparently did not. Instead, it hired third-party Johnson to perform that public function. Moreover, the

29

fact that Johnson made the initial contact with Rawson supports the finding that Johnson was acting on behalf of the State at the time. Gauger, Jackelen, or Blinka could have called Rawson, but they gave that task to Johnson.

Rawson is a step removed, because he was contacted first by Johnson rather than the detectives. But by the time of the telephone call between the odontologists, Johnson had concluded that Stinson's dentition matched the bite marks. The facts support a reasonable jury finding that Johnson phrased the request for a second opinion as a request for confirmation of his own conclusion, and Rawson complied, as evidenced by the extremely short time it took him to confirm Johnson's findings at the hotel when Gauger and Jackelen arrived in Las Vegas. Bowers says a confirmation could not be made upon such a short review. Enough evidence exists on which a reasonable jury could find that a meeting of the minds occurred between Rawson and Johnson (acting on behalf of the detectives and prosecutor). That Gauger and Jackelen may have had different motives than Johnson or Rawson for pinning the crime on Stinson (animus after the Ricky Johnson murder and desire to close the Cychosz murder case quickly versus promotion of their own careers as bite mark experts), is immaterial.

B.    Absolute Immunity

Next, Johnson and Rawson claim absolute immunity from liability because they were testifying witnesses. In response, Stinson clarifies that he sues them for manipulating evidence and falsifying their opinions during the investigatory phase of the homicide case; Stinson does not sue them for providing testimony at trial. (Doc. 110 at 37.)

Absolute immunity is exceptional and is to be applied sparingly in the § 1983 context. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). The official seeking absolute

30

immunity bears the burden of establishing that it is justified. *Id.* The Supreme Court has directed a "functional approach" for absolute immunity, meaning that the court must look at the nature of the function performed rather than the identity of the actor who performed it. *Id.* For instance, when a prosecutor functions as an advocate in evaluating evidence, interviewing witnesses, and otherwise preparing for judicial proceedings or trial, he or she is absolutely immune. But if the prosecutor functions as a detective in searching for clues and corroboration that may generate probable cause to seek arrest, no absolute immunity applies. *See id.* at 273-74.

Absolute immunity for trial testimony applies even when testimony is perjured. *Briscoe v. LaHue*, 460 U.S. 325 (1983). Public policy protects witness testimony because immunity promotes discovery of the truth in court; witnesses might avoid testifying if they feared subsequent liability. *Id.* at 333. But the same rationale does not operate to protect pre-testimonial, investigatory actions. For those actions, only qualified immunity is available. *See Buckley*, 509 U.S. at 273-74; *Whitlock*, 682 F.3d at 580. Even a prosecutor does not enjoy absolute immunity before he or she has probable cause to arrest someone. *Buckley*, 509 U.S. at 274; *Whitlock*, 682 F.3d at 579. And a determination of probable cause does not guarantee absolute immunity for all actions afterward; the prosecutor may still engage in investigative work protected by qualified immunity only. *Buckley*, 509 U.S. at 274 & n.5; *see Gregory v. City of Louisville*, 444 F.3d 725, 740-41 (6th Cir. 2006) (rejecting forensic examiner's argument that she had absolute immunity for actions after probable cause was established).

The same is true of state-actor expert witnesses working with the police and prosecutor; their immunity is no greater than a prosecutor's. *Gregory*, 444 F.3d at 741 ("It

31

would be incongruous for this Court to grant a forensic examiner greater protection for her investigatory acts than the Supreme Court has seen fit to grant to prosecutors for the same."). Thus, none of Johnson's actions or Rawson's actions before probable cause to arrest Stinson existed are covered by absolute immunity. And the time at which probable cause developed is a factual question. *See Whitlock*, 682 F.3d at 579-80. Actions occurring after the existence of probable cause must be analyzed based on the expert's function at that time. That Johnson and Rawson testified at trial months later "does not wipe away [their] involvement in the investigation at its earliest stages." *Id.* at 578; *see Buckley*, 509 U.S. at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . .").[13]

In *Keko v. Hingle*, 318 F.3d 639, 642-44 (5th Cir. 2003), the Fifth Circuit denied absolute immunity to a forensic odontologist for actions of examining the victim's body, obtaining and examining Keko's dental impressions, and writing a report stating that Keko's dental impressions corresponded with bite marks on the victim. Similarly, the Sixth Circuit

