UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT LEE STINSON,

       Plaintiff,

                                   Case No. 09-cv-1033-pp

     v.

CITY OF MILWAUKEE,[1]
JAMES GAUGER,
DR. LOWELL T. JOHNSON, and
RAYMOND D. RAWSON,

       Defendants.

## ORDER RESOLVING REMAINING DAUBERT MOTIONS (DKT. NOS. 189, 191, 194, 196)

On February 7, 2019, the court held a hearing on the parties' Daubert[2] motions. Dkt. No. 282. The court ruled on several of the motions but took others under advisement. This order resolves the remaining motions.

## I.    Preface

In considering the parties' arguments, it is helpful to understand two things: the factual basis for the plaintiff's claims, and the claims themselves.

### A.    Factual Basis for the Plaintiff's Claims

On September 30, 2013, Judge Charles N. Clevert, to whom this case was assigned until September 2017, denied the defendants' motions for summary judgment; he provided an extensive recitation of the facts he

---

[1] The City remains a defendant solely for purposes of the plaintiff's indemnification claim.

[2] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

1

considered. Dkt. No. 129 at pp. 3-25. In its *en banc* ruling on the defendants'
interlocutory appeal from Judge Clevert's ruling, the Seventh Circuit also
provided a summary of the facts. Dkt. No. 152 at 2-10.

Judge Clevert and the Seventh Circuit considered the facts in the light
most favorable to the plaintiff (as required at the summary judgment stage).
Neither court had the benefit of expert witness discovery. For the purpose of
providing context for the rulings in this order, the court has summarized the
facts relied upon by Judge Clevert and the Seventh Circuit. The court
understands that the parties—particularly the defendants—dispute many of
these facts, and that at trial, the jury will not be obligated to view any facts in
the light most favorable to the plaintiff. The below are not "factual findings," in
the legal sense.

1.     *Events Preceding the Crime for Which the Plaintiff Was
       Convicted*

In early November 1982, a man named Ricky Johnson was murdered.
Defendant James Gauger and his (now-deceased) partner Tom Jackelen were
the homicide detectives assigned to investigate the murder. The night of the
murder, the plaintiff was with three other men; a witness told police that two of
those men were present when Johnson was shot. Detectives interrogated the
plaintiff as part of their investigation, but after recounting what he'd done that
night, the plaintiff said he had no information about who had killed Ricky
Johnson. The police did not believe him; the plaintiff continued to tell them he
knew nothing. Eventually, charges were dropped. The plaintiff alleges that

2

Gauger believes that the plaintiff and the men he was with that night committed the murder, but that Gauger was not able to prove it.

2.    *The Crime for Which the Plaintiff Was Convicted*

Ione Cychosz was killed on November 3, 1984 (two years after Ricky Johnson). She was found in a back yard, almost nude but for a bra and a shirt bunched around her neck. Her body was severely bruised and bore bite marks in several areas. Someone from the medical examiner's office authorized retaining defendant Johnson as a forensic odontology expert. Gauger—lead detective along with Jackelen—recalled that this was the first homicide investigation in which he'd participated that involved collection and use of bite mark evidence. Johnson recommended using David Cadle, a photographer for the state crime lab, to take pictures. Johnson examined the body on the day of the murder, and Cadle took pictures of the bite marks on the body. Johnson took rubber impressions of the bite marks on the victim's right breast, and came back the next day to extract tissue from that same area. Johnson made a sketch of the assailant's teeth and showed it to Gauger and Jackelen before their first visit to the crime scene, so before they started interviewing witnesses, the detectives had reason to believe that they were looking for someone with a missing tooth and a twisted tooth.

Three days after the murder, the detectives went to the scene and began interviewing neighbors who had not been previously interviewed. One of those neighbors was the plaintiff; he lived in a home close to the scene with his mother, twin brother and younger siblings. Jackelen interviewed the plaintiff.

3

The plaintiff's right central incisor tooth is fractured, decayed almost to the gum line.

After the detectives finished interviewing people in the plaintiff's household, Jackelen told Gauger that they had their man. The detectives spoke with the plaintiff again, saying something that made him laugh, and saw that he had a missing tooth. They went to the district attorney with this information, but the prosecutors felt this was not enough to establish probable cause for a search warrant to examine the plaintiff's teeth. They asked Johnson whether he could identify a biter based on the bite marks; Johnson responded that he could under the right conditions, if he had a mock-up of the suspect's dentition. At some point, the idea of conducting a John Doe investigation came up.

About a week later, the detectives met with Johnson. The next day, the detectives interviewed and prepared reports on two other suspects; Johnson reviewed their dentition and ruled them out as suspects.

A few weeks later, Johnson collaborated with a police sketch artist and created a second sketch of the biter's dentition. The sketch was done from Johnson's memory; it was to be used to help police understand dental terminology and to help find the assailant.

The district attorney began a John Doe proceeding, and the plaintiff was subpoenaed to the hearing. Johnson was there (he'd never met the plaintiff before). Johnson testified that if he could look into the plaintiff's mouth, he could figure out whether he could exclude the plaintiff as the biter, or whether

4

he'd need more evidence. The judge allowed Johnson to examine the plaintiff's mouth for fifteen to twenty seconds, after which Johnson concluded that the plaintiff's teeth were consistent with what he expected from his analysis of the bite marks. He opined that there was reason to conduct a more detailed study. The judge ordered the plaintiff to submit to an examination by Johnson, as well as to having photos and impressions taken. The plaintiff submitted to those procedures on December 3, 1984.

Using various methods, Johnson compared the bite marks to the plaintiff's dentition, and expressed the opinion that the plaintiff's teeth were identical to the ones that caused the bite mark injuries on the victim. The detectives presented this information to the prosecutor, who—after speaking with Johnson—concluded that there was enough evidence to charge the plaintiff, but that questions remained. Either the prosecutor or Johnson selected defendant Rawson to give them a second opinion on the bite mark match. In January 1985, Johnson contacted Rawson (who had a dental practice in Las Vegas); the two men had been colleagues and professional acquaintances for several years.

On January 17, 1985, the detectives traveled to Las Vegas with the preserved skin tissue samples, photographs and dental molds. Rawson went to Gauger's hotel room and spent one to three hours reviewing the evidence. He verbally confirmed Johnson's findings.

On January 21, 1985, the district attorney's office charged the plaintiff with first-degree murder. The State presented some of the bite mark evidence

5

at the preliminary hearing, and Johnson testified. The judge found probable cause, and bound the plaintiff over for trial.

In March 1985, Rawson asked to see the bite mark evidence a second time. (He did not get the drawing the police sketch artist had created for Johnson.) Rawson reviewed the materials Johnson had created, and again confirmed Johnson's conclusions. Johnson and Rawson both wrote expert reports for the prosecution.

The plaintiff went to trial in early December 1985. No witness provided a motive for the plaintiff to have killed the victim, nor did any witness testimony link the plaintiff to the murder. There was some evidence that the plaintiff had given conflicting versions of his location the night of the murder, and that his version of events conflicted with the version testified to by one of the friends he'd been with that night. The plaintiff's lawyer moved to exclude the bite-mark evidence; in response, Rawson testified about his views of the quality of Johnson's work. Johnson also testified. On December 12, 1985, the jury returned a guilty verdict.

### 3. *Exoneration of the Plaintiff*

Some twenty-three years later, the DNA evidence from the crime scene was analyzed; the testing excluded the plaintiff. An attorney at the Wisconsin Innocence Project asked a forensic odontologist named Gregory Golden to put together a panel of forensic odontologists to reanalyze the bite mark evidence put together by Johnson and photographer Cadle. The panel (which included an odontologist named David R. Senn) did so, and concluded that the bite

6

mark evidence excluded the plaintiff. The plaintiff's conviction was vacated in January 2009, and he was released from prison. Seven months later, the State dismissed all charges against him.

### 4. *Identification of the Assailant*

In the spring of 2010, the Wisconsin State Crime DNA Database matched the DNA profile from the crime scene to a convicted felon named Moses Price. A month later, Price confessed that he'd found himself standing over the victim's body, holding a bloody knife, after having blacked out. The State hired a forensic odontologist named Paula Brumit to reanalyze the bite mark evidence. She concluded that she could not exclude Price as the biter, but that the evidence excluded the plaintiff. The State charged Price with the murder in May 2012. He pled guilty in July 2012.

### 5. *This Lawsuit*

The plaintiff filed this civil rights suit in November 2009, a few months after the State dropped the charges against him. The parties conducted discovery, and in October 2012, the defendants filed for summary judgment. Dkt. Nos. 90, 96, 100. On September 30, 2013, Judge Clevert denied those motions. Dkt. No. 129. The defendants took an interlocutory appeal from Judge Clevert's decision on immunity grounds. Dkt. Nos. 130-147. On August 18, 2017, the Seventh Circuit—sitting *en banc*—dismissed the qualified immunity appeals and affirmed Judge Clevert's rulings as to absolute immunity. Dkt. No. 152; Stinson v. Gauger, 868 F.3d 516 (7th Cir. 2017). The parties had not conducted expert discovery prior to Judge Clevert's summary judgment ruling,

so this court ordered the plaintiff to disclose the identities of its expert witnesses, along with their reports, by December 29, 2017. Dkt. No. 155. After some extensions, the plaintiffs disclosed their experts in the summer of 2018.

On November 6, 2018, the plaintiff filed two motions; one to partially exclude the testimony of plaintiff's experts Drs. Golden, Senn, and Brumit, dkt. no. 189; and one to exclude certain testimony of defendants' expert Dr. Lowell Levine, dkt. no. 191. Eight days later,[3] the defendants also filed two motions; one to exclude certain testimony of plaintiff's expert Dr. C. Michael Bowers, dkt. no. 194; and one to exclude testimony from other plaintiff's experts, dkt. no. 196. The court resolved some of these motions at the final pretrial conference on February 7, 2019. Dkt. No. 282.

B.     The Plaintiff's Claims

The plaintiff has eight[4] surviving substantive claims from his second amended complaint (dkt. no. 51):

Count I:      Under 42 U.S.C. §1983, the plaintiff alleges that the individual defendants conspired to violate his constitutional right to a fair trial in violation of the due process clauses of the Fifth and Fourteenth Amendments, by "deliberately" withholding exculpatory evidence and "fabricat[ing] false reports and other evidence, thereby misleading and

---

[3] The parties originally had the same deadline for filing <u>Daubert</u> motions, but the court struck the defendants' original filings as an attempt to circumvent page limit requirements. Dkt. No. 193. The court ordered the defendants to file their revised motions by November 14, 2018. They complied.
[4] The plaintiff's ninth surviving claim is an indemnification claim against the City.

misdirecting the criminal prosecution." Dkt. No. 51 at 13. To prove this claim, the plaintiff must prove by a preponderance of the evidence that the defendants conspired to deprive the plaintiff of his right to a fair trial by knowingly concealing and/or fabricating evidence (Seventh Circuit Pattern Jury Instruction 7.14, (Aug. 2017 rev.)),[5] and that they did, in fact, deprive him of that right. See Vaden v. Vill. of Maywood, Ill., 809 F.2d 361, 366 (7th Cir. 1987) ("To state a claim for relief under 42 U.S.C. § 1983, [the plaintiff] must allege not only that the defendants conspired under color of state law to deprive [him] of [his] constitutional rights, but also that [he] was in fact deprived of those rights.").

Count IV:    Under 42 U.S.C. §1983, the plaintiff alleges that one or more of the individual defendants stood by and failed to intervene as others violated his constitutional rights. To prove this claim, the plaintiff must prove by a preponderance of the evidence that a defendant knew that others were about to violate his constitutional rights, that the defendant had an opportunity to prevent the harm, but that the defendant failed to take reasonable steps to do so. Seventh Circuit Pattern Jury Instruction 7.22, (Aug. 2017 rev.).

Count V:    Under 42 U.S.C. §1983, the plaintiff alleges that the individual defendants conspired to violate his constitutional rights by framing

---

[5] The parties have submitted proposed jury instructions; they do not agree on the instructions the court should give. By citing instructions in this order, the court does not mean to imply that it has ruled on the disputes over the jury instructions. It references the instructions only to illustrate its point that most of the plaintiff's claims require him to prove that the defendants acted knowingly or intentionally.

9

him for the murder and depriving him of exculpatory materials that would have led to his timely exoneration on false charges. Again, the plaintiff must prove by a preponderance of the evidence both the conspiracy—the agreement—and the intent to deprive the plaintiff of his constitutional rights.

Count VII:    The plaintiff alleges that the defendants made intentional misrepresentations to the police and/or the prosecution that the plaintiff's dentition matched the bite marks on the victim's body. Under Wisconsin law, to prove intentional misrepresentation, the plaintiff must show by a preponderance of the evidence that the defendant either knew the representation was not true or recklessly did not care whether it was true, and must show that the defendant made the representation with the intent to deceive. Wis. JI-CIVIL 2400.

Count VIII:   The plaintiff alleges that the defendants made negligent misrepresentations to the police or prosecution.

Count IX:    The plaintiff alleges that the defendants negligently inflicted severe emotional distress on the plaintiff by manipulating the bite mark evidence.

Count X:    The plaintiff alleges that "by wrongfully inculpating Plaintiff in a crime he did not commit," the defendants intentionally caused him emotional distress. Under Wisconsin law, this claim requires the plaintiff to show that the defendants "acted for the purpose of causing emotional distress to the other person." Wis. JI-CIVIL 2725.

Count XI:   The plaintiff alleges that the defendants maliciously prosecuted him, by making false accusations, withholding evidence and fabricating evidence. Under Wisconsin law, the plaintiff must show that the defendants acted with malice—that they had "a hostile or vindictive motive, or act[ed] primarily for a purpose other than bringing a guilty person to justice." Wis. JI-CIVIL 2600.

C.    Daubert Issues

The admissibility of expert testimony is governed by Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993). Rule 702 says that a witness "may" testify as an expert if the witness is "an expert by knowledge, skill, experience, training, or education;" the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue;" the expert's testimony is "based on sufficient facts or data" and is "the product of reliable principles or methods;" and the expert "has reliably applied the principles and methods to the facts of the case."

The Supreme Court has held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The Daubert Court held that under Rule 702, a court must engage in a three-step inquiry before allowing a witness to testify as an expert. Id. at 592. The court must "determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact at issue." Id. at 592. Next, the court must determine whether

11

"the reasoning or methodology underlying the testimony is scientifically valid."
Id. at 592-93. Third, the court must determine "whether that reasoning or
methodology properly can be applied to the facts at issue." Id. at 593. "Daubert
interpreted an earlier version of Rule 702, but it remains the gold standard for
evaluating the reliability of expert testimony and is essentially codified in the
current version of Rule 702." Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796,
806 (7th Cir. 2013) (citing Lees v. Carthage College, 714 F.3d 516, 521 (7th Cir.
2013)).

The plaintiff filed two Daubert motions—one asking the court to prohibit
the defendants from questioning three of the plaintiff's experts about five
topics, dkt. no. 189, and a second asking the court to prohibit defense expert
Levine from testifying on nine topics, dkt. no. 191. The defendants also filed
two Daubert motions—one asking the court to prohibit the plaintiff's "primary"
expert, Dr. Bowers, from presenting testimony on nine topics, dkt. no. 194, and
one asking the court to (a) prohibit the plaintiff's other experts from testifying
on three topics, (b) exclude one of the plaintiff's proposed experts altogether,
and (c) prohibit the plaintiff's police procedures expert from testifying as to one
topic, dkt. no. 196.

Only a few of the parties' twenty-eight sub-motions ask the court to
exclude a witness, or a portion of a witness's testimony, on the ground that the
witness is not qualified to present expert testimony; the court ruled on most of
those motions at the final pretrial conference. Many of the sub-motions relate
to the requirement under Rule 702 and Daubert that an expert's testimony be

12

"relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597. To be "relevant" for purposes of Rule 702, the testimony must assist the trier of fact to understand the evidence or to determine a fact at issue. Relevant evidence is evidence "that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." <u>Id.</u> at 587.

## II. Analysis

A. <u>Plaintiff's Motion to Partially Exclude Testimony of Dr. Golden, Dr. Senn, and Dr. Brumit: #3 This Court Should Bar Testimony About How the Science of Forensic Odontology Has Changed (Dkt. No. 190 at 8)</u>

In 1984 and 1985, defendants Johnson and Rawson formulated their opinions on whether the plaintiff's dentition matched the bite marks on the victim's body, and they testified to those opinions at the plaintiff's 1985 criminal trial. The plaintiff and the defendants want to present expert witness testimony from forensic odontologists who reviewed the 1984/85 evidence between 2008 and 2018—a quarter century or more later. The chronology of events explains why this would be—it was not until the first decade of the twenty-first century that the information that exonerated the plaintiff came to light. But the necessary fact that experts in the twenty-first century, who have the advantage of hindsight and more advanced assumptions, methods, and technology, have been asked to opine on the work done by Johnson and Rawson in 1984/85 has created an issue that permeates several of the <u>Daubert</u> motions.

