UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

ROBERT LEE STINSON,

        Plaintiff,

v.                                                   Case No. 09-cv-1033-pp

CITY OF MILWAUKEE, JAMES GAUGER,
DR. LOWELL T. JOHNSON and
DR. RAYMOND D. RAWSON,

        Defendants.

_____

**ORDER SUSTAINING DEFENDANTS' OBJECTIONS (DKT. NO. 270) TO QUESTIONS 4 AND 5 ON THE PLAINTIFF'S PROPOSED VERDICT FORM (DKT. NO. 265-12) AND REJECTING THE PLAINTIFF'S PROPOSED JURY INSTRUCTIONS AS TO THE TWO UNPLED CLAIMS THAT FORM THE BASIS FOR THOSE QUESTIONS (DKT. NO. 265-10 AT PP. 6, 10-11)**

_____

The plaintiff submitted a proposed verdict form which contains, among other things, the following question:

> **QUESTION NO. 4: FEDERAL MALICIOUS PROSECUTION**
>
> **Did any of the following Defendants violate Plaintiff's constitution right to be free from malicious prosecution?**

Dkt. No. 265-12 at 2. The form also contains the following question:

> **QUESTION NO. 5: ILLEGAL DETENTION**
>
> **Did any of the following Defendants cause Plaintiff to be detained without probable cause?**

Dkt. No. 265-12 at 3. The plaintiff submitted a proposed jury instruction for illegal detention, dkt. no. 265-10 at 6, and a proposed "modified" jury instruction for malicious prosecution, dkt. no. 265-10 at 10-11.

The defendants objected in writing to the questions on the form of verdict, arguing that the operative complaint—the second amended complaint—did not plead either a federal malicious prosecution claim or an

1

illegal detention claim. Dkt. No. 270 at 1-5. The plaintiff indicated in his proposed jury instructions that the defendants objected to the jury instructions for these claims, dkt. no. 265-10 at pp. 6, 10-11, and he presented arguments in support of the two instructions in his pretrial brief, dkt. no. 266 at pp. 5-8, 9-10. At the final pretrial conference on June 11, 2019, the court heard brief argument from the parties. The court now sustains the defendants' objections to questions 4 and 5 in the plaintiff's proposed form of verdict and rejects the plaintiff's proposed jury instructions for the two unpled claims that form the basis of those questions.

The plaintiff filed his complaint on November 2, 2009—over nine and a half years ago. Dkt. No. 1. While the complaint was fifteen pages long, stated detailed and extensive facts and enumerated five specific causes of action, it did not mention a Fourteenth Amendment due process claim of deprivation of liberty due to malicious prosecution, or a claim (whether under state law or the federal Constitution) for false imprisonment/illegal detention. A little over a month later, the plaintiff filed an amended complaint. Dkt. No. 7. The amended complaint blossomed to twenty-one pages, added known and unknown defendants, added several state-law claims (including a state-law claim for malicious prosecution)—even added images—but still made no mention of a federal due process claim for malicious prosecution or a false arrest/illegal detention claim of any kind.

The plaintiff filed the operative complaint—the second amended complaint—in June of 2011, over eighteen months after he filed the lawsuit. Dkt. No. 51. The second amended complaint had grown in length, reaching twenty-seven pages, but did not mention a federal malicious prosecution claim or a false arrest/illegal detention claim. In the almost eight years that passed

between the filing of the second amended complaint and February 2019 (when the plaintiff filed his proposed verdict form and jury instructions), the parties have engaged in two rounds of discovery, vigorously litigated the defendants' motions for summary judgment, made a trip to the Seventh Circuit and filed thousands of pages of pleadings and other documents. Yet it was not until February 1, 2019—three weeks ahead of the then-scheduled February 25, 2019 trial date—that the plaintiff mentioned federal malicious prosecution and false imprisonment/illegal detention, and even then, he mentioned these causes of action in proposed jury instructions and a proposed verdict form.