---

[13]In the case below, the Supreme Court's *Buckley* decision, the Seventh Circuit found three expert witnesses were absolutely immune for "pretrial activities" such as evaluating a bootprint, writing expert reports, discussing the case with prosecutors, and preparing to testify. But those activities appear mainly related to the experts' trial testimony. *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1244-45 (7th Cir. 1990) ("[T]he testimony is the real gravamen of [Buckley's] complaint."). And to the extent that such pretrial activities related to the investigatory phase of the case, the opinion must be discounted in light of the Supreme Court's decision regarding the prosecutor. *See Keko v. Hingle,* 318 F.3d 639, 644 n.8 (5th Cir. 2002) ("The expert witnesses were granted absolute immunity in *Buckley, supra,* [919 F.2d 1230,] but as the court's opinion granting absolute immunity to the prosecutors in that case was overturned by the Supreme Court, the status of his comparable decision for the experts seems uncertain."); *cf. Gregory*, 444 F.3d at 741 ("It would be incongruous for this Court to grant a forensic examiner greater protection for her investigatory acts than the Supreme Court has seen fit to grant to prosecutors for the same."). Moreover, even the Seventh Circuit's *Buckley* decision recognized that a suspect's rights could be violated by an expert's "'cooking' a laboratory report in a way that misleads the testimonial experts." 919 F.2d at 1245.

has stated that expert forensic examiners act in an investigatory fashion when they interpret and document physical evidence. *Gregory*, 444 F.3d at 740. Further, said that court:

> [u]nder the Supreme Court's functional test, the pre-trial investigatory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions. This Court sees no reason to treat the intentional fabrication of a forensic report differently from the intentional fabrication of a police officer or prosecutor.

*Id.*

Here, Johnson was deeply involved in the investigatory phase of the state's prosecution of Stinson. He collected the bite mark evidence as well as the molds and impressions of Stinson's teeth. Johnson's role in late 1984 and early 1985 was to determine whether Stinson's and two or three others' teeth were consistent or inconsistent with the bite marks. Such determination of which individuals were excluded or included as suspects was a separate function from his expert testimony at trial, and for the former role absolute immunity does not apply.

Similarly, a reasonable jury could find that Rawson's actions in January 1985 were part of the investigatory phase prior to Stinson's arrest. Rawson was brought in to confirm Johnson's conclusion that Stinson had inflicted the bite marks to support a finding of probable cause to arrest; Rawson's initial conclusion that Stinson's teeth matched the bite marks could be considered part of the investigatory phase of the case. Although Blinka may have thought he had probable cause before Rawson's opinion, he and Johnson's desire for a second opinion suggests the opposite, creating a jury question. And whether Rawson's further review of evidence following Stinson's arrest and the probable cause hearing constituted investigatory or testimonial work cannot be determined on the present

33

record. That Rawson restated his opinion in an expert report on the verge of trial, possibly as part of trial preparation, cannot immunize his prior actions in generating that opinion during the investigatory phase, before Stinson was arrested. In sum, the court cannot find as a matter of law that either odontologist has absolute immunity from Stinson's suit.

C.    Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982); *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine balances the need to hold public officials accountable when they exercise power irresponsibly with the need to shield officials from distraction and liability when they perform their duties reasonably. *Pearson*, 555 U.S. at 231. Qualified immunity protects a defendant from suit unless (1) the plaintiff has established a violation of a constitutional right and (2) that right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 232. The court may address either step first. *Id.* at 236. To be "clearly established," a right "must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). However, the very act in question need not have previously been held unlawful for a public official to be on notice. *Id.*

Stinson asserts several theories of liability under federal law, all stemming from the odontologists' opinions. First, he suggests that defendants violated his due process right to a fair trial by fabricating the primary evidence of his guilt, i.e., the expert opinions that his dentition matched the bite marks on Cychosz's body. Second, he offers that

34

defendants violated his right to due process by failing to disclose *Brady* evidence[14] by withholding from him their agreement to fabricate the opinion evidence. Third, he submits that each defendant failed to intervene to prevent the others' misconduct. And fourth, he contends that the defendants conspired to deprive him of his constitutional rights.