13

Dr. Golden and Dr. Senn were members of the four-person panel organized by the Wisconsin Innocence Project to conduct a re-analysis of the bite mark evidence after DNA analysis excluded the plaintiff as the person who killed Ione Cychosz. Dkt. No. 205-15. The Innocence Project contacted Dr. Golden in February 2007—twenty-two years after the plaintiff was convicted—and asked him to chair a panel of forensic odontologists who would investigate the bite-mark evidence in the case. Id. at 5. The panel conducted its review and analysis, and issued its report on February 13, 2008. Dkt. No. 205-15. The report discusses "technological advances since 1985" that had "reduced the risk of erroneous identification by ensuring greater precision and accuracy." Id. at 4.

The district attorney's office contacted Dr. Brumit on June 20, 2010—twenty-four-and-a-half years after the plaintiff's conviction—to review the bite mark evidence. Dkt. No. 198-26. On June 27, 2011, she issued an opinion that excluded two of the three individuals whose dentition she'd been given and indicated that she could not exclude a third. Id. A few months later, on September 30, 2011, the district attorney's office asked Brumit to compare the plaintiff's dentition to the bite marks on the victim's body. Dkt. No. 198-27. On March 17, 2012, she issued an opinion concluding that the plaintiff could be excluded as the person who caused the bite marks on the victim. Id.

14

The plaintiff wants to call Golden, Senn, and Brumit as expert witnesses.[6] He indicates, however, that at the depositions of these witnesses, the defendants asked them questions about how the science of forensic odontology had changed in the years between the plaintiff's conviction and the dates when they had conducted their reviews and analyses. Dkt. No. 190 at 8. The plaintiff concedes that the field has changed but argues that the court should not allow the defendants to question these witnesses on this topic. Id. He argues that Johnson and Rawson have taken the position that their 1984/85 conclusions—that the bite marks on the victim's body were made by the plaintiff—were correct, and that subsequent advances in the field of forensic odontology have not altered those conclusions. Id. The plaintiff alleges that Johnson and Rawson *fabricated* their findings in 1984/85, not that they made errors as a result of primitive technology or inadequate understanding of the relevant science. Id. at 9.

The defendants respond that they need to educate the jury on the changes in the field to rebut the anticipated testimony of the plaintiff's primary odontological expert, Dr. Bowers. Dkt. No. 203 at 6-7. They argue that Bowers' expert witness report conflates (perhaps deliberately) the practices and assumptions governing bite mark analysis in the mid-1980s with the practices and assumptions applicable in the twenty-first century.[7] Id. at 7. They assert

_____

[6] Because Golden is deceased, his "testimony" will consist of excerpts from his May 2018 deposition.
[7] The court shares the defendants' concerns in this regard and will address those concerns later in the order.

Case 2:09-cv-01033-PP   Filed 02/21/19   Page 15 of 95   Document 287

that the plaintiff is going to ask the jury to decide whether Johnson and

Rawson got it wrong deliberately in order to frame the plaintiff, and argue that

"[e]vidence related to the massive changes in the science and the technology

related thereto that have occurred in the decades since 1985 goes directly to

that question." Id. They conclude by stating,

> The undeniably significant changes in the science of forensic
> odontology as well as the technology available in the practice of
> forensic odontology in the decades intervening since 1985 is not only
> relevant to [the plaintiff's] allegations in this lawsuit, they are <u>critical</u>
> considerations in addressing them. The limitations in the
> understanding of the science in 1985, and the technology that was
> available in 1985 versus that which is available today, make it less
> likely that Dr. Johnson and Dr. Rawson "got it wrong" <u>deliberately</u>
> in 1985.

Id. at 9 (emphasis in original).

The plaintiff replies that he will not ask the jury to judge Johnson and

Rawson's conclusions using modern standards, and regardless, that Johnson

and Rawson are not claiming that they would have come to a different

conclusion using modern standards. Dkt. No. 208 at 7. The plaintiff

acknowledges, however, that it is impractical to expect Golden, Senn and

Brumit to testify that they excluded the plaintiff as the biter twenty-five to

thirty year after the fact without acknowledging that they did so using more

advanced science than existed in 1984/85. To that end, he proposes that the

court allow each expert to testify to his or her conclusions and the

technology/procedures used to reach those conclusions, and that the court

allow cross-examination of each expert regarding whether that technology or

those procedures were available in 1984/85. Id. at 10. He argues that the court

should preclude the defendants from arguing that because the field of forensic odontology was arguably nascent in 1984/85, and because the technology available then was less advanced than the technology available to Golden, Senn and Brumit, it is unlikely, or impossible, that the defendants fabricated or manipulated evidence to frame the plaintiff.

The gist of the plaintiff's claims appears to be that Gauger was either frustrated with the plaintiff for refusing to cooperate in the Ricky Johnson investigation or driven by a firm belief that the plaintiff was involved in Johnson's murder. When, in the course of canvassing the neighborhood during the Cychosz investigation, looking for a suspect with a missing tooth and a twisted tooth, Gauger came across the plaintiff, he saw an opportunity to right what he saw as a wrong. The plaintiff appears to contend that Gauger co-opted Johnson into manipulating the evidence, as well as the casts and photos of the plaintiff's dentition, to make it look as if the plaintiff's dentition matched the marks on Cychosz's body, when Johnson knew that there was not a match. The plaintiff also appears to contend that either Johnson, Gauger or Jackelen, or all three, brought Rawson into the conspiracy.

If this is the plaintiff's theory, it is hard to see how subsequent advances in the field of forensic odontology tend to make it more or less probable that the defendants fabricated or manipulated evidence to make the plaintiff look guilty when they knew he was not. Whether the field of forensic odontology in 1984/85 was primitive or unsophisticated relative to the field in 2008 or 2010 is not the question; the question is whether, regardless of the sophistication of

the science, the defendants manipulated the science to achieve a desired outcome—an outcome that an honest and procedurally proper analysis of the evidence using the science existing at that time would not have supported.

If the defendants were arguing that they reached an erroneous conclusion due to good faith reliance on primitive science, the court would grant the plaintiff's motion without qualification. But that is not what the defendants are arguing. The defendants assert that they got it right when they concluded that the bite marks on the victim's body were made by the plaintiff.

The plaintiff plans to have Golden, Senn, and/or Brumit testify to their conclusions that the bite marks on the victim's body were *not* made by the plaintiff's teeth. It ought to be unnecessary for the plaintiff to present evidence of his innocence. The plaintiff has been exonerated; the State is not alleging that the plaintiff is guilty of the murder of Ione Cychosz, and the man who confessed to the crime has been convicted and sentenced.

The plaintiff reiterates, however, that the defendants are not arguing they made a mistake in 1984/85. While the defendants stated multiple times at the final pretrial conference that they would stipulate to the fact that DNA analysis had demonstrated the plaintiff was not guilty, they continue to assert that they were correct in 1984/85 when they concluded that the plaintiff's dentition matched the bite marks on the body. At trial, they want to tell the jury that they were right—they want to demonstrate to the jury that the evidence they had in 1984/85 shows that the plaintiff's teeth made the bite marks on the victim's body.

The plaintiff responds that if the defendants are going to maintain that their 1984/85 conclusions were correct, the court must allow the plaintiff to show that the teeth that made those bite marks weren't his, citing the Seventh Circuit's decision in <u>Parish v. City of Elkhart, In.</u>, 702 F.3d 997 (7th Cir. 2012). In <u>Parish</u>, the innocent plaintiff brought a wrongful conviction suit. <u>Id.</u> at 998-99. The jury found in favor of the plaintiff, but awarded an "astoundingly low" amount of damages for the eight years the plaintiff had been wrongfully imprisoned. <u>Id.</u> at 999. At the Seventh Circuit, the plaintiff argued that the district court erred in refusing to allow him to present evidence of his innocence. The appellate court reviewed the evidence and found that while the defense had introduced significant testimony of the plaintiff's guilt, the trial court had excluded evidence of his innocence. <u>Id.</u> The Seventh Circuit concluded that the district court's rulings "improperly limited the introduction of evidence relating to [the plaintiff's] innocence, and that evidence was critical to the damages issue," and so it vacated the damages award and remanded for a new trial on damages. <u>Id.</u> at 1003.

The Sixth Circuit cited <u>Parish</u> in holding that a district court did not err in admitting evidence of innocence in a malicious prosecution case. <u>Ayers v. City of Cleveland</u>, 773 F.3d 161, 169-170 (6th Cir. 2014). In <u>Ayers</u>, the court found that the evidence to which the defense objected "tended to prove that [the plaintiff] did not kill [the victim], which bears on the [plaintiff's] malicious-prosecution claim . . . ." <u>Id.</u> at 169. The <u>Ayers</u> court also concluded that

19

"[e]vidence concerning [the plaintiff's] innocence is also relevant to the issue of damages." Id.

Under Parish, this court must allow the plaintiff to provide the jury with the evidence that proved his innocence, including bite mark analysis by Golden, Senn and/or Brumit.[8] But the testimony of these witnesses is relevant to that topic only—the plaintiff's right to show the jury that he is not guilty of the crime. It is *not* relevant to the question of whether the defendants, using the knowledge and technology available in 1984/85, manipulated or fabricated evidence. The jury should hear about "modern" assumptions, methods and technologies only to the extent that they should know whether any of Golden, Senn or Brumit's conclusions were the result of using methods or technologies that were not available in 1984/85.

The plaintiff's proposal appropriately resolves this motion. The parties may ask Golden, Senn and/or Brumit what conclusions they reached regarding whether the plaintiff's teeth made the bite marks on the victim's body. They may ask what assumptions, methods and technologies the witnesses used to reach those conclusions. And they may ask whether those assumptions, methods and technologies existed in 1984/85.

The court will *not* allow the plaintiff to argue that because experts using more modern assumptions, methods, and technologies reached a different

---

[8] The parties should not interpret this ruling to mean that the plaintiff may present the kind of full-throated defense he might present were he on trial for the murder today. The court will confer with the parties at a later pretrial conference about avoiding duplicative or cumulative evidence, and about how to keep the focus of the trial on the claims in the amended complaint.

result, Johnson and Rawson necessarily manipulated or fabricated evidence. The court will *not* allow the plaintiff to (in the defendants' words) argue for the jury to judge Johnson and Rawson's methods and conclusions using modern assumptions, methods, and technologies. Conversely, the court will *not* allow the defendants to make the strained argument that because forensic odontology was less sophisticated, or more "primitive," in 1984/85, it is less likely (or unlikely) that the defendants manipulated or fabricated evidence to make it look as if the plaintiff committed a crime they knew was not supported by the evidence.

B.    <u>Plaintiff's Motion to Partially Exclude Testimony of Dr. Golden, Dr. Senn, and Dr. Brumit: #4 This Court Should Preclude Any Opinion Testimony on Whether Cross-Examination or Hiring a Competing Expert is Best Practice for Challenging an Expert, or Can Cure Fabrication (Dkt. No. 190 at 10)</u>

At their depositions, the defendants asked Golden, Senn and Brumit questions about whether hiring an opposing forensic odontology expert, or conducting cross-examination of the prosecution's experts, would have been effective ways to reveal the flaws in the prosecution experts' opinions. Dkt. No. 190 at 10.

To the extent that this motion asks the court to bar the defendants from asking Golden, Senn and Brumit for a *legal* conclusion about effective techniques for rebutting expert witness testimony, the court granted the motion at the February 7, 2019 hearing. But there was another issue buried in the motion, one the court did not resolve at that hearing.

21

Before the plaintiff's criminal trial, his criminal defense attorney tried to find a bite mark expert to testify for the defense. Dkt. No. 129 at 21. The prosecution provided him with a list of fifty-four "diplomates"[9] of the American Board of Forensic Odontology from which he could try to find an expert. Id.; Dkt. No. 192-3 at 35-36. The plaintiff's lawyer retained Dr. George R. Morgan, but did not call Morgan to testify at the criminal trial and did not offer Morgan's report as evidence. Dkt. No. 129 at 21. Toward the end of the trial, counsel submitted Morgan's resume, report and a cover letter to the trial court, which sealed the documents "for appellate purposes." Id. The court unsealed the documents in 2008. Id. at 22.

The plaintiff argues that the defendants should not be able to "use" Golden, Senn or Brumit "to introduce the report of Dr. George Morgan—the forensic odontologist that Plaintiff's criminal defense attorney hired back in 1985." Dkt. No. 190 at 11. He asserts that Golden and Senn testified that Morgan's report didn't impact their conclusions or analyses, and that Brumit never read Morgan's report. Id. He also argues that Morgan's report is deficient—there isn't enough in it for it to qualify as an expert witness report. Id. at 11-12. Finally, the plaintiff argues that Golden, Senn and Brumit should

---

[9] It appears, from the American Board of Forensic Odontology's web site, that the organization currently defines a "diplomate" as someone who has met certain criteria on education, experience and forensic cases, and who has taken a certifying examination. https://abfo.org/membership/application-documents/A_Brief_History (last visited February 11, 2019). There is another, separate professional organization, the American Society of Forensic Odontology, which has educational requirements for membership in various sections of the organization. asfo.org/courses-and-meetings (last visited February 11, 2019).

be prohibited from opining on whether Morgan was "qualified" to be an expert, asserting that that decision belongs to the court. Id. at 12.

The defendants devoted one paragraph of their response to this argument. While noting that Morgan's report "likely will be the subject of a future pretrial motion, because Stinson knows that he must hide that report from the jury in order to salvage his 'conspiracy' claim," they argue that the admissibility of Morgan's report was not the subject of this motion. Dkt. No. 203 at 12. They state that they have not asked Golden, Senn, or Brumit for opinions about Morgan's specific conclusions. They assert that in their view, Morgan's conclusions are less important than the fact that Morgan—the plaintiff's own expert—agreed with the conclusions Johnson and Rawson reached in 1984/85, "destroying Stinson's conspiracy claim, and putting the lie to Dr. Bowers' contention that the only way Dr. Johnson and Dr. Rawson could have arrived at their respective opinions in 1985 was to 'fabricate' them." Id. at 12-13. The defendants conclude by asserting that they are "entitled to question Dr. Senn, Dr. Golden and Dr. Brumit at trial as to the extent to which Dr. Morgan's report factored (or did not factor) into their respective opinions." Id. at 13.

The plaintiff insists that Morgan's conclusions—including his conclusion that Johnson and Rawson "got it right," as the parties have phrased it—don't pass muster under Rule 702 and Daubert. Dkt. no. 208 at 13. He argues that the defendants are trying to use the Morgan report to improperly bolster their own conclusions.

23

The plaintiff's motion puts the cart before the horse. To determine whether the defendants can question Golden, Senn or Brumit about Morgan's report, the court first must determine whether the report—or its existence, regardless of content—is admissible at all. The plaintiff's motion in *limine* to "bar references to and introductions of hearsay in the Morgan report and the report's purported findings[,]" dkt. no. 213, raises the question in a more direct way. For their part, the defendants have filed a motion *in limine* asking the court to admit Morgan's report and "accompanying documents." Dkt. No. 226. While the court will issue a separate order ruling on the motions *in limine*, it will address the admissibility question here, so that its ruling on the issue as raised in the plaintiff's <u>Daubert</u> motion has context.

There are three documents relating to Dr. Morgan. First, there is a cover letter to the plaintiff's criminal defense attorney, signed by "George R. Morgan D.D.S., M.B.A." Dkt. No. 213-1 at 1. The letter is undated, but at the bottom, there is a file stamp from the Milwaukee County Circuit Court clerk, criminal division, dated December 12, 1985 (the date of the plaintiff's conviction). <u>Id.</u> Second, there is a curriculum vitae for George R. Morgan D.D.S., M.B.A. <u>Id.</u> at 3. Whoever created this document did not date it, but the clerk's office file stamp bears the same date. <u>Id.</u> Third, there is a document titled "REPORT OF EXAMINATION OF EVIDENCE WEDNESDAY 11-26-1985." <u>Id.</u> at 2. It bears the same clerk's office file-stamp date. <u>Id.</u> The report is a single page, and bears a signature at the bottom, next to the type-written name "George R. Morgan D.D.S., M.B.A." <u>Id.</u>

24

Morgan has passed away; the plaintiff indicates that Morgan died before this federal case began. Dkt. No. 213 at 2. In his summary judgment decision, Judge Clevert noted that the plaintiff had objected to the defendants' proposed statements of fact relating to the Morgan documents on the ground that the documents constituted hearsay and had not been authenticated. Dkt. No. 129 at 22, n.11. Judge Clevert stated, "Because the report and CV have not been properly authenticated by someone with personal knowledge the court will not refer to their contents." Id. He also noted that even had the documents been authenticated, they would not have altered his summary judgment decision. Id.