To say that the plaintiff is asserting two new claims at the eleventh hour is an understatement. The plaintiff, however, insists that the fact he did not assert these claims in any of his three complaints or at any prior stage of the nine years of litigation that preceded his jury instructions and verdict form is irrelevant, because "it is axiomatic that in this Circuit, plaintiffs plead facts—not legal theories." Dkt. No. 266 at 5, 9. At the June 11, 2019 hearing, plaintiff's counsel stated that the plaintiff "did notice pleading," and that the facts in the second amended complaint were sufficient to put the defendants on notice that the plaintiff might choose to proceed on the unpled claims of federal malicious prosecution and false arrest/illegal detention.

In support of his argument that plaintiffs plead facts, not legal theories, the plaintiff cited <u>Bartholet v. Reishauer A.G.</u>, 953 F.2d 1073, 1078 (7th Cir. 1992). That case involved a plaintiff who sued in state court, alleging that although his new employer contracted with him to create a pension plan that would credit his years with a prior employer, the plan the employer actually adopted did not give him credit for his prior service. The defendant removed the case to federal court, arguing that the facts the plaintiff had pled stated an

3

ERISA claim. The plaintiff asked the federal court to remand the case to the state, arguing that his claims didn't relate to the pension plan; he characterized the case as a simple contract case. The district court denied the remand motion, finding that the complaint stated an ERISA claim because the plaintiff sought "pension benefits greater than the pension plan provides." Id. at 1076. Oddly, though, after reaching that conclusion, the district court granted the defendant's motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), holding that ERISA preempted the plaintiff's *contract* claim. Id.

The Seventh Circuit reversed. It explained that while other courts had viewed violation of an agreement to create a pension plan as a contract claim unrelated to the actual technical requirements of ERISA or the plan itself, the Seventh Circuit wasn't one of those courts. Id. at 1076-77. The court noted that it had held in prior cases that "[a] suit based on the difference between the pension promised by contract and the pension established by the plan 'relates to' the pension plan." Id. at 1077. Given that holding, the court concluded that the district court had erred in dismissing the case on the ground that the plaintiff had not amended his complaint to specifically mention ERISA. Id. Judge Easterbrook explained that

> [the defendant] promised to establish a pension plan that counted [the plaintiff]'s years of service with [the prior employer], and that the plan established [after the employer made that promise] failed to do this. [The defendant] argued, and the district court held, that this allegation comes within ERISA. Removal depended on the conclusion that the complaint, *as filed*, arose under federal law. What would be the point of amending the complaint to make explicit what the district judge has held is the only possible interpretation of the document?

Id. at 1078.

4

It was in this context—considering a district court judge's dismissal of a complaint for failure to amend it to specifically reference the only federal cause of action the facts could have supported—that Judge Easterbrook made the statements the plaintiff quotes in his trial brief, asserting that the Federal Rules of Civil Procedure don't require plaintiffs to cite a statute or legal theory. Id. Notably, Judge Easterbrook pointed out that the complaint—the pleading document—"limns the claim; details of both fact and law come later, in other documents." Id. The question at the pleading stage, Judge Easterbrook explained, is "whether relief is possible under any set of facts that could be established consistent with the allegations." Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). He concluded with an illustration of the difference between the purpose of a pleading and the purpose of proof at the later stages of litigation:

> A drafter who lacks a legal theory is likely to bungle the complaint (and the trial); you need a theory to decide which facts to allege and prove. But the complaint need not identify a legal theory, and specifying an incorrect legal theory is not fatal.

Id.