1.    Due Process

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates the due process clause if the evidence is later used to deprive the defendant of her liberty in some way." *Whitlock*, 682 F.3d at 580; *see Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("There was and is no disputing that such conduct [fabricating evidence and withholding exculpatory evidence from the defense and prosecutor] violates clearly established constitutional rights."); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). In *Jones*, the plaintiff had been wrongly accused of murder and brought to trial based on a fabricated report by police officers and a fabricated serology report by a lab technician. A detective had written a report based on new evidence he had discovered that led him to believe that the wrong individual had been charged, but that information was removed from the final police report. And the lab technician had found that plaintiff had different semen and blood type than that found on the victim but excluded this information from the lab report she prepared for the prosecution. 856 F.2d at 991. Both the officer and lab technician were held liable for their misconduct.

---

[14]*See Brady v. Maryland*, 373 U.S. 83 (1963).

Defendants contend that no physical evidence was actually fabricated and that all of that physical evidence was available to Stinson and his defense team. Also, Gauger and Rawson maintain that they did not create any of the bite mark or dentition evidence—Johnson did. However, Stinson does *not* contend that the physical evidence (such as photographs, molds, and impressions) was fabricated or physically tampered with. (Doc. 110 at 49.) Instead, he contends that the odontologists' *opinions* were fabricated through intentional manipulation or misreading of physical evidence. Moreover, he contends that Gauger conspired with the odontologists to achieve those opinions.

Stinson has sufficient evidence to get to trial. As discussed above, Johnson altered the identification of the missing tooth following discussion with Gauger and Jackelen on November 15, 1984, *after* they interviewed Stinson. Then, Johnson called Rawson who subsequently concurred with his stated opinion. Further, according to Bowers, Johnson and Rawson had to have known that Stinson was excluded from causing the bite marks on Cychosz because of obvious differences between Stinson's teeth and the bite mark patterns. *See Gregory*, 444 F.3d at 745 n.9 ("Plaintiff offers expert opinion that the evidence presented to Katz for analysis does not and could not support the conclusions that Katz reached. Plaintiff's expert provides proper testimony as to what a reasonable forensic examiner would do with hair examinations and an expert assessment of the evidence presented to Katz."). Bowers's opinion that Johnson's and Rawson's conclusions were far afield of what a reasonable forensic odontologist would have concluded supports a reasonable jury finding that Johnson and Rawson fabricated their opinions.

Moreover, qualified immunity does not apply, as the law as of 1984 and 1985 clearly established that an investigator's fabrication of evidence violated a criminal defendant's

36

constitutional rights. In *Whitlock*, the Seventh Circuit held that by February 1987 it was clearly established that prosecutors could not fabricate evidence during an investigation. 682 F.3d at 585-86. But such a due process violation existed before February 1987 as well. The *Whitlock* court pointed to *Mooney v. Holohan*, 294 U.S. 103 (1935), and its progeny for this holding, meaning that the right had been clearly established for some time. Moreover, in *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008), the Fifth Circuit held that the deliberate creation of a scientifically inaccurate serology report violated due process "and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights." In *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001), the Ninth Circuit said that the due process right not to be subjected to criminal charges on the basis of evidence deliberately fabricated by the government was "virtually self-evident" even if no prior cases had expressly recognized it. The First Circuit wrote that "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process . . . ." *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

Regarding Stinson's other due process theory, *Brady* applies when one asserts that he did not receive a fair trial because of the concealment of exculpatory evidence in existence and known at the time of that trial. *Whitlock*, 682 F.3d at 588. Defendants contend that no evidence was suppressed during Stinson's criminal case because the relevant photographs, overlays, and molds were not fabricated and all were available to Stinson prior to trial such that he could have discovered the errors in 1985. Again, as

37

discussed above, the alleged fabrication or manipulation is not of the physical evidence, but of Johnson's and Rawson's opinions. The falsity of those expert opinions can be considered exculpatory evidence known to the defendants. That the physical evidence was available to Stinson is not dispositive because Stinson was not privy to Johnson's and Rawson's disputed adjustment of the physical evidence to create a match to Stinson's dentition. When *Brady* material is contained in someone's mind it cannot be considered available in the same way as a document or other item of physical evidence. *Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001). Plus, Stinson was not privy to the conversations between Gauger and Johnson and then Johnson and Rawson in which a desired result in the opinions was implied. Although the topic was not discussed in *Jones*, the lab technician in that case was held liable even though the hair samples she tested likely were available to the defense. Likewise here, the availability of the physical evidence to Stinson does not cure the failure of defendants to inform Stinson of what they did with the evidence and what they discussed regarding the opinions. Further, the pool of experts in the forensic odontology bite mark field was small, meaning that Stinson's ability to find an appropriate expert to review the physical evidence was impeded. Stinson says his defense team located an expert in identifying a deceased through dental records, not in matching dentition to bite marks.