The plaintiff raises similar concerns in his motion *in limine*. He asserts that Morgan never described (in a deposition, for example, or a declaration) what kind of analysis he conducted or how he reached his conclusions (reliability of expert opinion), and never confirmed that the report or the signature appearing at the bottom of it are his (authenticity). Dkt. No. 213 at 2. The plaintiff also asserts that the report is "pure hearsay without exception." Id. He argues that even if the defendants could surmount these hurdles, it is impermissible for them to use Morgan's conclusions to bolster their conclusions and those of their expert. Id. at 2-3. They argue that for the defendants to use Morgan's report to demonstrate that they could not have manipulated the evidence or fabricated their opinions is improper bolstering. Id. at 3-4. Finally, they argue that admission of Morgan's report would be more prejudicial than probative. Id. at 4.

1. *Authenticity*

Under Fed. R. Evid. 901, the proponent of a piece of evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The proponent can do that in several ways, including presenting testimony of a witness with knowledge, presenting nonexpert testimony of handwriting or having an expert or the trier of fact compare the evidence with an authenticated specimen. Rule 901(b) (1-3). In the case of a document, the proponent also may authenticate the document by presenting evidence that it "is in a condition that creates no suspicion about its authenticity," that it "was in a place where, if authentic, it would likely be," and that it "is at least 20 years old when offered." Rule 901(b)(8); this is known as the "ancient documents" method of authentication.

Dr. Morgan cannot testify that these documents are his cover letter, resume and report. Possibly the plaintiff's criminal defense lawyer—Steve Kohn—could testify that he recognizes the documents as the ones Morgan prepared for him, or that he recognizes Morgan's signature.[10] Possibly the defendants could call a witness who knows Morgan's writing—a family member or a colleague—to identify his signature, or they could obtain a verified sample of Morgan's handwriting and ask the jury to do its own comparison of the

---

[10] The defendants provided the court with the portion of the 1985 trial transcript in which Attorney Kohn asked the judge to allow him to place the three Morgan documents into evidence for appellate purposes. Dkt. No. 227-1 at 7-8. The plaintiff has not alleged that the three documents before *this* court are not the three documents Attorney Kohn asked the 1985 Milwaukee County trial court to admit.

signatures. The defendants argue, though, that they likely could authenticate the documents under the "ancient documents" method prescribed in Rule 901(b)(8). Each of the three documents bears the file stamp of the criminal division of the Milwaukee County Clerk of Court, dated the day the transcript shows that the plaintiff filed Morgan's report, CV and cover letter and the judge put those documents under seal. Dkt. No. 226 at 9-10. There is a transcript of the hearing at which another judge unsealed the documents. Id. The plaintiff does not seriously contend that these three documents were not prepared by Dr. George Morgan at the request of Attorney Kohn, and the court will not exclude the documents on authenticity grounds.

2. *Hearsay*

The plaintiff next alleges that the documents are hearsay. All three documents contain statements that Morgan made outside of court. One would think that if the defendants are offering those statements for the truth of the matters they assert, the statements are hearsay. Fed. R. Evid. 801(c).

The defendants respond that Morgan's statements do not constitute hearsay, because they are offering the statements against the plaintiff, and the plaintiff authorized Morgan to make the statements, or Morgan was acting as the plaintiff's agent in making the statements. Dkt. No. 226 at 7-8; Fed. R. Evid. 801(d)(2)(C) and (D). There are cases holding that an opposing party may offer a party's expert report against that party as an admission under Rule 801(d)(2). See, *e.g.*, Samaritan Health Ctr. v. Simplicity Health Care Plan, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006) (allowing one party to offer its

27

opponent's expert report against that opponent, and concluding that in that circumstance, the expert report was not hearsay). But it is not clear that the plaintiff "authorized" Morgan to make statements on his behalf at his criminal trial, or that he "authorized" Morgan to make statements on his behalf in *this* trial.

The plaintiff did not present Morgan's documents to the jury during his 1985 criminal trial. On the last day of trial—December 12, 1985—before memorializing the jury instruction conference, the trial judge put several issues on the record. She stated, "[t]he final thing is that the defense attempted earlier, and I indicated that they should wait, to introduce the credentials of the defense expert who was not called at trial." Dkt. No. 227-1 at 7. During this discussion, the judge stated that she "now" would accept the resume and order it to be placed into the file jacket "for any appellate purposes." Id. Attorney Kohn responded that he had not only Morgan's resume, but his report and a cover letter "which also speaks to his findings in some degree." Id.

The court does not think it has the transcript from the moment at the trial when Attorney Kohn asked the court to introduce Morgan's credentials.[11] Other than the statements from Kohn and the judge that Kohn wanted the credentials admitted "for appellate purposes," the court does not know why Kohn wanted the Morgan documents in the case file. The fact that he did not call Morgan as a witness, or seek to present Morgan's report to the jury,

---

[11]That transcript may be present somewhere in the thousands of pages of exhibits contained in over 200 attachments and 283 docket entries. The court has not yet unearthed it.

implies that the plaintiff did not want Morgan to speak for him at trial; the contents of Morgan's report (which the court will discuss below) support that conclusion. While Kohn told the judge that his review of Morgan's resume and his observations of Morgan led him to believe that Morgan was "an expert in excellent standing," id., that belief was not enough for Kohn to call Morgan as a witness or present Morgan's report to the jury.

More to the point, the plaintiff hired Morgan in his *criminal* case. While he arguably authorized Morgan to speak on his behalf (at least to the extent of writing a report) in the *criminal* case, he has not proffered Morgan's report in *this* case. The court cannot conclude that the plaintiff has authorized Morgan to speak for him in this case, or that Morgan is acting as his agent in this case. See Acantha LLC v. DePuy Orthopaedics, Inc., Case No. 15-cv-1257, 2018 WL 2431852, at *4-5 (E.D. Wis. May 30, 2018) (citing Kirk v. Raymark Indus., Inc., 61 F.3d 147, 164 (3d Cir. 1995); SanDisk Corp. v. Kingston Tech. Co., Inc., 863 F. Supp. 2d 815-818-19 (W.D. Wis. 2012)).

The defendants also argue that Morgan's statements are not hearsay because the defendants are not offering them for the truth of the matter asserted. Dkt. No. 226 at 6. They explain that they are not offering Morgan's report to show that the plaintiff's dentition matched the bite marks on the victim's body; instead, they are offering it for "an entirely different purpose"—

> to establish that [the plaintiff's] own expert, who was not connected in any way to the alleged defendant "conspirators," independently reviewed the same evidence upon which Dr. Johnson and Dr. Rawson relied (and he was the only expert other than Dr. Johnson and Dr. Rawson to do so in 1985, contemporaneously with the criminal trial), and reached the same conclusions as did Dr.

Johnson and Dr. Rawson. The particulars of Dr. Morgan's opinion are not important, as the present trial is not about [the plaintiff's] guilt or innocence. The importance of Dr. Morgan's report lies instead in the simple fact that a qualified expert, unconnected in any way with the alleged defendant "conspirators," arrived at the same scientific conclusions that Dr. Johnson and Dr. Rawson did as a result of his independent assessment of the bite mark evidence contemporaneous with the work done by Dr. Johnson and Dr. Rawson.

Dkt. No. 226 at 6.

The last line of Morgan's report stated, "[i]t is therefore my professional opinion to a high degree of Medical (Dental) certainty that the bite marks inflicted upon the victim were, in fact, done by Mr. Stinson." Dkt. No. 213-1 at 2. The defendants claim that they are offering Morgan's report to show, not that the plaintiff made the bite marks, but that the plaintiff's own expert concluded, independently of Johnson and Rawson, that the plaintiff made the bite marks. It is a subtle distinction.

The court need not decide whether that subtle distinction is enough to rescue Morgan's documents from classification as hearsay, or whether the documents are admissible under the "statements in ancient documents" exception of Fed. R. Evid. 803(16), or whether the documents fall under the "Hail Mary" exception to the hearsay rule (the residual exception in Fed. R. Evid. 807). Even if the Morgan documents are not hearsay, or fall under a hearsay exception, the the defendants' argument as to their *relevance* is flawed.

3. *Relevance*

The defendants assert that Morgan's report is relevant to the plaintiff's allegation that Johnson and Rawson conspired to manipulate the evidence to

30

make it appear to support a conclusion that the plaintiff's teeth inflicted the bite marks on the victim, and/or conspired to fabricate evidence that would support that conclusion (which the plaintiff alleges Johnson and Rawson knew, or had reason to know, was false). Their theory is that the existence of an independent forensic odontological expert who (a) wasn't a defendant, so was unlikely to be a member of the alleged conspiracy, (b) independently reviewed and analyzed the evidence, (c) used the methods, techniques and assumptions available in 1985, and (d) came to the same conclusion reached by Johnson and Rawson, refutes the plaintiff's "dubious contention that the 1985 opinions of Dr. Johnson and Dr. Rawson were so wrong, that the only way to explain them was to attribute them to 'deliberate fabrication.'" Dkt. No. 226 at 5 (emphasis in original). They argue that Morgan's "independent" conclusion

> makes it more probable that Dr. Johnson and Dr. Rawson's 1985 opinions were arrived at honestly and in accord with the technology available and the state of the science at the time, because Dr. Morgan is the only non-defendant forensic odontologist in this case who analyzed the bite mark evidence contemporaneously with Dr. Johnson and Dr. Rawson, and he agreed with their opinions completely.

Id.

The defendants might have a point, if their characterization of what Morgan did was supported by Morgan's letter and his report, but it is not.[12]

---

[12] The third Morgan document is Morgan's CV. Dkt. No. 213-1 at 3. During the final pretrial hearing, the court told the defendants that it was not going to admit the Morgan report because it could not find that his *report* passed muster under Daubert. The court made no ruling on whether Morgan's CV showed that he was qualified to testify as an expert in the field of forensic odontology. The hearing included discussion on the state of the law as to the admissibility of expert testimony in Wisconsin courts in 1985; counsel for

Unlike the reports of the Wisconsin Innocence Project panel, Dr. Brumit, Dr. Levine and Dr. Bowers, Morgan's documents consist of a scant two pages. The first page is his cover letter to Attorney Kohn. The first paragraph of that letter says that Morgan is enclosing his report "of my examination of the evidence concerning the bite marks in the Stinson case." Dkt. No. 213-1 at 1. The second paragraph says, "[a]s I told you last Wednesday, the workup done on the evidence by Dr. Rossen [sic] and his associates was very well done; and more than that, was not controvertible." Id. The last paragraph consists of pleasantries and expressions of gratitude.

The report itself indicates that Morgan examined the evidence on November 26, 1985. Dkt. No. 213-1 at 2. Morgan recounted that he arrived at Attorney Kohn's office at 9:00 a.m., discussed the facts of the case with Kohn and his colleague, and then "we"—presumably Morgan and Kohn, and perhaps Kohn's colleague—went to the Wisconsin Crime Lab. Id. David Cadle, the crime lab's photographer and the one who'd taken photos of the bite marks, met Morgan at the lab. They went to a private viewing room, where Morgan was "presented with the evidence workup prepared by the expert witnesses for the State." Id. Morgan said that present in the viewing room were models made from impressions of the plaintiff's mouth, and that of his fraternal twin brother,

_____

Gauger reminded the court that in 1985, Daubert had not been decided, and that unlike federal courts, the Wisconsin courts had not adopted the standard articulated by the District of Columbia Circuit in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Whether the Milwaukee County judge would have allowed Morgan to testify in 1985 is not an issue in this case. The issue before this court is whether Morgan's documents are relevant to the issues in this case. They are not.

32

as well as "wax bites, photographs, and Transview overlays mounted in position for comparison." Id. Morgan noted that "[a]lthough there were a larger number of bites than the number of transparencies, the overlays taped into position provided the opportunity to judge the correlation between the bite marks on the skin as represented by the photographs (2x) and the Transviews of the suspects' mouths." Id. Morgan described the plaintiff's broken upper central incisor tooth, and opined that the characteristics of the plaintiff's mouth "and the correlation between them and the marks on the skin of the victim as represented by the photographs is close enough that the opinion must be drawn that the bite marks on the body of the victim were made by the suspect, Mr. Stinson." Id. He then stated his final opinion, "[i]t is therefore my professional opinion to a high degree of Medical (Dental) certainty that the bite marks inflicted upon the victim were, in fact, done by Mr. Stinson." Id.

The court agrees with the defendants that Morgan was "independent" of Johnson and Rawson in two ways: the plaintiff—rather than the state—hired him, and he was not (to the court's knowledge) affiliated with Johnson, Rawson, or the Milwaukee Police Department. But the court cannot conclude that Morgan's *review* was "independent" of Johnson or Rawson, or that he conducted an independent "analysis" of the evidence. Morgan says that he was presented with the workup prepared by the expert witnesses for the State. He does not say who those experts were, although he references "Dr. Rossen" in his cover letter; the court assumes he meant Dr. Rawson. Morgan's chosen language implies that Morgan saw the evidence as it had been processed and

33

"worked up" by Johnson and/or Rawson. Morgan stated that the overlays were "mounted into position for comparison." Morgan does not say that *he* mounted the overlays into position over the photographs; his choice of language indicates that the overlays had been mounted by someone else. Perhaps that "someone else" was Johnson or Rawson; perhaps it was someone else. Morgan stated that the overlays were "taped into position." He does not say that *he* taped them into position; someone else—Johnson? Rawson?—had done that before he arrived. The limited, single-page report Morgan prepared indicates that Morgan looked at evidence collected by other people, staged by other people, positioned by other people, and that he affirmed the conclusions those other people had reached.

Kohn told the trial judge that he had seen Morgan "go over the state's evidence for a number of hours," dkt. no. 227-1 at 8—circumstantial evidence that Morgan did not announce his conclusion after a brief glance at the contents of the viewing room. He did *something* in that lab, and that "something" took more than a few minutes. But his report does not indicate what that "something" was. The court cannot tell whether Morgan looked at the preserved tissue from the victim's body, or just the photos of the tissue. Morgan did not mention the quality of the photos or say how many photos he viewed. He did not say whether he made his own efforts to line up overlays or casts with photos or the preserved skin tissue. Morgan does not say whether he tried to make comparisons of any dentition other than those of the plaintiff and the plaintiff's twin brother; in other words, he does not say whether he

34

conducted a "blind" comparison. It appears that Morgan knew when he walked in the door that other experts had identified the plaintiff as the biter.

Morgan's own words belie the defendants' argument that Morgan conducted a review and analysis uninfluenced by anything Johnson or Rawson had done. Morgan's report reveals that his analysis relied on the evidence present in the crime lab and how that evidence had been previously set up. He is not here to say otherwise. For the court to allow the defendants to present Morgan's report to a jury as if it stood on equal footing with an analysis he might have conducted had he been retained as the crime scene analyst, or had he been asked to conduct a blind analysis without having the evidence set up beforehand, would be misleading and improper.

The only way that Morgan's cover letter and report would tend to make the possibility of Johnson and Rawson's conspiracy to manipulate or fabricate less likely would be if Morgan's opinions and conclusions were not influenced by Johnson and/or Rawson's methodologies and conclusions. The defendants cannot demonstrate the absence of such influence. The court will grant the plaintiff's motion *in limine* to exclude Morgan's cover letter, CV, and report, and will not allow the defendants to elicit from any witness the fact that Morgan came to the same conclusions as Johnson and Rawson (in other words, it will grant the portion of the plaintiff's <u>Daubert</u> motion that relates to prohibiting the defendants from trying to elicit from Golden, Senn, or Brumit information about Morgan's report). The court will deny the defendants' motion *in limine* to admit Morgan's cover letter, CV and report.

35

C.  Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #3 Dr. Levine Should Be Barred From Testifying About the Quality of Images (Dkt. No. 192 at 8); Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #5 Dr. Bowers Should Be Precluded From Offering Opinions In the Field of Forensic Imaging (Dkt. No. 195 at 20)

1.  *Background*

Each of the parties filed a motion relating to the photos of the bite marks and the plaintiff's dentition that Johnson and Rawson used to conduct their analyses. This exemplifies an issue plaguing this litigation—a party asks the court to prohibit the other side from doing something that the moving party wants to be allowed to do. Neither side appears to put much stock in the bromide, "What's sauce for the goose is sauce for the gander."

a.  ABFO Guidelines

On February 21, 1984, the American Board of Forensic Odontology adopted "Guidelines for bite mark analysis." Dkt. No. 198-9 at 3. The guidelines relate to the collection of bite mark evidence. There are two sections that govern photography. Section II(A) governs photography when collecting evidence from the victim. Id. at 3-4. This guideline states:

A variety of types of photographic equipment and films may be used as described below. While it is recognized that the odontologist is often required to work with evidence provided by other sources that is less than ideal, whenever possible he should obtain or produce photographs which meet the following guidelines:

1.  Orientation and close-up photographs should be taken.
2.  Photographic resolution should be of high quality.
3.  If color film is used, accuracy of color balance should be assured.
4.  Photographs of the mark should be taken with and without a scale in place.

36

5.   When the scale is used, it should be on the same plane and adjacent to the bite mark. It presently appears desirable to include a circular reference in addition to a linear scale.