The plaintiff's reliance on isolated sentences from Bartholet in support of his argument that the court should allow him to pursue unpled causes of action *at trial* borders on disingenuous. The plaintiff—unlike the plaintiff in Bartholet—*has* pled constitutional provisions and specific legal theories in all three of his complaints, even though he's absolutely right that the law didn't require him to do so. This plaintiff didn't just state a bunch of facts, without identifying theories or causes of action, then wait to "refine the claims" through, as the Bartholet court described them, "[l]ater documents, such as the pretrial order under Rule 16(e)." Id. This plaintiff specifically identified and

pled twelve distinct causes of action, including "Count XI—*State* Law Claim Malicious Prosecution." Dkt. No. 51 at 25. (Emphasis added). The court suspects that the plaintiff made a strategic decision to identify specific causes of action in order to avoid a motion to dismiss for failure to state a claim—a wise and successful strategy, given that the defendants did not file motions to dismiss. And had the plaintiff decided not to identify specific causes of action, he likely would have survived a motion to dismiss on many of the claims he identified (and maybe some that he didn't), given the twelve pages and forty-one paragraphs of detailed facts he chose to plead.

But this case isn't at the pleading stage. This court isn't considering a motion to dismiss for failure to state a claim. Three weeks before the then-scheduled February 25, 2019 trial date, the plaintiff argued for the first time that because the facts he alleged could support a Fourteenth Amendment due process claim that he was deprived of his liberty as a result of a malicious prosecution, the defendants (and, it appears, the court) should have been on notice that he might seek to assert that cause of action at trial. Three weeks before the February 25, 2019 trial date, he argued that, despite the fact that he specifically identified twelve causes of action but did *not* specify a cause of action for false imprisonment/illegal detention under state or federal law, the twelve pages of facts should have put the defendants on notice that he was going to argue false imprisonment/illegal detention at trial. He made these assertions *after* the parties filed all those "later documents" Judge Easterbrook referenced in Bartholet, the ones that are supposed to "refine the claims," including the pretrial order, briefs and memoranda in support of or opposing summary judgment, Daubert motions and motions *in limine*.

6

The plaintiff is trying to do what the Seventh Circuit disapproved in Murphy v. White Hen Pantry Co., 691 F.2d 350 (7th Cir. 1982). The district court in that case granted summary judgment; on appeal, the plaintiffs alleged that "the district court ignored a claim for breach of the franchise agreement, implicitly alleged in the complaint." Id. at 351. The plaintiffs argued that the "liberal pleading policy underlying the Federal Rules of Civil Procedure required the district court to construe the complaint broadly and prohibited dismissal of the action simply because the plaintiffs failed to expressly plead the precise legal theory on which their claim was based." Id. The Seventh Circuit disagreed.

In some respects, the Murphy facts were more stark—the complaint in Murphy made almost no mention of an agreement between the parties, so the court held that there was no way it could have put the defendants or the court on notice that the plaintiffs were trying to allege breach of an unmentioned contract. But even the more detailed facts the plaintiff alleged in this case don't alter the fact that "[t]he district court is not required . . . to speculate over the nature of the plaintiffs' claim or to refuse to enter summary judgment for the defendant simply because the plaintiffs may, theoretically, be entitled to recover under a cause of action based on facts never alleged in the complaint." Id. at 353. And the procedural status of this case makes the plaintiff's effort here even more problematic. The Murphy court concluded that the district court did not err in refusing to allow the plaintiffs to amend the complaint to state the breach of franchise agreement claim "six weeks before trial, two years after commencing the action, and several months after the parties had completed discovery." Id. The plaintiff here waited until three weeks before the February 25, 2019 trial date—long after the close of even the second, post-

7

remand round of discovery, well past summary judgment—to indicate that he planned to argue unpled causes of action at the trial.

At the June 11, 2019 hearing, counsel for the plaintiff told the court, more than once, that it should instruct the jury on the two unpled claims (and require the jury to render verdicts on them) because the plaintiff had engaged in "notice pleading." The court is puzzled by this argument. It implies that under the notice pleading standard, a plaintiff not only isn't required to plead a legal theory or cause of action, but that that he can raise a legal theory or cause of action at any point in the litigation.