Gauger argues that even if the odontologists fabricated evidence, he was not aware of it, as he is not a dental expert. However, taking the facts in Stinson's favor, Gauger was cognizant of Johnson's shifting view of which tooth was missing and he was fully aware of the contents of his conversations with Johnson and what he implied in their second meeting, following his and Jackelen's interview of Stinson.

38

Here, the withheld evidence was material. The odontologists' opinions were the key evidence at trial. Other evidence included the proximity of Stinson's residence to the murder scene and some contradictions regarding his whereabouts the night of the murder. But a reasonable jury could find that the odontologists' opinions linking Stinson to the bite marks were the lynchpin of his conviction. Moreover, *Brady* evidence includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). And the credibility of Johnson and Rawson was extremely important at the criminal trial.

Here, too, there are credibility questions that preclude summary judgment. On summary judgment, the district court cannot decide credibility, weigh the evidence, or decide which inferences to draw; those actions are the province of the jury at trial. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Therefore, in this case the jury will have to decide whether Gauger, Jackelen, and Johnson, and then Rawson, impliedly agreed that the odontologists would opine that Stinson's dentition matched the bite marks. The evidence in the record about Johnson's shift regarding which tooth was missing after the detectives thought they had their man, the lack of a sketch at the John Doe hearing, Johnson's call to Rawson, Rawson's extremely brief initial review of the physical evidence in Las Vegas, and the existence of gross errors in Johnson's and Rawson's review of the physical evidence (which another expert says could not be honestly made) provides enough to allow Stinson to get Johnson, Rawson, and Gauger before the jury for evaluation.

Further, it was clearly established by 1984 that the withholding of information about fabricated evidence constituted a due process violation. The Seventh Circuit held in *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001), that it was clearly established

39

by 1979 (and likely earlier) that police could not withhold from prosecutors exculpatory *Brady* evidence and that qualified immunity did not protect the officers in a § 1983 suit for such a violation.

      2.      Failure to Intervene

    A person may be held liable for failing to intervene if the individual had reason to know that a constitutional violation was being committed and a realistic opportunity to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). For the reasons previously discussed, each defendant had reason to know, based on the facts and law, that a constitutional violation was being committed by the other defendants and possibly Jackelen. Moreover, the evidence shows that at any time any of the defendants could have prevented the harm by telling what he knew to ADA Blinka, DA McCann, the court, or Stinson's defense team.

    A failure-to-intervene claim is dependent on the issue of whether a constitutional violation occurred in the first place. *See Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). With respect to this case, the law regarding the due process violations was clearly established by 1984. Further, in 1972 the Seventh Circuit recognized a failure-to-intervene claim against a police office for failure to stop other officials from violating constitutional rights. *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). ("[O]ne who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge."). By 1984, liability for an official's failure to intervene in a manipulated-evidence case such as Stinson's was clearly established.

40

3.    Conspiracy

To be liable as a conspirator one "must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme . . . . It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them."  *Jones*, 856 F.2d at 992-93.  The question of whether an agreement exists should not be taken from a jury in a civil conspiracy case if the jury can possibly infer from the evidence that the alleged conspirators had a "meeting of the minds" and reached an understanding to achieve the conspiracy's objectives.  *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 841 (7th Cir. 1984).  For the same reasons as discussed above regarding state action, a question of fact exists as to whether a meeting of minds occurred among any of the defendants and, perhaps Jackelen, concerning one or both of the odontologists' opinions.

In *Jones*, the Seventh Circuit found the defendants liable on a conspiracy claim of "railroading" an individual in a criminal case.  The conduct for which they were held liable occurred in 1981 and included *Brady* violations among other acts.  Thus, the law of conspiracy under § 1983 was clearly established by late 1984.