6.   The most critical photographs should be taken in a manner that will eliminate distortion.

7.   In the case of a living victim, it may be beneficial to obtain serial photographs of the bite mark.

Id.

Section III(B) governs photography when collecting evidence from a

suspect. It states:

Whenever possible, good quality extraoral photographs should be taken, both full face and profile. Intraoral photographs preferably would include frontal view, two lateral views, occlusal view of each arch, and any additional photographs that may provide useful information. It is also useful to photograph the maximum intercisal opening with scale in place. If inanimate materials, such as foodstuffs, are used for test bites, the results should be preserved photographically.

Id. at 4.

b.   The Photographs of the Bite Marks on the Victim's Body

David Cadle was a forensic scientist and "Imaging Unit Leader" for the

Wisconsin state crime lab's Milwaukee office in November 1984. Dkt. No. 99 at

¶2. On November 3, 1984, an investigator with the Milwaukee County medical

examiner's office asked for the assistance of a forensic photographer to

document an autopsy. Id. at ¶6. Cadle responded to the request, and he

photographed Ione Cychosz's body with the help of a member of the medical

examiner's office. Id. at ¶7. He used a Hasselblad 120mm roll film camera and

a Polaroid CU-5 close-up camera. Id. at ¶9; Dkt. No. 192-4 at ECF 69, Tr. 67.

He took "overall views and close up photographs without and with scales (ruler)

37

. . . ." Id. at ¶10. Specifically, Cadle's practice when using the *roll film* camera was to take a photo without a scale, then repeat the photo with a scale. Id. at ¶11. When he used the Polaroid CU-5, however, "a scale was not included in the photographs;" he stated that this was because the "images made with the CU-5 camera were life size on the negative." Id. at ¶15. Johnson was present at the medical examiner's office when Cadle took the photos. Dkt. No. 192-4 at ECF 65, Tr. 63. Cadle said that Johnson told Cadle what needed to be photographed. Id. at ECF 66, TR. 64.

> c. The Dispute About Who Took the Photos of the
> Plaintiff's Dentition on December 3, 1984

The parties briefed their motions for summary judgment in 2012. Cadle prepared an affidavit in connection with that litigation. Dkt. No. 99. Cadle's affidavit was dated May 6, 2011. Id. at 6. Cadle attested that on December 3, 1984, he "assisted Dr. Johnson in photographing the dentition of Robert Lee Stinson." Id. at ¶16. In attesting that a Polaroid CU-5 close-up camera with a 1:1 dental kit had taken the photos of the plaintiff's teeth that day, Cadle stated, "[a]ttached hereto as *Exhibit F* are examples of photographs that I took of the dentition of Robert Lee Stinson on December 3, 1984 . . . ." Id. at ¶18. In explaining the "dental kit," Cadle stated, "[a]ttached hereto as *Exhibit G* is a manual detailing the Polaroid 1:1 Dental Kit that I used in conjunction with the CU-5 camera to take the photographs of Robert Lee Stinson's dentition on December 3, 1984." Id. at ¶19. Cadle stated, "I took all of the photographs, and I produced all of the negatives, enlargements and overlays used by Dr. Johnson." Id. at ¶24.

A little over six months later, the plaintiff deposed defendant Johnson. Dkt. No. 192-7. Well into the deposition, the plaintiff's lawyer asked, "And you were able to analyze all of Mr. Stinson's teeth on December 3, 1984 when you were—participated in the John Doe collection of Mr. Stinson's dentition, correct?" Id. at ECF 85, Tr. 83. Johnson responded, "We recorded it, yes." Id. Counsel then asked, "Okay. And you took photos?" Johnson responded, "Yes." Id. Later in the deposition, counsel asked Johnson what evidence he collected from the plaintiff at, or after, the John Doe proceeding. Id. at ECF 174, Tr. 173. Johnson replied that "[w]e did a clinical examination of his mouth, his teeth, photographs of his face, frontal of his teeth, intraoral pictures of the biting edges of his teeth . . . ." Id. Johnson said there may also have been "some overall pictures taken of him head and shoulders and then profile." Id.

Johnson prepared an affidavit in support of his summary judgment motion, dated October 1, 2012—over a year and a half after Cadle's. Dkt. No. 98 at 17. Johnson attested that "David Cadle . . . documented Mr. Stinson's dentition photographically" on December 3, 1984, id. at ¶¶50, 54, and that from that point on, "Mr. Cadle was responsible for the development of all scaled transparencies and photographic exhibits pertaining to Robert Lee Stinson's dentition." Id. at ¶55. He attested that "[a]ll photography was accomplished by David Cadle, the assigned crime laboratory analyst/photographer." Id. at ¶59. Johnson stated that even though it was common in 1984/85 for forensic odontologists to do their own photography, "[i]n this case, I took an added precaution and requested that an independent forensic photography specialist,

39

in the person of David Cadle, be involved in order to perform all photography and to create all photographic evidentiary materials, so as to assure the accuracy and quality of the photographic evidence." Id. at ¶63. He stated that he testified at trial as to the steps he took to preserve the plaintiff's dentition after the December 3, 1984 John Doe hearing, including "having forensic photographer David Cadle take life-size, scale photographs of Robert Lee Stinson's dentition with a specialized CU-5 Polaroid camera . . . ." Id. at ¶90.

In 2012—the date the parties submitted their summary judgment materials to Judge Clevert—the affidavits indicated that David Cadle had taken the intraoral photos of the plaintiff's dentition on December 3, 1984; Johnson's deposition testimony was unclear, because he used the plural "we" to identify who took the photographs that day.

Fast-forward to 2018—the Seventh Circuit had affirmed Judge Clevert's ruling on summary judgment, and this court allowed the parties to conduct the expert witness discovery they had not conducted prior to briefing summary judgment. On June 21, 2018—seven years after he signed his summary judgment affidavit—Cadle was deposed. Dkt. No. 192-4. In the deposition, Cadle testified that Johnson contacted Cadle and asked him to come to the courthouse on December 3, 1984. Id. at ECF 79-80, Tr. 77-78. Johnson told Cadle that Johnson was "executing a court order to photograph the teeth of someone." Id. at ECF 80, Tr. 78. The two discussed using the CU-5 camera to take the pictures, as well as an "intraoral kit." Id. at ECF 80, Tr. 78; ECF 85, Tr. 83. Also called a "dental kit," the intraoral kit has five parts, and "makes it

40

possible to take the common types of intraoral photographs." Dkt. No. 99 at ¶18. Cadle had practiced using the "intraoral kit" in the lab, but never had used it for a case before December 3, 1984. Dkt. No. 192-4 at ECF 85-86, Tr. 83-84. On December 3, Cadle also had the Hasselblad 120mm film camera with him. Id. at ECF 91, Tr. 89.

Cadle testified that he used the film camera to take identification photographs of the plaintiff. Id. at ECF 95-96, Tr. 93-94. He then testified that he loaded the CU-5 Polaroid with film and gave it to Johnson, who took photos of the inside of the plaintiff's mouth. Id. at ECF 96, Tr. 94; ECF 108, Tr. 106. The CU-5 was outfitted with mirrors—the dental kit—which Cadle testified that Johnson positioned in the plaintiff's mouth to photograph the plaintiff's teeth. Id. at ECF 97-98, Tr. 95-96. Cadle said that Johnson asked Cadle questions about operating the camera—"where the trigger was to fire the flash and when the film was loaded in the camera and ready to go." Id. at ECF 99-100, Tr. 97-98. The intraoral photos of the plaintiff's dentition that Johnson took with the CU-5 "did not have a scale." Id. at ECF 142, Tr. 140. (Cadle had stated in his 2011 affidavit that, "[a]s the images on the CU-5 negatives were 1:1, no enlargement was needed to make reference overlays." Dkt. No. 99 at ¶32.)

In contrast to Cadle's affidavit from 2011 and Johnson's affidavit from 2012, which indicated that Cadle took the intraoral photos on December 3, 1984, Cadle's testimony in 2018 indicated—depending on how one interprets his words—that either Johnson took the intraoral photos, or that Cadle *and*

Johnson took the intraoral photos, or that Cadle *helped* Johnson take the intraoral photos.

        d.     Bowers' Expert Witness Report

Bowers, the plaintiff's primary expert, did not date his expert witness report.[13] Dkt. No. 190-9. Bowers opined that the overlay analysis Johnson and Rawson conducted "lacked scientific accuracy," in part because of criticisms Bower had of the photography. His report states:

> 15.    Johnson's and Rawson's overlay technique is . . . flawed because of the photographic distortion in the bite mark injury photographs and the intraoral photographs taken of Stinson's teeth by David Cadle . . . on December 3, 2014. As trained forensic odontologists, it is my opinion that Johnson and Rawson should have insisted that scales were included in any photographs they used for their overlays.
>
> a.    The CU-5 is a fixed focus camera. The CU-5 camera lens has multiple lenses and attachments that require the photographer to place a framework onto the top (directly above) of an object to be photographed. This frame establishes the focal length (distance from the lens to the object) and establishes a set magnification. The camera lens set does 2:1, 1:1: 1/4:1: and 1/2:1.
>
> b.    Mr. Cadle wrongly assumes that the photographs he took with his CU-5 camera did not need to be scaled because the CU-5 camera automatically took 1:1 or 2:1 scaled photographs. He wrongly assumed that they can be accurately enlarged without a scale present. *See* Cadle Affidavit at ¶15. I have measured the photographs taken by Cadle of the bite mark injuries and Stinson's dentition, and a large number of these photographs are not scaled to the dimensions Cadle states. That is why it was imperative for Johnson and Rawson to only use photographs of the teeth and bite mark injuries that included a scale in the photograph. While the

---

[13] It appears that Bowers may have prepared the report in 2012, in response to the summary judgment motion in this case. <u>See</u> Dkt. No. 198-6 (Bowers deposition), ECF at 24, Tr. at 79.

improperly scaled photographs of the bite mark injuries was problematic, even more troubling is the distortion present in the inter-oral photographs taken of Stinson's teeth by Mr. Cadle and the CU-5.

With regard to the intraoral photographs Mr. Cadle took with the CU-5 Dental Kit, it was especially important to include a scale in the photograph because of the angular distortion created by his photographic technique in this case. A scale would have revealed the distortion in the photographs. These photographs were important because the overlay photographs of Stinson's upper and lower teeth are what Johnson and Rawson compared with the bite mark injuries to say there was a "match." First, the picture on [sic] Stinson's teeth is actually a photograph of a **reflection** in a large intra-oral exam mirror held inside Stinson's mouth. You cannot put the CU-5 lens frame into a human mouth. It is too big. That is why the mirror is placed inside the mouth with the patient opening wide. The mirror is placed all the way back into the mouth and the mirror to tooth distance varies from back teeth to front teeth.

The CU-5 will take a 1:1 photograph of the reflection in the mirror **only** if the mirror is parallel to the lens **and** the teeth. This parallelism is not possible in intraoral photography due to anatomical limitations. When the mirror is not parallel to the teeth, as in this case, then the photographs are not properly 1:1. This is precisely the distortion that resulted in the intraoral photographs of Stinson's teeth because it is impossible for the mirror to be parallel to the teeth when held inside a subject's mouth. The CU-5 was made to take 1:1 photos if the lens and the object of forensic interest are properly aligned. That is not what happened in this case. The alternative photographic methods described in Paragraph 12 would have eliminated angular distortion created by the [sic] Mr. Cadle. He does not know how far the mirror is from Stinson's teeth. The further away the mirror distance is the reflection of the teeth becomes smaller.

c.   The proper method of using a CU-5 is to take photograph [sic] of the biting surfaces of the teeth without distorting the image would have been possible in this case. Cadle should have taken a photograph of

Case 2:09-cv-01033-PP   Filed 02/21/19   Page 43 of 95   Document 287

the dental model of Stinson's teeth. This is described more fully in Paragraph 12 above.

d.    Mr. Cadle's use of these intraoral photos of teeth for all additional photographic representations of Mr. Stinson's dentition compounded the errors in his photography and Johnson's and Rawson's attendant analyses. Cadle's original assumption that the CU-5 would create automatic life size imagery of teeth was faulty. The distorted photographs that resulted adversely effected [sic] all the subsequent steps and conclusions by Johnson and Rawson.

e.    In particular, these improperly scaled prints were used for later enlargements set by the original scaled (incorrectly as stated in 15.c) negatives. The correct way is to enlarge properly scaled images.

16.    Johnson's and Rawson's "overlay" analysis was also improper because they used unscaled injury and overlay photographs in their analysis. Proper overlay technique at that time requires placement of a ruler or measurable reference to be placed in the camera's field of view next to any photographic evidence. Scaled photography was the accepted practice in the field of forensic odontology in 1984-85 because it allows the forensic odontologist to confirm that the comparison of the photograph of the bite mark injury [sic] a suspect's dental biting surfaces are the same proportions. The earliest forensic odontologists required use of scaled photographs. A certified forensic odontologist, such as Johnson or Rawson, would have know that the use of scaled photography was the only proper way to conduct overlay analysis. Use of unscaled photography by a forensic odontologist was unacceptable as a method of overlay analysis in 1984 and renders the comparison unreliable. *See* Exhibit B (American Society of Forensic Odontology Workbook by Dr. Robert Spiegel and Dr. Norman Sperber). In the forensic odontology manual authorized by the ASFO in 1980, it is clear that scales were to be included in the photographs of the bite injuries. *Id.* at page 19 ("Take multiple photographs of the body and bite mark with a centimeter or inch scale placed as near as possible to the bite mark.").

Dkt. No. 190-9 at 6-8.

44

e.    Bowers' Deposition

The defendants took Bowers' deposition on March 22, 2108. Dkt. No. 198-6. Bowers testified that in his experience as an expert, he had taken bite mark photographs "[t]wo or—two, three—two or three times." Id. at ECF 30, Tr. 101. He testified that it was more the "norm" for him to be provided with photographs taken by others. Id. at ECF 30, Tr. 102. In most of his expert cases, Bowers reviewed photos other people had taken. Id. at ECF 52, Tr. 189. Bowers testified that he had used the CU-5 camera two times in his career. Id. at ECF 64, Tr. 237. When asked if he'd received any training on the CU-5 camera, Bowers responded, "Oh, it has a little operator's manual." Id. When asked to identify all the training he'd received over the course of his career "with regard to imaging or photography," Bowers responded that he was "self-taught," having read "multiple" books and taken some community college classes. Id. He also had self-published a book. Id. at ECF 64, Tr. 238. After Bowers opined that the intraoral photography in the plaintiff's case was "a disaster," the following exchange occurred:

> Bowers:    I'm a dentist. I've taken photographs. I've had camera systems. I don't have a Ph.D. in photography.
>
> Defense Counsel:  Okay.
>
> Bowers:    I wouldn't be considered a photographic expert. I'm not a computer expert, computer software expert. I'm a computer software user. I know how to use the tools.
>
>         *  *  *  *  *
> Defense Counsel: Do you have any type of specific certifications or degrees, anything at all, in imaging or photography?
>
> Bowers:    No.

45

Id. at ECF 64-65, Tr. 239-40.

Later in the deposition, defense counsel asked whether Bowers intended "to render expert testimony in this case as an expert in the field of photography in general." Id. at ECF 67, Tr. 248. Bowers responded that he was "a user, photography user," and that he'd been "trained to use photography in certain areas." Id. Finally, Bowers testified that he used "digital" to conclude that "the actual size of Mr. Stinson's teeth did not comport with the teeth that were represented on Dr. Johnson's photographic acetate overlays. There was a difference in dimension." Id. at ECF 54-55, Tr. 199-200.

f.      Levine's Expert Witness Report

In his May 11, 2018 expert report, defense expert Levine stated the following:

> The ABFO guidelines suggest that high quality color & black and white photographs be taken. These were taken in the *Stinson* case by a very well trained forensic photographer, David Cadle, under the direction of Dr. Johnson. Frequently a reviewing forensic odontologist will take photos of the bite mark injury himself. It was appropriate and above the standard typically seen in 1984-1985 for Dr. Johnson to have obtained the participation of a skilled professional imaging specialist like Mr. Cadle to take the photographs back in 1984-1985. The photos were taken and developed with and without a grey scale ruler, again as suggested by the prevailing guidelines. I have personally examined the original photographs that are accessioned at the Milwaukee Police Evidence Facility, and it is my opinion that they are state of the art for forensic bite mark photography taken in 1984. This was a difficult case to photo-document, as the victim was an obese individual, so that the injuries on the breast were somewhat distorted and difficult to document using the grey scale ruler available in this case.

Dkt. No. 192-3 at 10-11.

46

Later in the report, Levine critiqued Bowers' report. He specifically addressed Bowers' conclusion that the overlay technique Johnson and Rawson used was flawed because of photographic distortion in the photos of the bite marks and the plaintiff's dentition. Id. at 18. Levine asserted that Bowers was offering opinions in the field of professional forensic imaging, and that Bowers was not an expert in that field. Id. Levine said, "Training in the field of forensic odontology does not automatically make a forensic odontologist an 'expert' in the field of forensic imaging," and he opined that Bowers was "self-taught" in the field of forensic photography and had been rejected as an expert in that field by at least one court. Id. Levine went on to say,

> I personally examined the photographs of the bite marks taken by forensic photographer, David Cadle. They are of excellent quality, color and black & white, taken with and without a grey scale ruler.