Notice pleading isn't novel. It's been around since the Federal Rules of Civil Procedure were adopted in 1938, replacing (reforming, perhaps) the prior strict pleading requirements of common law, or "fact," pleading and its successor, code pleading. See Christopher M. Fairman, The Myth of Notice Pleading, 45 ARIZ. L. REV. 987, 988 (2003). Every plaintiff who files a complaint in federal court is subject to notice pleading; no plaintiff who files a complaint in federal court is required to "plead . . . legal theories." Heffernan v. Bass, 467 F.3d 596, 599 (7th Cir. 2006). The Supreme Court put a finer point on the *facts* a plaintiff must plead under notice pleading standard, when it held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (Citations omitted.) Twombly may require more *facts* than plaintiffs thought were necessary before it was decided, when it required factual allegations sufficient to "raise a right to relief above the speculative level." Id. But it has been the case for decades that,

8

unlike plaintiffs in jurisdictions with fact pleading standards, federal plaintiffs do not have to *plead* theories, or causes of action.

The fact that the rules didn't require the plaintiff to plead federal malicious prosecution or false imprisonment/illegal detention in his complaint might have, as the court has said, gotten him past a motion to dismiss. But the court fails to see how it supports the plaintiff's position that he can assert these causes of action for the first time—and ask the court to instruct the jury on them, and the jury to render verdicts on them—three weeks prior to trial in a case that has persisted for over nine years. Citing "notice pleading" in support of this position mixes apples and oranges. The court cannot find any authority for the proposition that because the federal rules implement a notice pleading standard, a plaintiff can raise unpled causes of action at any time.

Regarding the unpled federal malicious prosecution claim, the plaintiff also argues that the court should instruct the jury and require a verdict on that cause of action because Wisconsin's common law tort of malicious prosecution does not provide an adequate remedy for the harm he suffered. The plaintiff cites Julian v. Hanna, 732 F.3d 842 (7th Cir. 2013) in support of this argument. The plaintiff stretches the holding in Julian into an unrecognizable shape.

In Parratt v. Taylor, 451 U.S. 527 (1981), the Supreme Court held that if the state provided a sufficient post-deprivation process to "persons who believe they have suffered a tortious loss at the hands of the State," a plaintiff could not use 42 U.S.C. §1983 to address that deprivation through a federal, Fourteenth Amendment due process claim. Id. at 543. The Parratt Court noted that the plaintiff didn't like the remedy provided by the state—in that instance, Nebraska—but concluded that "[a]lthough the state remedies may not provide

9

the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." Id. at 544.

In Julian, the district court dismissed the plaintiff's claims that the defendants—Indiana state officials—had deprived him of his liberty through malicious prosecution in violation of the Fourteenth Amendment's due process requirement. Julian, 732 F.3d at 844. The district court concluded that "Indiana state law provide[d] an adequate remedy for malicious prosecution, barring recourse to section 1983." Id. The Seventh Circuit, however, explained that Indiana law immunized state officers against malicious prosecution suits. Id. at 846. Indiana law also indemnified state officers for conduct performed within the scope of their employment. Id. at 847. The result, the court found, was that Indiana had "create[d] blanket immunities from federal suits for violations of federal law (such as the Fourteenth Amendment's due process clause) . . . ." Id. at 848. The court rejected the defendants' implied argument that even though the plaintiff couldn't sue them for malicious prosecution under Indiana law, Indiana's cause of action for false arrest provided the plaintiff with an "adequate" remedy. Id. at 847. The court observed that under Indiana law, false arrest would have allowed the plaintiff to recover damages only for the week between when he was arrested and when he was released, not the thirty-eight months he spent in prison after his conviction. Id. at 846-47. The court held that the district court erred in finding that Indiana law provided the plaintiff with an adequate remedy for the alleged deprivation of his rights, because Indiana law deprived "plaintiffs who assert due process claims against state officers of an adequate alternative remedy to a federal suit." Id. at

846. In other words, the Julian court found that Indiana didn't provide *any* remedy for a plaintiff who had been maliciously prosecuted by state officials.