SUPPLEMENTAL CLAIMS

Stinson asserts state-law claims of intentional misrepresentation (count VII), negligent misrepresentation (count VIII), negligent infliction of emotional distress (count IX), intentional infliction of emotional distress (count X), and malicious prosecution (count XI), plus indemnification (count XII).  Because the federal claims survive, dismissal of the supplemental claims under 28 U.S.C. § 1367 is unwarranted.  Gauger bases his request

41

for dismissal solely on the supplemental jurisdiction statute, so consideration of his summary judgment motion ends here.

Johnson and Rawson attack the state claims on the basis of absolute testimonial immunity. In *Bergman v. Hupy*, 64 Wis. 2d 747 (1974), the Supreme Court of Wisconsin set forth four categories of communications afforded privilege. Pertinent to this case, (1) all words published or spoken by witnesses during judicial proceedings are absolutely privileged "if relevant to the issues in the matter where the testimony is given;" (2) statements made to law enforcement officers are conditionally privileged, meaning that they are privileged if made for the purpose of apprehension or conviction of someone and made in good faith without malice; and (3) statements made to a grand jury or district attorney relating to matters being investigated are absolutely privileged, even if the statements are malicious or false. *Id.* at 749-53. This last category includes statements made in a John Doe investigation or to an assistant district attorney seeking issuance of a criminal complaint. *Id.* at 753-54.

As discussed above, Stinson concedes that he does not seek liability for Johnson's or Rawson's statements made during trial. Instead, he focuses on the odontologists' fabrication of opinions during the investigation. This court cannot grant summary judgment regarding all of the odontologists' statements or actions outside of the trial. Though some conduct in the end may be parsed out (such as that in the John Doe proceeding or relating to the criminal complaint), the facts are not clear enough at this time for the court to make statement-by-statement rulings regarding which statements can be considered made to law enforcement versus to the assistant district attorney. Johnson and Rawson interacted with Gauger and Jackelen before they talked with Blinka. Taking the facts in Stinson's favor,

42

Johnson and Rawson were part of the law enforcement team. Thus, their investigative words are protected by a conditional privilege only, which was forfeited if they knew the statements were false or they otherwise acted in bad faith. Because a reasonable jury could find that Johnson and Rawson acted with knowledge of the falsity of their stated opinions and with bad faith, summary judgment must be denied. Moreover, Johnson and Rawson are sued not only for their statements and related actions but for conspiracy and their failure to disclose exculpatory evidence or to intervene. Those claims fall outside of *Bergman's* discussion of privileged communications.

Finally, Rawson argues that he deserves summary judgment on Stinson's malicious prosecution claim because he did not have prosecutorial powers and there is no evidence of malice. One element of the malicious prosecution cause of action is that prior proceedings "must have been by, or at the instance of the defendant in this action." *Pollock v. Vilter Mfg. Corp.*, 23 Wis. 2d 29, 37 (1964). As discussed above, sufficient evidence suggests that Rawson conspired with Gauger and Johnson to accuse Stinson of murder by virtue of the false expert opinion reports that matched Stinson's teeth to the bite marks, and Gauger could be seen as heavily involved in the institution of proceedings. Moreover, "[o]ne who gives to a third person . . . information of another's supposed criminal conduct . . . causes the institution of such proceedings as are brought by the third person." Restatement (Second) of Torts § 653 cmt. d. Here, the prosecution wanted a second opinion before instituting charges against Stinson, and Rawson's opinion provided the information that triggered criminal charges and Stinson's arrest. Although in the end it could very well be that Rawson's actions did not so influence Blinka in bringing charges, *see id.* ("The giving of the information or the making of the accusation, however, does not

43

constitute a procurement of the proceedings that the third person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit."), the jury can decide the matter. As for the element of malice, the evidence is slim, but sufficient for present purposes. Bowers has opined that such gross errors were made that they should not be deemed accidental. And Rawson could be seen as wanting to boost his and his friend Johnson's careers at the expense of Stinson. For now, the claim will continue.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the motions for summary judgment filed by Rawson (Doc. 90), Johnson (Doc. 96), and Gauger and the City (Doc. 100) are denied.

IT IS ORDERED that the parties appear in person on Monday, October 28, 2013, at 2:00 p.m. to discuss a trial date and mediation.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

44