Id. at 19. As to the photos of the plaintiff's dentition, Levine said that he couldn't tell which ones were used for analysis and which for demonstration, but he stated that he thought Johnson and Rawson had "adequate information to arrive at an opinion." Id. Regarding Bowers' conclusion that the Johnson and Rawson overlay analyses were flawed because they used unscaled injury and overlay photos, Levine again opined that Bowers was not an expert in forensic imaging. Id. He concluded, "All information available in 1984 suggested color and black & white photographs be taken, with and without scales, so as to be able to visualize surrounding tissue content. This was done by Mr. Cadle in this case." Id.

### g. Levine's Deposition Testimony

The plaintiff deposed Levine on July 3, 2018. Dkt. No. 192-1 at ECF 3. At one point, plaintiff's counsel asked Levine whether one could photograph casts of teeth "truly perpendicular? You don't need a mirror to do that?" Id. at ECF 322, Tr. 320. Levine responded in the affirmative, id., but then added, "You know, I'm not a photo expert, so I don't want to get into that, you know, because I may give you misleading information." Id. at ECF 323, Tr. 322. He was deposed again on October 19, 2018. Dkt. No. 192-2. Levine testified that he was not an expert in the field of forensic imaging, and that he had "very little" training in the field of forensic imaging. Id. at ECF 33, Tr. 454; ECF 24, Tr. 456; ECF 47, Tr. 468.

### 2. *The Substance of the Motions*

### a. The Plaintiff's Motion

The *plaintiff* asks the court to bar *Levine* from testifying about the quality of the photographs. Dkt. No. 192 at 8. The plaintiff first argues that while Cadle took the photos of the bite marks on the victim's body, and was present on December 3, 1984, it was *Johnson* who took the photos of the plaintiff's dentition. Id. (Curiously, the plaintiff does not mention that his own expert, Dr. Bowers, also operated under the assumption that Cadle took the intraoral photos of the plaintiff's dentition. See Dkt. No. 198-6 at ECF 51, Tr. 187.) The plaintiff states this as if it were an established fact. Next, the plaintiff argues that because Levine is not an expert in photography, and admitted as much at his deposition, "he should be barred from opining about whether the

48

photographs were properly taken, whether there is distortion in the photographs, and whether the lack of a scalar reference and presence of any distortion renders them unreliable for analysis." Id. at 8-9. The plaintiff argues that Levine did not take measurements or make comparisons himself; he simply looked to see whether Johnson and Rawson used proper methodology. Id. at 9 n.2.

The defendants respond that that the ABFO guidelines include guidelines for how to collect photographic evidence, and that a forensic odontologist would need to know about the subject of forensic photography. Dkt. No. 202 at 9. They argue that Levine will provide limited testimony about whether the photographs complied with the guidelines in place in 1984. Id. at 9-10. They assert that Levine has been "practicing bite mark analysis for 50 years, and has seen thousands of photographs taken in connection with myriad bite mark cases." Id. at 10. They conclude by arguing that the plaintiff's objection goes to the weight of Levine's testimony, not its admissibility. Id. at 11.

In his reply, the plaintiff "recognized" that he had argued that Bowers' experience in the field of forensic odontology qualified him to "opine on the photographic evidence." Dkt. No. 209 at 6. The plaintiff then proposed that the court allow "both Dr. Levine and Dr. Bowers" to "opine on the photographic evidence to the extent that is consistent and supported by each of their respective experiences with photography and digital imagery (as well as based on the acts in the record)." Id. at 6-7. While this proposal sounds equitable, the plaintiff then spends the next page of his reply arguing that Bowers has more

49

experience with "forensic photographs and digital imaging based on his training and experience, including teaching and publishing on the topic . . . ." Id. at 7.

        b.    The Defendants' Motion

The *defendants* ask the court to bar *Bowers* from "offering opinions in the field of forensic dentistry." Dkt. No. 195 at 20. They argue that Bowers has used the CU-5 camera only twice, years ago; that he is self-taught in the field of forensic photography; that he holds no certifications or degrees in that field; and that he described himself as a "user" of photography equipment, not an expert. Id.[14]

The plaintiff responded that Bowers is "experienced and trained in digital forensic imaging" and that Bowers has published "many peer reviewed articles in the field of forensic odontology on the use of digital images and correcting photographic distortion." Dkt. No. 205 at 20. He spends the remainder of his response arguing that it was Johnson, not Cadle, who took the intraoral photos of the plaintiff's dentition, and reiterating his view of Bowers' qualifications in the field of forensic photography.

The defendants reply that the plaintiff refers to Bowers' purported expertise in *digital* imaging and overlays. Dkt. No. 206 at 9. They point out that

---

[14] The defendants also argued that this court should bar Bowers' testimony on this topic because a court in the Southern District of Texas sustained an objection to him testifying as an expert in the field of digital forensic imaging. Dkt. No. 195 at 21 (citing United States v. Bourgeois, Case No. 02-cr-216, 2011 WL 1930684 (S.D. Tex. 2011)). The court need not consider this argument, because it has concluded that Bowers is not qualified to testify regarding the operation and use of the CU-5 Polaroid camera.

digital imaging wouldn't have been available to Johnson and Rawson in 1984/85. Id. They disagree with the plaintiff's characterization that Johnson "took" the intraoral photos. Id. at 10, n.4. They argue that Bowers' treatise on how the CU-5 camera works is an attempt to testify as an expert on how that camera works. Id. at 10. They state—as a fact—that "[t]he intraoral photographs that were taken with the CU-5 camera were manufacturer-certified to be scaled 1:1 automatically, so no scales were required on the intraoral photographs," citing Cadle's deposition. Id. at 10 n.5. They also argue that the plaintiff has not identified which, if any, photographs of the bite marks were not scaled. Id. at 10.

3.    *Analysis*

Again—the plaintiff claims that the defendants manipulated the evidence, or fabricated evidence, to make it appear as though that evidence supported a conclusion that the plaintiff made the bite marks on Ione Cychosz's body when they knew that the evidence did not support that conclusion.

How is the "quality" of the bite mark photos taken by Cadle, and of the photos of the plaintiff's dentition taken by Johnson or Cadle or both, relevant to this claim? The word "quality" is imprecise, but the plaintiff asks the court to bar Levine from testifying about (1) whether the photographs were properly taken, (2) whether there is distortion in the photographs, and (3) whether "the lack of a scalar reference and presence of any distortion renders them unreliable for analysis." Dkt. No. 192 at 9.

51

As to whether the photographs were "properly taken": Levine admits that he is not a forensic photography expert, and at his 2018 deposition, he declined to opine about whether the intraoral photographs of the plaintiff's dentition were properly taken. The court agrees with the plaintiff that Levine cannot testify as to whether the photographs were properly taken.

The plaintiff asks the court to allow *Bowers* to testify about how the CU-5 camera works, how he believes it should be used, and how he believes it was misused in the plaintiff's case. The court agrees with the defendants that Bowers' testimony about these three topics is expert forensic photography testimony—specific expert testimony as to the CU-5 Polaroid close-up camera—and agrees that Bowers is not qualified to provide such testimony.

Bowers testified that he taught himself about forensic photography, through reading books and attending community college classes. As to the CU-5 camera, he appears to have learned about it from the "little operator's manual," and he testified that he had used the camera only two times in his career. Indeed, he has photographed bite marks only two or three times in his career—most of his work as an expert has been reviewing bite mark photographs taken by others. The court will not allow Bowers to testify about how the CU-5 camera works, how it should be used or how he believes it was misused in the plaintiff's case.

There is another reason the court will not allow Levine or Bowers to testify about whether the photos were taken properly, specifically regarding intraoral photographs of the plaintiff's dentition taken after the John Doe

52

hearing on December 3, 1984. Levine and Bowers both assumed that Cadle used the CU-5 Polaroid and the dental kit to take those photos. Cadle's 2018 deposition testimony raised a question about whether that assumption was correct. The identity of the person who took the photographs could be relevant to the question of whether Johnson manipulated or fabricated evidence. If Johnson played no part in taking the photographs, the possibility that he might have "manipulated" or "fabricated" the photos themselves is lower. If Johnson took the photos, or if he and Cadle each played a role in taking them, the possibility that Johnson might have "manipulated" or "fabricated" the creation of the photos is higher. For the court to allow either Levine or Bowers to testify about alleged errors that they believed Cadle may have made, when there now is a question about whether it was Cadle or Johnson who made those alleged errors, would be misleading and confusing.

As to whether there was distortion in the photographs: To the naked eye, photographs such as these can be "distorted" in one of two ways. First, the *photographic image* might appear distorted. Lay people look at photographic images and cannot tell what they represent, because the photos are blurred or over-exposed or under-exposed or contain only portions of their subjects. Second, the *subject* of the photo might be distorted—the orange peel might be flattened, the vehicle may be obscured by exhaust, the fabric may be stretched.

Whether the photographic image itself appears distorted to the naked eye might depend on whose eye is doing the viewing. An image of a bite mark in skin may look distorted and unrecognizable to a lay person, but not to a

53

forensic odontologist who has viewed hundreds or thousands of such photographs during his or her career. An image of someone's teeth might be confusing to a layperson—am I looking at the top or bottom teeth? Are these the molars or the incisors?—but not to a forensic odontologist. Levine and Bowers have viewed many photos of teeth and bite marks during their careers. The court finds that both are qualified to testify about whether the photographic images they viewed for this case appear, to their trained eyes (without the assistance of technology), distorted; both are subject to cross-examination on that topic.

Similarly, whether the subject of the photograph appears distorted also may depend on who is doing the viewing. Levine has opined that the fact that the victim was obese, and the fact that there was "adipose" (subcutaneous fat) tissue around the area of some of the bite marks, made analysis of those marks difficult. He has indicated that the victim's skin in the area of the bite marks was distorted by that adipose tissue. Bowers may disagree, although there is no way to know that from this record because Levine prepared his report, and testified at his deposition, after Bowers was deposed. But because both experts have viewed many images of bite marks in flesh during their careers, both are qualified to testify about whether distortions in the flesh that is the subject of a photo might result in an image that is difficult to analyze, and both are subject to cross-examination on that topic.

Finally, a person may discover distortion by using technology to reveal that the image is not an accurate representation of the subject. In contrast to

54

the two methods described above, discovering *this* sort of distortion depends on the technology available. While Levine did not conduct any tests of his own, Bowers used a laptop, flatbed scanner and Adobe Photoshop (following protocols in his own self-published 2002 book) to create digital outlines of the plaintiff's teeth, compared them with the images in the photos, and concluded that the photos of both the bite mark injuries and the plaintiff's dentition were distorted. The court will not allow Bowers to present this testimony. Bowers used technology, protocols, and techniques that were not available to Johnson and Rawson in 1984/85 to conclude that the images Johnson and Rawson used were distorted. The fact that twenty-first century protocols, techniques, and technology may have shown that the images in the photos did not represent the exact scale of the subjects of those photos is not relevant to whether Johnson and Rawson could have or should have been aware in 1984/85 that the scale of the images was off.

As to whether the "lack of scalar reference" renders the photographs unreliable for comparison: Bowers criticized Johnson and Rawson's conclusions because they used unscaled injury and overlay photographs to conduct their analysis. It is not clear whether he was referring to all the photographs, or only the dentition photographs used to create the overlays. Cadle testified that he used both the CU-5 Polaroid and his film camera to take photos of the bite mark injuries on the victim's body. When using the film camera, he would take one photo without a scale/ruler, then would take a second photo of the same subject with a scale/ruler. He testified that when

using the CU-5 camera, he did not use a scale; his testimony indicates that he believed that the CU-5 automatically scaled subject-to-image to a 1:1 scale. Because the CU-5 camera was used to take the intraoral photos of the plaintiff's dentition, those photos are unscaled.

The ABFO guidelines discussed best practices regarding using scales when photographing bite mark evidence. The court has not reviewed them, but Bowers testified that the ASFO's guidelines also contained guidelines on using scales to take photographs. Both experts are qualified to testify about what the guidelines in existence in 1984/85 said about using scales. Both are qualified to testify about what scales existed and were in use in 1984/85. Both are qualified to testify about why scaling is important. Both are qualified to testify about whether best practices for forensic odontologists in 1984/85 would have included using scales.

Again, however, the court will not allow Bowers to testify as to how a CU-5 camera works, or to his belief that it does not automatically scale photos, or that using a CU-5 camera without a scale will result in a distorted image. The court is not certain that those facts are relevant even if Bowers were an expert on the topic; the plaintiff would have to demonstrate that in November and December 1984, *Johnson* had reason to know that the CU-5 did not automatically scale on a 1:1 ratio, and to show that *Rawson* knew that when he conducted his analyses during the same period. If the plaintiff believes he can prove that knowledge on the part of Johnson and Rawson, he will have to

do it through someone who is an expert on the operation and use of a CU-5 Polaroid close-up camera, and that is not Bowers.

In summary, the court will grant in part the plaintiff's motion, and will grant the defendants' motion in its entirety.

D.    <u>Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #7 Dr. Levine Should Be Barred From Testifying About Moses Price (Dkt. No. 192 at 18)</u>

This is another example of one of the parties asking the court to bar the other side from doing something that the moving party wants to do.

Levine devoted a section of his expert witness report to critiquing the work Paula Brumit did in 2010 and 2012. Dkt. No. 192-3 at 26. He asserted that while Brumit "attempted" to conduct a blind comparison, the materials she received to review and analyze were biased. <u>Id.</u> He opined that by the time of her 2012 analysis (when she was asked whether she could exclude the plaintiff as the biter), Brumit was aware that (a) Moses Price had been identified as the person she couldn't exclude in 2011; (b) that there was DNA evidence suggesting that Price was the biter; and (c) that the odontologists on the Innocence Project panel had concluded that the plaintiff was not the biter. <u>Id.</u> Levine argued that this information "infected" Brumit's conclusion that Stinson was not the biter, and that no one could know what her conclusion would have been in 2012 had she not had that information. <u>Id.</u> He also noted that she reached her conclusions using technology available to her in 2010 and 2012, not the technology that would have been available in 1985. <u>Id.</u>

The defendants correctly observe that while the title of the motion asks the court to bar Levine from testifying about Moses Price, the body of the motion asks the court to preclude Levine from critiquing Brumit's work. Dkt. No. 202 at 21-22. They respond that Levine's criticisms of Brumit's work are relevant. The defendants say that in 1985, three experts—Johnson, Rawson and Morgan—concluded that the bite marks on the victim's body were made by the plaintiff. Id. Twenty-three years later, four different experts (the members of the Innocence Project panel) concluded otherwise; some twenty-five or so years later, two additional experts (Brumit and Bowers) concluded otherwise. Id. at 22-23. The defendants ask, "What changed in the intervening decades to explain this?" Id. at 23. Their answer: "New technology, advances in the understanding of the science of criminal odontology, and new DNA evidence." Id. They assert that Levine's opinion about Brumit's biases "offers one potential explanation for why all of the 1985 expert opinions agree on one conclusion, while each of the experts who reviewed the same evidence 30 years later reached a different conclusion." Id. The defendants insist that Johnson and Rawson were "working with a blank slate in 1985," while Brumit was not. Id. They state that "[t]he jury will be asked to determine whether the differences in the opinions of the 1985 experts versus those of the experts who reviewed the evidence 30 years later are better explained by the 'deliberate fabrication' of evidence, or an alternative explanation," and they assert that "bias infecting Brumit's reports is one potential explanation for the disparate conclusions." Id.

58

The court already has ruled on the relevance of the differences between assumptions, methods and technology that existed in 1984/85 and those that existed in 2008-2012. The defendants may question the plaintiff's experts on whether the assumptions, methods and technology they used to conduct their reviews and analyses existed in 1984/85. However, the court will not allow Levine to testify generally about changes in assumption, methods, or technology.

As to the argument that Levine should be allowed to testify that Brumit's biases infected her conclusions, the defendants' response sets up a false premise. The question before the jury will not be whether the twenty-first century experts used better science than the 1984/85 experts, or whether the twenty-first century experts were better forensic odontologists than the 1984/85 experts. The question before the jury will be whether the evidence shows by a preponderance that using the assumptions, methods and technologies in existence in 1984 and 1985, Johnson and Rawson deliberately manipulated evidence to make it look as if the plaintiff was the biter when they knew the evidence did not support that conclusion, or whether they deliberately fabricated evidence to support that conclusion when they knew it to be false.