Wisconsin, in contrast, provides a remedy for a person maliciously prosecuted by state officers. Wisconsin does not immunize state officials from tort suits. Instead, it caps the damages a plaintiff may recover from state officials "for acts done in their official capacity or in the course of their agency or employment" at $50,000. Wis. Stat. §893.80(3). The plaintiff asserts that $50,000 is "woefully inadequate" to remedy him for the fact that he was "wrongfully convicted of murder and spent 23 years in prison."[1] Dkt. No. 266 at 7. The plaintiff says that the Julian court "explained that the amount of damages under state tort law is the key to a determination of adequacy." Id. (citing Julian, 732 F.3d at 848). This is a flat misstatement of the holding in Julian.

After concluding that Indiana's failure to provide any remedy for malicious prosecution by public officers "open[ed] the door to federal malicious prosecution suits against such officers," the court explained that it did not "mean to belittle the state's interest in limiting officers' liability." Julian, 732 F.3d at 848. It noted that it was common to immunize public law enforcement employees (although police officers more frequently enjoy qualified, not absolute, immunity). Id. It identified indemnification as an alternative to immunity, but described both immunity and indemnity as devices that "prevent[] public officers from being made timid in the performance of their

---

[1] Even if one agrees with the plaintiff's opinion that $50,000 is "woefully inadequate" to compensate someone who spent over two decades of his life in prison for a crime he did not commit, the plaintiff's argument assumes that he would not prevail on any of his other causes of action—his due process claim, his failure-to-intervene claim, his conspiracy claim. State law caps only his state-law tort claims.

11

duties by fear of being sued by persons whom they arrest or investigate." Id. The court opined that indemnification protected officers "somewhat less" than immunity and observed that another common device for protecting law enforcement officers from fear of being sued "is a cap on damages, a common feature of public employee tort liability." Id. (citations to representative state damage cap laws omitted). The court stated that, to its knowledge, damage caps were "unchallenged in cases governed by the *Parratt* doctrine." Id. It then clarified:

> This is not to say that they can't be challenged. Nor do we want to be understood as approving the specific caps in the statutes that we've cited as illustrative. But whatever the lowest damages cap may be that would leave the state remedy adequate, it is not zero.

Id.

So the Julian court did *not* hold that "the amount of damages under state tort law is the key to a determination of adequacy," as the plaintiff claims. It didn't even come close. It held only that a state cannot create "blanket immunities from federal suit for violations of federal law," id., and left for another day the question of whether a state might legislate a damages cap so low that it would constitute an inadequate remedy sufficient to allow a plaintiff to pursue a tort claim in federal court through §1983.

Far from supporting the plaintiff's position that the court should allow him to argue a federal malicious prosecution theory (and instruct the jury on it), Julian suggests that because Wisconsin has a remedy for victims of malicious prosecutions by state officials, if the plaintiff *had* pled his malicious prosecution claim under the Fourteenth Amendment through §1983, the defendants could have sought dismissal of that claim and succeeded. The plaintiff's blatant mischaracterization of the holding in Julian is concerning.

Regarding the unpled false imprisonment/illegal detention instruction/verdict question, the plaintiff's trial brief stated that he had proposed the instruction "for his unlawful detention under *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017)." Dkt. No. 266 at 9. He conceded that he hadn't pled "as a basis for liability the *Manuel* case that was decided eight years [after he filed his lawsuit]." Id. He made the puzzling assertion that "although the legal basis for liability was not decided by the Supreme Court until 2017," "[t]here is no legitimate dispute that in 1984, it was clearly established that it was unlawful to detain someone without probable cause or that fabricating evidence to manufacture that probable cause violated a person's constitutional rights." Id. at 10.

As the court pointed out at the June 11, 2019 hearing, and as the plaintiff's own statement quoted above appears to concede, Wisconsin recognizes the common law tort of false imprisonment, and did so long before the plaintiff's arrest. See Pritz v. Hackett, 440 F. Supp. 592 (W.D. Wis. 1977). That state-law cause of action existed in 2009 when the plaintiff filed this lawsuit; the plaintiff could have pled a supplemental state-law claim for false imprisonment or illegal detention in any of his three complaints.