As the court explained in §II(A), the conclusions of the twenty-first century experts are not directly relevant to that question. Judge Clevert did not have deposition testimony from the twenty-first century experts when he found a genuine dispute of material fact regarding whether the defendants had

59

manipulated or fabricated evidence. There are various kinds of circumstantial evidence relevant to that question—evidence regarding motive, evidence regarding collusion, evidence regarding timing, evidence regarding who collected and turned over what evidence and to whom—that the plaintiff might present that has little to do with expert testimony about forensic odontology. Expert testimony about whether Johnson and Rawson correctly and in good faith applied the assumptions, methods, and technologies in existence in 1984 is one of those kinds of circumstantial evidence. The fact that a quarter century later, other forensic odontologists disagreed with Johnson and Rawson's conclusions is less relevant than this other evidence to the question of whether Johnson and Rawson manipulated or fabricated evidence.

To what issue are the conclusions of the twenty-first century experts relevant? They are relevant to the issue of the plaintiff's innocence, which the defendants have made relevant because Johnson and Rawson claim that they "got it right" when they identified the plaintiff as the biter. Without evidence showing that the plaintiff was not the biter (was not involved in the murder), the jury might succumb to the logical fallacy that if the plaintiff is guilty, the defendants' conclusions that he was the biter cannot have been the result of manipulated or fabricated evidence.

The defendants insist that they did not manipulate or fabricate evidence, and that may be true—that is for the jury to decide. But the defendants cannot use a false impression of the plaintiff's guilt to prove that they did not manipulate or fabricate evidence. To allow the defendants to mount a vigorous

60

defense of their conclusions that the plaintiff's dentition matched the bite marks on the body, without allowing the plaintiff to show the jury that he has been exonerated and how, would mislead the jury, turn this civil rights trial into a re-trial of the criminal case (and an unfair one) and fly in the face of the Seventh Circuit's decision in Parish.

The conclusions of the twenty-first century experts are, at best, *tangentially* relevant to the question of whether Johnson and Rawson intentionally manipulated evidence that did not demonstrate that the plaintiff was the biter to make it look as if he was the biter, or whether Johnson and Rawson deliberately fabricated evidence supporting a conclusion they knew to be false. They are *directly* relevant to the plaintiff's ability to show the jury that he has been exonerated, and to avoid the possibility of the jury concluding that even though he has been released, the plaintiff is guilty, and because he is guilty, the defendants could not have violated his civil rights.

At the final pretrial conference, the defendants assured the court that at trial, they would not argue that the defendant was guilty. Dr. Rawson acknowledged that the DNA evidence excluded the plaintiff; counsel said something along the lines of "there's nothing we can do about that." The defendants indicated that they would be willing to stipulate that DNA evidence had excluded the plaintiff (or something to that effect). There was argument about whether that simple stipulation would assuage the plaintiff's concerns about the jury basing a verdict on the mistaken belief that the plaintiff is guilty

61

of the murder. The court itself wondered whether such a simple stipulation might suffice.

Given the defendants' arguments, the court does not believe such a stipulation would suffice. If the defendants were taking the position that they rigorously and properly applied the assumptions, methods, and techniques that existed in 1984/85 and (regrettably) came to the wrong conclusion, but did not manipulate or fabricate evidence to reach that conclusion, the stipulation might be enough. If that were the defendants' position, the jury would not have reason to think that the defendants persisted in asserting the plaintiff's guilt. But the defendants take the position that they rigorously and properly applied the assumptions, methods, and techniques that existed in 1984/85 and *came to the right conclusion*, and that they did not manipulate or fabricate evidence to reach that conclusion. In the face of that argument—the equivalent of, "We don't care what the exonerating evidence shows—Stinson was the biter!"—the plaintiff must have the opportunity to show that there is significant evidence of his innocence. He has more than DNA evidence, and he has a right to rebut "we don't care about all that—we got it right."

Because the court will not allow the parties to argue about whether the twenty-first century experts got it wrong, and will not allow the parties to argue that the twenty-first century experts' conclusions prove that Johnson and Rawson manipulated or fabricated evidence, one might conclude that the question of whether Brumit's work was infected by bias is irrelevant. Brumit's testimony—which plaintiff's counsel stated at the February 7 hearing would be

62

brief and contained—is relevant only to address the Parish/Ayers issue and allow the plaintiff to rebut the defendants' implied argument that they were right when they concluded that he was guilty of the murder.

As the court noted, however, the plaintiff has asked the court to bar the defendants from doing something that the plaintiff himself wants to do. The plaintiff alleges that Johnson and Rawson concluded that he was the biter because they were biased—they knew that the plaintiff was a suspect, and they manipulated the bite mark evidence, or fabricated evidence, to support a conclusion that he was guilty. Relevant to that allegation is the question of whether a forensic odontologist's knowledge of the identity of a suspect might influence his or her conclusions. To that extent, the possibility that *Brumit's* conclusions were infected by bias has some relevance to the question of whether the *defendants'* conclusions were the result of bias.

But the defendants do not need Levine to elicit that evidence. Brumit herself acknowledged and expressed concern about the possibility of bias infection. The defendants can explore the question of bias and how it might impact an expert's conclusions through cross-examining Brumit, if she testifies. (They can cross examine Senn on the topic, as well, and Golden was asked about it in his deposition.) The court will grant the plaintiff's motion and prohibit Levine from testifying on whether Brumit's conclusions were infected with bias.

63

E.   Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #8
     This Court Should Bar Dr. Levine From Testifying that the
     Innocence Project Panel Was Biased (Dkt. No. 192 at 20)

Levine also devoted over three pages of his expert report to critiques of the Innocence Project panel's composition, analyses, and conclusions. Dkt. No. 192-3 at 12-15. In addition to arguing bias infection, Levine critiques the fact that the four members of the panel worked as a group and issued a group report (rather than working independently and issuing separate reports), the fact that the panel conducted its analyses using assumptions, methods, and technology not available to Johnson and Rawson in 1984/85, and the fact that distortions in the victim's skin due to fatty tissue made analyzing certain photographs difficult. Id.

The reasoning the court articulated above in ruling that the defendants cannot use Levine to critique Brumit's analyses and conclusions applies to this motion. The plaintiffs may cross-examine Senn (and they questioned Golden) on whether the assumptions, methods, and techniques Senn and Golden used were available in 1984/85. They may question Senn and Golden regarding whether the presence of significant amounts of adipose tissue would make it difficult to identify clear bite mark patterns in the victim's skin. They may cross-examine about possible bias inherent in reaching conclusions as a group, rather than independently. They may *not* elicit testimony on these topics from Levine. The court will grant this motion.

**F.** **Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #6 Dr. Bowers Should Be Precluded From Offering the Opinion that Dr. Johnson "Provided a False Level of Certainty" in his 1985 Report (Dkt. No. 195 at 22)**

The first part of the defendants' motion asked the court to find that Bowers was not qualified to opine on whether Johnson and Rawson correctly used assumptions, methodologies, and technology in existence in 1984/85. Dkt. No. 195 at 4. At the February 7 hearing, the court found that question a close call, but ruled that Bowers could testify on that topic, subject to cross-examination by the defendants as to his involvement in the field during 1984/85.

This part of the motion challenges specific opinions in Bowers' report. Generally, the court observes that Bowers' report contains conclusory, judgment-laden opinions. For example, the defendants asked the court to preclude Bowers from testifying that Johnson and Rawson relied on "meritless assumptions" in reaching their conclusions. Dkt. No. 195 at 13. At the February 7 hearing, the court granted that motion, noting that there is a difference between saying, "the defendants made assumptions that were not accepted in the forensic odontology community in 1984/85"—an arguably fact-based assertion relevant to the plaintiff's allegations—and saying "the assumptions on which the defendants relied had no merit"—a judgment, and one that does not include a temporal frame. The assumptions Bowers labeled "meritless" included: (1) that each human dentition is unique; and (2) that it is possible to perfectly match an unknown bite mark on human skin to a known actor's dentition. Dkt. No. 190-9 at 24. The relevant issue is not whether

65

twenty-first century forensic odontologists have concluded that those assumptions have no merit, but whether forensic odontologists in 1984/85 believed that those assumptions had merit. What is relevant here is whether forensic odontologists in 1984/85 operated under those assumptions—not whether those assumptions are correct.

The court lays out this background because the opinion to which the defendants object suffers from the same flaws. At page 16 of his expert report, Bowers stated the following:

> Johnson concluded in his report that it was his professional opinion "to a reasonable degree of scientific certainty, that the teeth of Robert Lee Stinson would be expected to produce bite patterns identical to those which I examined and recorded" in his analysis. The level of certainty that Johnson ascribed to his conclusions were knowingly false. The field of forensic odontology prohibits such certainty and did at the time of Johnson's analysis. There is absolutely no scientific basis for Johnson to reach his conclusion that Stinson's dentition was unique and the bite injuries he observed were identical to the pattern that only Stinson's teeth would make to the exclusion of all others. Johnson would have known this in 1984 because it is impossible to reach this conclusion within the field of forensic odontology. Bite marks in human skin do not create a perfect imprint of an individual's teeth that can be used to compare with a suspect's dentition and reliably conclude with any scientific merit that it was this individual to the exclusion of all others. There was never the ability to reach such certainty in the field of forensic odontology. Even today, with the enhanced ability of computer analysis, forensic odontologists are prohibited from opining to this level of certainty.

Dkt. No. 190-9 at 16-17.

The defendants argue that Bowers "is either carelessly or intentionally attempting to blur the lines between what was accepted as general practice in 1985, and what is accepted in the field of forensic odontology today." Dkt. No. 195 at 3. The plaintiff responds that he will not "elicit testimony from Dr.

66

Bowers on Dr. Johnson's or Dr. Rawson's 'state of mind' such as testimony that they 'knowingly manipulated the bite mark evidence.'" Dkt. No. 205 at 26. He argues that the court should allow Bowers to testify "regarding his opinion about the ways in which Dr. Johnson's and Dr. Rawson's bite mark analysis departed from the accepted practices of forensic odontology in 1984 and 1985, which is proper subject of expert testimony . . . ." Id.

The plaintiff's agreement that he won't solicit "state of mind" testimony from Bowers is helpful as far as it goes, but it does not address all of the defendants' concerns—or the court's. Bowers cannot testify that Johnson's degree of certainty was "knowingly false"—that is state of mind testimony. The court ruled at the February 7 hearing that it will not allow *any* of the experts to testify regarding the defendants' states of mind.[15]

The defendants' motion goes farther, noting that throughout his expert report, Bowers conflates the present tense and the past tense, making it almost impossible to determine whether he is expressing opinions based on twenty-

---

[15] Bowers' report includes a section captioned, "Johnson and Rawson Went to Great Lengths to Try to Make the Bite Mark Evidence Match Stinson Even Though It was Plainly Evident Stinson Could Not Have Made Those Marks." Dkt. No. 190-9 at 8. He starts that section by saying that there are "multiple examples that demonstrate the Johnson and Rawson went out of their way to manipulate the bite mark evidence and their analysis to try to make Stinson's dentition 'match' the bite mark evidence when it was obvious that Stinson's teeth could not have made the bite mark injuries on the victim." Id. Bowers may testify about why, using the assumptions, methods, and technology that existed in 1984/85, it would have been evident that the plaintiff's dentition did not match the bite marks on the victim. But he cannot testify that the defendants "went to great lengths," or that they "went out of their way to manipulate," or that Johnson gave a "knowingly misleading" description, dkt. no. 190-9 at 16. All this testimony is prohibited state-of-mind testimony.

67

first century assumptions, methods, and technology, or opinions based on the those that existed in 1984/85. The paragraph of the report quoted above is rife with examples of this conflation. Bowers states that "the field of forensic odontology prohibits"—present tense—the level of certainty Johnson expressed. That statement is irrelevant. He ends the sentence by saying, "and did at the time of Johnson's analysis." *That* part of the statement *is* relevant. As the Seventh Circuit has held, and the plaintiff points out,

> In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful. Liability for constitutional torts is more limited in scope than common law tort liability. Negligence is not sufficient. Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.

Jimenez v. City of Chi., 732 F.3d 710, 721-22 (7th Cir. 2013) (citations omitted).

Bowers states that "[t]here is absolutely no scientific basis for Johnson to reach his conclusion that Stinson's dentition was unique and the bite injuries he observed were identical to the pattern that only Stinson's teeth would make to the exclusion of all others." That statement—in the present tense—is irrelevant. Bowers states that "Johnson would have known this in 1984 because it is impossible to reach this conclusion within the field of forensic odontology," appearing to assert that Johnson would have known that something was not possible in 1984 because it is considered impossible *now*, without stating whether it was considered impossible in 1984.

68

Bowers' next claim is in the present tense: "Bite marks in human skin do not create a perfect imprint of an individual's teeth that can be used to compare with a suspect's dentition and reliably conclude with any scientific merit that it was this individual to the exclusion of all others." While that statement is irrelevant, he then states, "[t]here was never the ability to reach such certainty in the field of forensic odontology," but does not explain whether he makes this assertion with the 20/20 vision of hindsight, or whether in 1984/85 forensic odontologists knew that bite marks did not create perfect imprints and did not allow reliable identification.

Bowers concludes by saying that even with today's advanced assumptions, methods and technology, forensic odontologists "are prohibited from opining" to the level of certainty Johnson expressed. That assertion mystifies the court. It contradicts the adage, commonly ascribed to Aristotle, that "[t]he more you know, the more you know you don't know." It ignores the possibility that if the assumptions, methods, and technology in existence in 1984 and 1985 were more primitive, professionals of that era may have had false confidence in their assumptions and methodology that modern technology since has proven unwarranted. In other words, perhaps modern forensic odontologists are aware that they cannot make a perfect match between bite marks on human skin and a specific person's dentition only because advanced technology has shown that such a perfect match is impossible.

The court will grant the defendants' motion to the extent that it asks the court to prohibit Bowers from testifying to what Johnson or Rawson knew. It

69

will grant the motion to the extent that it asks the court to prohibit Bowers from testifying that because twenty-first century forensic odontologists "know" certain things, or operate under certain assumptions, Johnson and Rawson "knew" those same things, or operated under those same assumptions, in 1984/85. Bowers may testify about the assumptions, methods, and technology that existed in 1984/85—to the extent that he knows—and he may opine on whether Johnson and Rawson's assumptions, methods, and technologies comported with the ones that existed in 1984/85. But the court cautions the plaintiff that if Bowers conflates past and present practices during his testimony at trial, or "blurs the lines" between them, as the defendants have argued, the court will sustain the defendants' objections on that basis.

       G.    <u>Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #7 Dr. Bowers Should be Precluded From Commenting Upon the Conclusion of the WI Innocence Project Odontology Panel and its Report (Dkt. No. 195 at 24)</u>

In paragraph 31 of his report, Bowers asserts that all four members of the Innocence Project panel, as well as Brumit, excluded the plaintiff as the biter. Dkt. No. 190-9 at 17. In paragraph 32, he describes specific provisions of the Innocence Project panel's report with which he agrees. <u>Id.</u> at 18.

The court has ruled that Dr. Levine cannot critique the conclusions of the Innocence Project panel. The defendants ask the court to preclude Bowers from testifying that other forensic odontologists have concluded that the plaintiff is excluded as the biter, and describing their conclusions with which he agrees. Dkt. No. 195 at 24. The defendants argue that this is nothing more

70

than Bowers bolstering his own opinion by saying, "See? Other people agree with me." In other words, they argue that this testimony is, in the plaintiff's words, "a credibility determination in the guise of an opinion." Dkt. No. 205 at 27.

The plaintiff responds that Bowers' testimony that five forensic odontologists have reached the same conclusion he reached is not a credibility determination; it simply is a statement of fact. Id. He says that in their depositions, the defendants repeatedly asked the plaintiff's experts whether the fact that three experts—Johnson, Rawson and Morgan—had reached the same conclusion before the plaintiff's trial affected their conclusions that the biter wasn't the plaintiff. Id. He asserts that "[t]he Defendants cannot introduce this type of testimony through their own questioning and preclude Plaintiff from doing the same." Id. The plaintiff also argues that Bowers' testimony that the Innocence Project panel agreed with him on various conclusions isn't an "expert opinion" requiring specialized knowledge. Id. Finally, the plaintiff asserts that this testimony would not be a waste of time or cumulative; he asserts that "the fact that Dr. Bowers reached the same conclusions as the IP Panel—i.e., could replicate their results—is very important in demonstrating the integrity of bite mark analysis," and "is . . . relevant corroboration for Plaintiff's innocence." Id. at 28.

The court will grant this motion. Even if the court were to allow Bowers to testify about his own bite mark analysis—and it will not allow that testimony, as it will explain in the next section—the jury would not need

71

Bowers to point out that his conclusions match those of Senn and Golden. The jury likely will hear either Senn's or Golden's conclusions, or both. The jury will be able to decide whose conclusions match whose.