To state a *federal constitutional* claim for false imprisonment or illegal detention in 2009 (or 2011, when he filed the second amended complaint), the plaintiff would have faced a problem. He could have alleged that defendants Gauger and Jackelen arrested him without probable cause, and caused him to be held in custody prior to any court proceeding without probable cause, in violation of the Fourth Amendment. Such a claim would have covered the time he was detained between arrest and the start of judicial process. But once a judge or other judicial officer ordered him detained, he would have had to

challenge any post-judicial-process detention under the Fourteenth Amendment due process clause, and thus would have had to show (as with a federal malicious prosecution claim) that state law did not provide an adequate remedy. Manuel, 137 S. Ct. at 916. That is because the Seventh Circuit, in a line of cases that included Newsome v. McCabe, 256 F.3d 747, 750 (7th Cir. 2001), held that "pretrial detention following the start of legal process could not give rise to a Fourth Amendment claim." Id.

In 2017, the Supreme Court decided Manuel, rejecting the Newsome line of cases and holding "that the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process."[2] Id. at 920. The Court remanded Manuel to the Seventh Circuit to identify the event that triggers the accrual of a Fourth Amendment false imprisonment claim for limitations purposes. Id. at 922. On remand, the Seventh Circuit held that Manuel's Fourth Amendment claim that he was detained without probable cause accrued when that detention ended, and that his suit was timely. Manuel v. City of Joliet, Ill. ("Manuel II"), 903 F.3d 667, 670 (7th Cir. 2018).[3]

The plaintiff is correct, then, that in 2009, he could not have stated a federal claim that the entirety of his detention, from arrest to release, violated the Fourth Amendment; Seventh Circuit law did not allow such a claim. He also likely could not have sustained a claim that his detention from the date a judge ordered him detained until the date he was released violated the Fourteenth Amendment, because he could not have shown an inadequate

---

[2] The plaintiff listed Newsome among the cases supporting his proposed malicious prosecution jury instruction, despite the fact that the Supreme Court abrogated it in Manuel.

[3] The defendants in Manuel II have petitioned the Supreme Court for *certiorari*. No. 18-1093, Feb. 21, 2019.

remedy under state law. The Fourth Amendment detention-without-probable-cause claim did not become available to the plaintiff until March 21, 2017—the date the Supreme Court issued its decision in Manuel.

On March 21, 2017, the defendants' appeal of Judge Clevert's order denying their motions for summary judgment was still pending in the Seventh Circuit. But the Seventh Circuit issued its mandate on September 11, 2017, and the case returned to this court that same day. Dkt. No. 152. As of February 1, 2019, the date the plaintiff filed his proposed verdict form and jury instructions, the case had been back in the district court for over sixteen months. Yet the plaintiff did not seek to amend the complaint to add a Fourth Amendment claim for detention without probable cause. He did not come to the court and argue that a claim had become available to him that hadn't been available when he filed the amended complaint, or when he was defending against the summary judgment motions. He did not argue that adding this claim, through a third amended complaint, wouldn't prejudice the defendants, because the second amended complaint contained all the facts necessary to support the claim and no new discovery would be required. Instead, he waited until the eve of trial, then attempted to raise the new claim through the proposed jury instructions and verdict form. It is too late.

The court **SUSTAINS** the defendants' objections to questions 4 and 5 on the plaintiff's proposed verdict form. Dkt. No. 270.

The court **REJECTS** the plaintiff's proposed jury instruction titled "SECOND CLAIM—ILLEGAL DETENTION." Dkt. No. 265-10 at 6.

The court **REJECTS** the plaintiff's proposed jury instruction titled "SEVENTH CLAIM—MALICIOUS PROSECUTION" to the extent that it differs from the Wisconsin Civil Jury Instruction for state-law malicious prosecution.

Dated in Milwaukee, Wisconsin this 13th day of June, 2019.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**