      H.     <u>Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #9 Dr. Bowers' Opinions Based Upon his Own Purported Bite Mark Analysis Should be Prohibited as Lacking Adequate Scientific Foundation under <i>Daubert</i></u> (Dkt. No. 195 at 27)

At pages 19-22 of his report, Bowers included a section titled "My Methods of Analysis." Dkt. No. 190-9. He explains that on September 4, 2012, he went to the crime lab to view the bite mark evidence from the Cychosz case. <u>Id.</u> at 19. He "took a dental impression of the model of [the plaintiff's] upper and lower teeth to create a duplicate of the dental model Johnson made of [the plaintiff's] teeth in 1984." <u>Id.</u> He then "performed photographic analysis performed [sic] using an HP laptop computer, a Canon flatbed scanner and Adobe Photoshop software," using scanning, sizing and imaging protocols described in the 2002 edition of his own book, "Digital Analysis of Bitemark Evidence." <u>Id.</u> Bowers also "created dental stone exemplars of [the plaintiff's] dentition . . . from impressions of dental models labeled as 'RLS' at the Milwaukee Crime Lab . . . ." <u>Id.</u> The report states, "These exemplars were scanned and 1:1 (life-size) magnification and used to create digital 'overlays' or outlines of RLS anterior teeth." <u>Id.</u> Bowers then compared the "digital dental exemplars to numerous print and transparent images available to [him]" at the crime lab. <u>Id.</u> Later—Bowers doesn't say when—he "reviewed and analyzed

72

additional evidence obtained and photographed in 2007 by Dr. Greg Golden." Id.

Bowers includes photos of the dental model he created "from the impression" he took of the 1985 models of the plaintiff's teeth, taking pains to point out that he has placed an "'L' shaped ruler" in the image. Id. at 20. He included photos of the overlays he created. Id. at 20-21. He explains, and shows, how he "flipped" the overlay images he'd created, "so that [he] could directly compare them with the photograph of the bite mark injury patterns." Id. at 21. He includes an image of "[t]he completed digital overlay," noting that he did not show the overlay of the lower teeth. Id. at 22. He then explains his conclusion that Johnson and Rawson "knowingly manipulated the bite mark evidence" to make it look as if there was a match with the plaintiff when there wasn't. Id.

The defendants assert that the court should exclude Bowers' testimony about his own bite mark analysis and the opinion he formulated as a result of that analysis because the opinion lacks adequate scientific foundation under Rule 702 and Daubert. Dkt. No. 195 at 28. They state that because "scientific underpinnings and reliability of bite mark analysis" has been criticized by scholars in the past couple of decades, the science itself lacks sufficient reliability for the court to allow Bowers to testify to his opinion. Id. at 28. They also argue that Bowers himself has been one of the most vocal critics of using forensic odontology to try to match bite marks in skin with a particular person's dentition; given that, they state that "Dr. Bowers' quixotic attempt to

73

offer his own bite mark comparison opinions to the Court and the jury in this case in an effort to support his contention that [the plaintiff] can be excluded as the biter in this case should not be countenanced." Id. at 29.

The plaintiff appears to claim that this motion is nothing more than the defendants trying to prevent the plaintiff from presenting evidence that his dentition doesn't match the bite marks on the victim's body; he argues that that would be "patently unfair." Dkt. No. 205 at 26.

As noted throughout this order, the parties argue against themselves when it suits their purposes. The defendants take the position that the assumptions, methods, and technology they used in 1984/85 were proper and that they acted in accordance with the assumptions, methods, and technology that existed at the time. They argue that under those assumptions, methods, and technology, their conclusion that the plaintiff was the biter was correct. Implicit in this argument is the assumption that the science Johnson and Rawson used in 1984/85 was not junk science—it was reliable, and it led them to the "right result." Yet they ask the court to reject Bowers' opinion, based on more recent assumptions, methods, and technologies, as junk science. This argument strikes the court as disingenuous.

The plaintiff is no less disingenuous. The plaintiff has chosen as its primary expert a witness who has been vocal in his criticism of using forensic odontology to match someone's dentition with bite marks in human flesh. Yet he asks the court to allow that person to testify about how he used forensic odontology to exclude the plaintiff as the biter, by conducting comparisons of

74

the plaintiff's dentition with photographs of bite marks in human flesh. The plaintiff even argues that the fact that Bowers was able to "replicate" the results reached by the Innocence Project panel and Dr. Brumit proves that "when performed properly, experts can replicate the results reached by other experts;" the plaintiff argues that this rebuts the defendants' assertion that bite mark evidence is unreliable because one forensic odontologist cannot replicate the results of another's analysis. Dkt. No. 205 at 28. The defendants might use this very reasoning to argue that, rather than conspiring with Johnson to frame the plaintiff, Rawson used existing assumptions, methods, and technology to replicate Johnson's results, which is why he came to the same conclusion.

This case is not about whether forensic odontology is "junk science," or is an unreliable method of determining whether bite marks in human skin were made by a particular person. Again, this case is about whether the defendants knew or had reason to know that the evidence did not support the conclusion that the plaintiff was the biter, yet manipulated or fabricated evidence to support a conclusion they knew was false. The court *will* bar Bowers from testifying about his own analysis, but *not* because it lacked sufficient scientific reliability under Rule 702 or <u>Daubert</u>.

The court will bar Bowers from testifying about his own bite mark analysis because that testimony is not relevant to the question of whether the defendants manipulated or fabricated evidence in 1985. Bowers conducted his analysis in 2012—twenty-seven years after Johnson and Rawson conducted

theirs. Bowers used technology that was not available to Johnson and Rawson—a laptop computer, a flatbed scanner, Photoshop. Bowers used an "L-shaped" ruler for scaling; Levine stated in his report that that ruler "had not been developed in 1985." Dkt. No. 192-3 at 6.

The plaintiff agrees that the defendants should not be judged by modern forensic odontology standards and agrees that he will not make that argument. Yet that is exactly what Bowers did when he conducted his own tests, using modern methods, devices and technology unavailable in 1985, and then opined that Johnson and Rawson "knowingly" manipulated the evidence in 1985. The fact that Bowers came to a different conclusion using technology that was not available to Johnson and Rawson is irrelevant.

The plaintiff has argued that the court must allow him to present evidence of his innocence, to rebut the defendants' position that they got it right. The court agrees. That is why it has ruled that Senn, Golden and Brumit—the experts whose work was used to help prove that the plaintiff was innocent—may testify about the results they reached. Senn and Golden conducted their analyses and reached their conclusions before the plaintiff filed this lawsuit, for the purpose of determining whether the plaintiff should be granted a new trial. Brumit conducted her analysis at the request of the district attorney's office that she re-analyze the bite mark evidence when Moses Price emerged as the likely assailant.

The court does not know when the plaintiff retained Bowers, but Bowers visited the crime lab and conducted his analysis after the plaintiff's conviction

was vacated, and after Moses Price pled guilty and was sentenced. Presumably he conducted his analysis for this case—for the purpose of supporting the plaintiff's claim that the defendants violated his constitutional rights. The fact that Bowers used modern methods and technologies to exclude the plaintiff as the biter is not relevant to whether Johnson and Rawson conspired to violate the plaintiff's civil rights in 1984/85. The plaintiff can provide proof of his innocence through Senn, Golden and/or Brumit (in addition to any non-odontological evidence the plaintiff may present in support of his innocence).

I. <u>Defendants' Motion to Exclude Certain Opinions and Testimony Offered by Mr. Stinson's Experts Senn, Golden, Brumit, Adams and Waller: #1 Stinson's Odontology Experts Should be Precluded from Testifying About Their Own Analysis of the Bite Marks in This Case, and From Offering an Opinion that Stinson Can Reliably Be Excluded as the Biter Based Upon Bite Mark Analysis (Dkt. No. 197 at 3)</u>

As they did with Bowers, the defendants argue that the court should bar Senn, Golden and Brumit from testifying about their opinion that the plaintiff can be excluded as the biter because forensic odontology is not sufficiently reliable as a science under Rule 702 and <u>Daubert</u>. The court will deny the defendants' motion on this basis, as it denied their motion regarding Bowers' opinion on this basis.

The defendants have argued that the plaintiff does not need forensic odontology evidence to prove to the jury that he is innocent, because he has the DNA evidence and the confession of Moses Price. The court addressed this argument in §II(D).

The court will deny this motion, but reiterates that the testimony of Senn, Golden, and/or Brumit regarding their exclusion of the plaintiff as the biter is relevant to the plaintiff's innocence, and the defendants may ask them whether the assumptions, methods and technology that they used to reach those opinions existed in 1984/85.

J.     Defendants' Motion to Exclude Certain Opinions and Testimony Offered by Mr. Stinson's Experts Senn, Golden, Brumit, Adams and Waller: #3 Stinson's Odontology Experts Should be Precluded from Offering "Negligence" Opinions or Opinions Couched in Terms of "Standard of Care" on the Work Performed by Dr. Johnson and Dr. Rawson in 1985 (Dkt. No. 197 at 18)

In Counts VIII and IX, the plaintiff alleges that the defendants made negligent misrepresentations to the prosecutor and the police, and that by manipulating the evidence, they negligently caused him severe emotional distress. The defendants argue that none of the plaintiff's experts—Senn, Golden, or Brumit—stated that there were guidelines or standards governing how to conduct bite mark analyses in 1985. Dkt. No. 197 at 18-19. They argue that because the reports did not state the experts' opinions as to negligence, they cannot testify that Johnson and Rawson were negligent, or that Johnson or Rawson violated some existing standard of care, without violating the requirement that an expert's report must contain a complete statement of all of the opinions that the witness expresses and the reasons for those opinions. Id. at 20 (citing Fed. R. Civ. P. 26(a)(2)(B)(i)).

The plaintiff responds that the Innocence Project panel report "touched on" these issues. Dkt. No. 204 at 13-14. The plaintiff also asserts that during their depositions, the experts testified that the "overlay" technique used by

78

Johnson and Rawson was "a bad technique" that "did not work;" that the level of certainty Johnson expressed was not acceptable in 1985; that Johnson and Rawson misinterpreted the evidence; and that Johnson and Rawson made a series of errors in their analyses. Id. at 15-16. The plaintiff states that this testimony, elicited during the *defendants'* deposition of the experts, "is relevant to a claim that the Defendants' actions in analyzing the bite marks in this case fell below the standard of care." Id. at 16.

The plaintiff has conceded that neither Senn nor Brumit are qualified to comment on the assumptions, methods, and technologies (or the standards of care, assuming there were any) that existed in 1985, dkt. no. 207 at 10; this court ruled as much at the February 7 hearing. That leaves Golden as the only plaintiff's expert to whom this motion applies.

The defendants state that Golden used the word "negligence" only once in his deposition, when "conced[ing] that the instant case [was] not a negligence case." Dkt. No. 207 at 11. They assert that Golden never testified, and never stated the opinion, that Johnson and Rawson failed to exercise the degree of care and skill exercised by an average forensic odontologist in 1985. Id. at 11. Finally, they argue that Golden's testimony amounts to testimony that Johnson and Rawson made *mistakes*, and that a "mistake" is not negligence. Id. at 8 (citing Zintek v. Perchik, 471 N.W.2d 522, 529 (Wis. Ct. App. 1991)) ("In a medical malpractice action, the relevant inquiry is not whether a physician has made a mistake; rather, the question is whether he or she was negligent.").

79

The defendants' argument that Golden testified that this case was not a negligence case is misleading. During Golden's April 27, 2018 deposition, the following exchange occurred between counsel for defendant Johnson and Golden:

> Q:    As I understand it, your role in this case is simply to talk about what you did back in 2007 to 2008 which culminated in your report.
> A:    Correct:
> Q:    Do you understand as you sit here today that this is not about practice or a negligence case?
> A:    I do understand that.
> Q:    Do you have an understanding that this is a federal civil rights lawsuit?
> A:    Yes.
> Q:    Do you have any understanding as to what Mr. Stinson must prove in order to be successful in any of his federal civil rights claims against these defendants?
> A:    My limited understanding of it is that he would have to prove intent to convict prior to the investigation.

Dkt. No. 192-10 at ECF 89, Tr. 87.

Johnson's counsel told Golden that this was not a negligence case, but a civil rights case; that isn't true. The plaintiff has alleged two negligence claims. The *primary* claims in the case may be civil rights claims, but there are two negligence claims that have survived summary judgment. For defense counsel to lead Golden into stating that the case was not about negligence, and now argue that Golden "has not, and cannot, render an opinion that Dr. Johnson and Dr. Rawson were negligent," is disingenuous.

The defendants' argument amounts to a request that the court exclude Golden's opinion that Johnson and/or Rawson were negligent as a sanction for the plaintiff's failure to comply with Fed. R. Civ. P. 26(a)(2)(B)(i). That rule says

a party "that intends to rely upon an expert witness's testimony is required to furnish by a date set by the district court a report containing, among other information, 'a complete statement of all opinions' the retained expert will provide, 'and the basis and reasons for them.'" Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 641 (7th Cir. 2008) (citing Fed. R. Civ. P. 26(a)(2)). "Failure to comply with Rule 26(a)(2)'s requirements results in a sanction: the offending party is not allowed to introduce the expert witness's testimony as 'evidence on a motion, at a hearing, or at a trial.'" Id. (citing Fed. R. Civ. P. 37(c)(1); Jenkins v. Bartlett, 487 F.3d 482, 488 (7th Cir. 2007).

Golden's "expert witness report" is the February 13, 2008 group report of the Innocence Project panel. Dkt. No. 205-15. There has been much discussion in the moving papers, in the expert reports of Levine and Bowers, and at the hearing on February 7 about the unusual nature of a "group" expert witness report. One cannot discern from a group report whether one member of the group might have had nuanced views or opinions, or whether there were subtle differences of opinion. One cannot tell whether one person believed certain issues to be more important than others or found certain conduct more or less egregious. The only way to determine whether Golden's "report" contained an opinion regarding whether Johnson and Rawson were negligent is to look at the group's conclusions.

The panel unanimously concluded that there were "numerous errors" in the bite mark analysis conducted by Johnson and Rawson. Id. at 25. It listed some of those errors—unexplained discrepancies in the analysis of the injury

81

patterns, incorrect orientation of the "dental arches" of one bite mark, "[f]ailure to explain how a shorter, broken tooth can create an injury pattern when full-length, unbroken adjacent teeth do not," and a "misleading three-dimensional model comparison test." Id. The panel opined that one of the reasons for these errors was that Johnson and Rawson used "outdated methods," such as manual overly techniques, "rather than modern, computerized techniques;" failed to use proper scaling references, and used "drastically overstated levels of certainty that have no evidence-based, scientific, or statistical basis." Id. The panel concluded by opining that these errors resulted in "an incorrect determination by Drs. L.T. Johnson and R. Rawson that Robert Lee Stinson created the bitemarks on Ione Cychosz." Id.

The panel did not use the words "negligent," or "negligence." It did not say, "And it is our opinion that Johnson and Rawson acted negligently." The defendants appear to be asking the court to sanction the plaintiff by refusing to admit any opinion of Golden's that Johnson or Rawson were negligent. The court will grant that motion, but because Golden didn't opine that Johnson or Rawson were negligent, that ruling doesn't advance the ball for anyone.

The real issue is whether the plaintiff must present expert testimony to prove the first two elements of a negligence claim under Wisconsin law. May the plaintiff prove his negligence claim by arguing to the jury that Golden's criticisms of Johnson and Rawson's work amount to proof that Johnson and Rawson were negligent? Or must he present expert testimony regarding whether the Johnson and Rawson owed a duty of care to the plaintiff, and

82

whether they breached it? The court concludes that the plaintiff must present

expert testimony to prove his negligence claim.

To prove a claim of negligence under Wisconsin law, a plaintiff must

prove four elements[16]:

> (1) a duty of care on the part of the defendant; (2) a breach of that
> duty; (3) a causal connection between the conduct and the injury;
> and (4) actual loss or damages resulting from the injury.

White v. U.S., 148 F.3d 787, 793 (7th Cir. 1998) (citing Rockweit v. Senecal,

197 Wis.2d 409, 541 N.W.2d 742, 747 (1995)). The plaintiff has the burden of

production and proof on each of those elements. Id.

> Wisconsin courts characterize the doctrine of res ipsa loquitur
> as a rule of circumstantial evidence that allows a fact-finder to infer
> negligence (or in this case, a product defect) in certain fact
> situations. *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*,
> 267 Wis.2d 688, 704, 671 N.W.2d 346, 354 (Wis.App.2003) (citing
> *Lambrecht v. Estate of Kaczmarczyk*, 241 Wis.2d 804, 623 N.W.2d
> 751 (2001)). The doctrine "is meant to bridge an evidentiary gap
> when an injury could not have happened but for the defendant's
> negligence." *Buechel v. United States*, 746 F.3d 753, 765 (7th
> Cir.2014). The doctrine is appropriate in cases where:
>
>> (a) either a layman is able to determine as a matter of
>> common knowledge or an expert testifies that the result
>> which has occurred does not ordinarily occur in the
>> absence of negligence, (b) the agent or instrumentality
>> causing the harm was within the exclusive control of the
>> defendant, and (c) the evidence offered is sufficient to
>> remove the causation question from the realm of conjecture,
>> but not so substantial that it provides a full and complete
>> explanation of the event.
>
> *Peplinski v. Fobe's Roofing, Inc.*, 193 Wis.2d 6, 17, 531 N.W.2d 597,
> 601 (1995).

---

[16] The plaintiff did not provide the court with a proposed jury instruction on
the negligence claim. The court assumes that the plaintiff still wishes to
proceed on this claim, given that he opposed the instant motion.

Under Wisconsin law, "[a]n application of the doctrine based on common knowledge is allowed only when the occurrence clearly 'speaks for itself.'" *Kelly v. Hartford Cas. Ins. Co.*, 86 Wis.2d 129, 134, 271 N.W.2d 676, 679 (1978) (citation omitted). A court may apply res ipsa loquitur in the "rare instances" in which "circumstantial evidence may produce reasonable inferences upon which a jury may reasonably find that a defendant manufactured a product containing a defect." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1208 (7th Cir.1995). In a products liability action, res ipsa loquitur allows a jury to infer that a defect existed when the product left the manufacturer's control, and that the defect caused the product to fail, if plaintiff establishes the following three elements: (1) the problem ordinarily only occurs if there is negligence; (2) the plaintiff was using the product properly; and (3) the plaintiff negates other possible causes of the product's failure. *Jagmin v. Simonds Abrasive Co.*, 61 Wis.2d 60, 71, 211 N.W.2d 810, 817 (1973).

For the doctrine to apply, "it must be obvious to the trier of fact that an accident of the type that injured the plaintiff rarely occurs in the absence of negligence." *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 (7th Cir.2010) (citing *Smoot v. Mazda Motors of Am., Inc.*, 469 F.3d 675, 679–80 (7th Cir.2006)). "A typical example is where, after surgery, a plaintiff discovers that a surgeon's sponge was left inside his abdomen. In such a case, the trier of fact can infer without considering additional evidence that someone in the operating room was negligent." *Clifford*, 627 F.3d at 273 (internal citation omitted).

Expert testimony is required if the issue to be decided by the jury is outside the common knowledge of a layman.

There may be cases where the issue of causation, like the issue of negligence, involves technical, scientific or medical matters which are beyond the common knowledge or experience of jurors and without the aid of expert testimony the jury could only speculate as to what inferences to draw if it were left to determine the issue. The lack of expert testimony in such cases results in an insufficiency of proof.

*City of Cedarburg Light & Water Comm'n v. Allis–Chalmers Mfg. Co.*, 33 Wis.2d 560, 568, 149 N.W.2d 661, 662 (1967).

Johnson v. Mylan, Inc., 107 F. Supp.3d 967, 971-72 (E.D. Wis. 2015).

"In the medical malpractice setting, Wisconsin requires expert testimony to establish medical negligence except in situations where the errors were of such a nature that a layperson could conclude from common experience that such mistakes do not happen if the physician had exercised proper skill and care." Gil v. Reed, 381 F.3d 649, 659 (7th Cir. 2004) (citing Christianson v. Downs, 279 N.W.2d 918, 921 (Wis. 1979)). This is because the issues of standard of care, breach of that standard and causation in the area of medical malpractice are beyond the common knowledge or experience of jurors without the help of expert testimony.

The court concludes that the same is true in a case where the plaintiff asks the jury to decide whether a forensic odontologist was negligent. To prove his negligence claim, the plaintiff first must prove that Johnson and Rawson had a duty of care toward him. While it likely would be obvious to a layperson that Johnson and Rawson had a duty not to manipulate or fabricate evidence, a layperson would have no way to know the standard of care applicable to forensic odontologists in 1984/85. The defendants have implied that it would be impossible for anyone to testify that there *was* a standard of care applicable to the analysis of bite mark evidence in 1984/85, because the state of the field at the time was "the wild, wild West" and there were no written standards for analyzing bite marks.[17] In order for a jury to determine whether Johnson and

---

[17] The defendants verge on arguing that because in 1984/85 there was no written prohibition against using a particular method of analysis or a particular technology, nothing Johnson and Rawson did or could have done could constitute negligence. This is an absurd argument—if Johnson or Rawson had identified the plaintiff as the biter based on the fact that he had

85

Rawson owed the plaintiff an standard of care, and whether they breached that standard of care, it would need an expert in the field of forensic odontology as it stood in 1984/85 to provide it that information.

Golden testified at his deposition about certain practices that were not common in 1984/85, or not routine. For example, he testified that he thought that the preferred comparison technique in the 1980s was "hollow volume overlays," and that he did not think that the method of comparing dental casts to life-sized photos was generally accepted in 1984/85. Dkt. No. 192-10 at ECF 120, Tr. 118. He testified that while there were people making comparison by comparing dental casts to life-sized photos, it was "without sanction or vetting from the ABFO in general." Id. He testified that making overlays from photos of someone's teeth and placing them over life-sized photographs was "certainly not routine" in 1984/85, and that the "general consensus" among his colleagues and the ABFO "was that we understand what the comparison is supposed to be trying to do, but it's defeating its own purpose by obliterating the information in the bruise pattern when you overlay the image onto it. So what's the point? Why bother?" Id. at ECF 122-123, Tr. 120-121. He testified that he believed that technique—making overlays from photos of someone's teeth and laying them over life-size photos—was "just a bad method. It's a bad technique. It doesn't work." Id. at ECF 125, Tr. 123.

---

brown eyes, or if they had identified the plaintiff as the biter by comparing the shape of the bite marks with the size of the plaintiff's feet, they could not argue with straight faces that they did not act negligently because there was no prohibition against matching a person with bite marks via eye color or foot size.

That testimony, however, does not provide the jury with a standard of care for forensic odontology in 1984/85. The court concludes that to prove negligence, the plaintiff must present an expert witness to tell the jury what standard of care applied to this field in 1984/85. The court will grant the motion to preclude the plaintiff from arguing that Golden's opinions support his claim that Johnson and Rawson owed him a duty of care and breached it—the first two elements of a negligence claim.

K. Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #7 Dr. Bowers Should be Precluded From Mentioning or Commenting Upon "Dr. Rawson's History of Bad Bite Mark Analysis" (Dkt. No. 195 at 26)

Finally, the court will address a motion that it thought it had resolved at the February 7 hearing. The court now realizes that it did not address the specific basis for the motion, and it stated at the February 7 hearing that it was deferring ruling on the broader issue.

In paragraphs 34 and 35 of his report, Bowers stated that Rawson had provided bite mark analysis in another case, and characterized some of the evidence Rawson had presented in that case as "highly unusual and inflammatory." Dkt. No. 190-9 at ¶34 (citing State v. Krone, 897 P.2d 621 (Ariz. 1995)). He stated that Rawson had testified to a false degree of certainty in that case. Id. He stated, "Like Stinson, [the defendant in the other case] was exonerated after DNA evidence implicated another man in the crime." Id. at ¶35.

87

The defendants asked the court to bar Bowers from presenting this testimony, arguing that it was irrelevant, would not be helpful to the jury, and was unfairly prejudicial. Dkt. No. 195 at 26-27.

The plaintiff disagreed that Bowers' testimony on this point was irrelevant and unfairly prejudicial, but stated that he was "willing to mutually agree to Defendants' motion to the extent that they seek to bar Dr. Bowers from testifying to his opinions found in paragraphs 34-35 of his report regarding Dr. Rawson's bit mark analysis in *Krone*, if Defendants will similarly agree that they will not elicit testimony from their experts on work Dr. Bowers has performed in other bite mark cases." Dkt. No. 205 at 30.

The defendants declined the plaintiff's proposal, because

Statements that Dr. Bowers has made in his expert reports and on the witness stand in other cases have established his uncompromising opposition to the very bite mark science upon which he purports to rely in support of his own analysis of the bite mark materials in this very case. This directly impacts his credibility and the reliability of his opinions in this case.

Dkt. No. 206 at 14-15.

At the February 7 hearing, the court asked the plaintiff why evidence that another person had been exonerated in a case in which Rawson had provided expert bite mark testimony was not inadmissible propensity evidence under Fed. R. Evid. 404(b). The court now realizes that that question missed the mark. The question raised in the defendants' motion is not whether the plaintiff can present evidence at trial regarding what happened in the Krone case in 1995. The question raised in the defendants' motion is whether *Bowers*

88

can testify about what happened in the <u>Krone</u> case in 1995. The answer is that he cannot.

The court has ruled that Bowers can testify about whether what Rawson comported with the assumptions, methods, and technology in existence in 1984/85. It appears that Bowers' 2012 opinion about the flaws in Rawson's 1984-85 work relied, in part, on Bowers' knowledge that Rawson's 1995 <u>Krone</u> testimony was later discredited. However, the fact that—in 2012—Bowers knew about Rawson's discredited 1995 testimony is not relevant to the question of whether Rawson comported with the assumptions, methods, and technology of 1984/85. The court will not allow Bowers to testify about what happened in the <u>Krone</u> case, or to use what happened in the <u>Krone</u> case to justify any opinion evidence he provides at the plaintiff's trial. Nor will the court allow any other expert to testify about what happened in the <u>Krone</u> case or to use it to justify any opinions they may give at trial.

The plaintiff proposed that he would not ask Bowers about <u>Krone's</u> impact on his conclusions if the defendants would agree not to elicit testimony from their experts about work that Bowers has done in other bite cases. Because the defendants have disclosed one expert—Levine—this amounts to a motion asking the court to bar the defendants from asking Levine whether his criticisms of Bowers' conclusions are based in part on his knowledge of Bowers' testimony (and perhaps how courts have treated Bowers' testimony) in other cases. The court has ruled that Levine cannot testify that Brumit's work was biased, or that the Innocence Project panel's work was biased. For the same

89

reasons, Levine cannot testify that Bowers is biased. Nor may Levine criticize Bowers' conclusions on the basis that Bowers has been rejected or criticized as an expert in other cases.

Like any other expert, Levine, Bowers, Senn and Brumit may disagree with each other's opinions and conclusions about the evidence in this case. One may look at the way Johnson aligned an overlay with a photo of a bite mark and point to three places where the images do not match, while another may argue that the images are a match. Levine may opine that placing a cast of the plaintiff's dentition over a photo was an accepted method of trying to determine a match in 1984, while Bowers or Golden may opine that this method was not in common use in 1984. Brumit may look at the way Johnson or Rawson aligned the overlays and opine that they misaligned them, while Levine may give four reasons why he believes Johnson or Rawson correctly aligned the overlays. It is proper for experts to opine on, and disagree with, each other's opinions on these bases.

The court will not allow the experts to opine that another expert's opinions are flawed because that expert has been discredited in other cases, or because the testifying expert with whom he or she disagrees had an ulterior motive, bad intent, or a certain bias. All the experts must confine their disagreements with the opinions of other experts to disagreements based on examination of the evidence, in the context of the assumptions, methods, and technologies in existence in 1984/85.

90

This does not mean that a party cannot cross-examine an expert on his or her own possible bias, or about whether he or she has been criticized or rejected as an expert in other cases. While the defendants cannot raise Brumit's possible biases through Levine, they may cross-examine Brumit on the issue. The defendants cannot raise Bowers' possible bias through Levine, but they may cross-examine Bowers on that issue. While the plaintiff cannot raise the issue of the testimony Rawson presented in <u>Krone</u> through Levine's testimony, they may seek to cross-examine Rawson on that issue.[18]

## III.  CONCLUSION

The court **GRANTS IN PART AND DENIES IN PART** the plaintiff's Motion to Partially Exclude Testimony of Dr. Golden, Dr. Senn, and Dr. Brumit: #3 This Court Should Bar Testimony About How the Science of Forensic Odontology Has Changed. The parties may ask Golden, Senn and Brumit what assumptions, methods and technologies they used to reach their conclusions that the plaintiff was not the biter, and may ask whether those assumptions, methods and technologies existed in 1984/85. They may not elicit general testimony from these experts (or from Levine or Bowers) about how forensic

---

[18] The parties argued at the February 7 hearing about whether the <u>Krone</u> issue constituted improper propensity evidence under Fed. R. Evid. 404(b), and at the time, the court concluded that it was. In hindsight, that conclusion was irrelevant to the question of whether *Levine* could testify about what happened in <u>Krone</u>. It *is* relevant to whether the plaintiff may cross-examine Rawson about <u>Krone</u>. Rawson has a motion *in limine* on this issue, dkt. no. 210 at ¶2, as has Johnson, dkt. no. 225 at ¶¶10, 12. The court will resolve those motions separately.

odontology has advanced, evolved or changed in the last thirty-four years. Dkt. No. 190 at 8.

The court **GRANTS** the Plaintiff's Motion to Partially Exclude Testimony of Dr. Golden, Dr. Senn, and Dr. Brumit: #4 This Court Should Preclude Any Opinion Testimony on Whether Cross-Examination or Hiring a Competing Expert is Best Practice for Challenging an Expert, or Can Cure Fabrication. The parties may not question forensic odontology experts on whether cross-examination or hiring competing expert witnesses are good ways, or the best ways, of challenging the expert testimony of a forensic odontologist. The court will not admit the Morgan documents. The parties may not ask witnesses about Morgan or his conclusions, may not mention or refer to Morgan, and may not discuss the fact that the plaintiff hired an expert. Dkt. No. 190 at 10.

The court **GRANTS IN PART AND DENIES IN PART** the Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #3 Dr. Levine Should Be Barred From Testifying About the Quality of Images. Dr. Levine cannot testify as to whether the photographs of the bite marks or the plaintiff's dentition were properly taken. Dr. Levine may testify about whether, based on his experience viewing photographs of bite marks and dentition, the images appear to the naked eye to be distorted, or the subjects in the photos appear to be distorted. Dkt. No. 192 at 8.

The court **GRANTS** the Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #7 Dr. Levine Should Be Barred From Testifying About Moses Price. Specifically, Dr. Levine cannot testify about whether Dr. Brumit's

opinions (or those of any other expert) were infected by bias. Dkt. No. 192 at 18.

The court **GRANTS** the Plaintiff's Motion to Exclude Testimony of Dr. Lowell Levine: #8 This Court Should Bar Dr. Levine From Testifying that the Innocence Project Panel Was Biased. Dkt. No. 192 at 20.

The court **GRANTS IN PART** the Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #5 Dr. Bowers Should Be Precluded From Offering Opinions In the Field of Forensic Imaging. Bowers may not testify about how the CU-5 Polaroid close-up camera works, whether it automatically scales images at 1:1, or anything related to the technical operation of that camera. Bowers may not testify that he could tell by conducting ditigal imaging that the photographs of the bite marks or the plaintiff's dentition were distorted. Bowers may testify about whether, based on his experience viewing photographs of bite marks and dentition, the images appear to the naked eye to be distorted, or the subjects in the photos appear to be distorted. Dkt. No. 195 at 20.

The court **GRANTS** the Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #6 Dr. Bowers Should Be Precluded From Offering the Opinion that Dr. Johnson "Provided a False Level of Certainty" in his 1985 Report. Bowers may not testify about, or comment on, Johnson's or Rawson's state of mind. Bowers may not attack the conclusions of Johnson or Bowers based on assumptions, methodologies or technologies that were not available in 1984/85. Dkt. No. 195 at 22.

93

The court **GRANTS** the Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #7 Dr. Bowers Should be Precluded From Commenting Upon the Conclusion of the WI Innocence Project Odontology Panel and its Report. Dkt. No. 195 at 24.

The court **GRANTS** the Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #8 Dr. Bowers Should be Precluded From Mentioning or Commenting Upon "Dr. Rawson's History of Bad Bite Mark Analysis." Dkt. No. 195 at 26.

The court **GRANTS** the Defendants' Motion to Exclude Certain Expert Opinions and Testimony of Dr. C. Michael Bowers: #9 Dr. Bowers' Opinions Based Upon his Own Purported Bite Mark Analysis Should be Prohibited as Lacking Adequate Scientific Foundation under *Daubert*. Dkt. No. 195 at 27.

The court **DENIES** the Defendants' Motion to Exclude Certain Opinions and Testimony Offered by Mr. Stinson's Experts Senn, Golden, Brumit, Adams and Waller: #1 Stinson's Odontology Experts Should be Precluded from Testifying About Their Own Analysis of the Bite Marks in This Case, and From Offering an Opinion that Stinson Can Reliably Be Excluded as the Biter Based Upon Bite Mark Analysis. Dkt. No. 197 at 3.

The court **GRANTS** the Defendants' Motion to Exclude Certain Opinions and Testimony Offered by Mr. Stinson's Experts Senn, Golden, Brumit, Adams and Waller: #3 Stinson's Odontology Experts Should be Precluded from Offering "Negligence" Opinions or Opinions Couched in Terms of "Standard of Care" on the Work Performed by Dr. Johnson and Dr. Rawson in 1985. To

94

prove his negligence claim, the plaintiff must present expert witness testimony regarding whether the defendants owed him a duty of care and whether they breached that duty. Dkt. No. 197 at 18.

Dated in Milwaukee, Wisconsin this 21st day of February, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**